# EXHIBIT M

JOSE DOMENECH

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------
STACIE McGUIRE,

                              Plaintiff,

     -vs-

TOWN OF CHEEKTOWAGA,
BRIAN WESOLOSKI, Individually and in his capacity as a
Town of Cheektowaga Police Officer,
JOSE DOMENECH, Individually and in his capacity as a
Town of Cheektowaga Police Officer,
DENNIS KUSAK, Individually and in his capacity as a
Town of Cheektowaga Police Officer,
PAT CHLUDZINSKI, Individually and in his capacity as a
Town of Cheektowaga Police Officer,
JOHN DOE(s), Individually and in his/her capacity as a
Town of Cheektowaga Police Officer, and COREY MCGUIRE,

                              Defendants.
--------------------------------------------------
```

Examination Before Trial of

JOSE DOMENECH, Defendant, taken pursuant to Notice under

Article 31 of the Civil Practice Law and Rules, in the law

offices of CHELUS, HERDZIK, SPEYER & MONTE, P.C., 1000 Main

Court Building, 438 Main Street, Buffalo, New York, taken on

October 21, 2022, commencing at 10:05 A.M., before LESLIE E.

PINZONE, Notary Public.

2

1                          INDEX TO EXHIBITS

2

3

4    Exhibits                              For Identification

5    1 through 7     seven Photographs              30

6    8               three-page Cheektowaga         33
                     Police Department
7                    Complaint Information

8    9               three-page New York            39
                     State Domestic Incident
9                    Report

10   10              two-page Cheektowaga           44
                     Police Report
11
     11              two-page Domestic             58
12                   Incident Report

13   12              Cheektowaga Police             65
                     Department Complaint
14                   Information dated
                     11/8/17
15
     13              Town of Cheektowaga           72
16                   Police Department Order
                     of Protection Policy
17
     14              two-page Town of              72
18                   Cheektowaga Police
                     Department Procedure
19                   for Handling Prisoners
                     with Medications

20

21

22

23

3

INDEX TO DOCUMENT REQUESTS

Page, Line                    Description

 63    4        Full DIR report that was completed by
                Corey McGuire in the November 8th, 2017
                incident

4

```
1      APPEARANCES:

2      RUPP BAASE PFALZGRAF CUNNINGHAM LLC,
       By CHAD A. DAVENPORT, ESQ.,
3      and YOUNG WOO KIM, ESQ.,
       1600 Liberty Building,
4      424 Main Street,
       Buffalo, New York 14202,
5      Appearing for the Plaintiff.

6      CHELUS, HERDZIK, SPEYER & MONTE, P.C.,
       By NICHOLAS M. HRICZKO, ESQ.,
7      1000 Main Court Building,
       438 Main Street,
8      Buffalo, New York 14202,
       Appearing for the Defendants.

9

10          (The following stipulations were entered

11     into by both parties.)

12          It is hereby stipulated by and between counsel

13     for the respective parties that the oath of the

14     Referee is waived, that filing and certification

15     of the transcript are waived, and that all

16     objections, except as to the form of the

17     questions, are reserved until the time of trial.

18

19               J O S E   D O M E N E C H,

20       3223 Union Road, Cheektowaga, New York 14227,

21          after being duly called and sworn,

22             testified as follows:

23
```

5

1    EXAMINATION BY MR. DAVENPORT:

2

3    Q.   Officer, my name is Chad Davenport, we met a

4         little bit earlier in the lobby today.  I'm with

5         the law firm of Rupp Baase Pfalzgraf Cunningham,

6         we represent the Plaintiff in this lawsuit.

7              My first question for you is have you ever

8         given sworn deposition in a deposition setting

9         before?

10   A.   No.

11   Q.   Okay.  So because you haven't, I'm just going to

12        go through a couple ground rules that we

13        typically tell witnesses.  The first one is that

14        we have a court reporter who is here today, so

15        that means that we can't be speaking at the same

16        time.  So I would just ask that you wait until I

17        finish my question before you respond to it, and

18        I'll do the same and make sure that I don't cut

19        off any of your responses.

20             The second thing is that she can only take

21        verbal responses.  So just refrain from using

22        head nods or head shakes in response to any of my

23        questions.

6

1          The third thing is if at any point you don't

2     understand my questions, that happens quite

3     often, I ask bad questions, sometimes I misspeak.

4     So what I ask is if at any time you don't

5     understand the question or you need me to repeat

6     a question, just tell me.  More than happy to

7     repeat or rephrase the question.

8          And then the last one is if at any point you

9     need to take a break, just let me know.  More

10    than happy to oblige.  We're not holding you

11    hostage in here, so if you have to go to the

12    bathroom, want to talk with your attorney, that's

13    perfectly fine.  I just ask that you respond to

14    any question if there's a pending question.  Can

15    you do that for me?

16  A.  Okay.  Yes.

17  Q.  Okay.  Now, Officer, you're with the Town of

18    Cheektowaga Police Department, is that correct?

19  A.  Yes.

20  Q.  Okay.  And how long have you been with the Town

21    of Cheektowaga Police Department?

22  A.  A little over sixteen years.

23  Q.  So that would have you starting roughly in the

7

| | | |
|---|---|---|
| 1 | | mid 2000's? |
| 2 | A. | January, 2006, to be exact. |
| 3 | Q. | Okay.  And when you started, what was your |
| 4 | | position with the Town of Cheektowaga? |
| 5 | A. | Patrolman. |
| 6 | Q. | Okay.  Is that still your position today? |
| 7 | A. | No. |
| 8 | Q. | What's your position today? |
| 9 | A. | I'm currently a sergeant. |
| 10 | Q. | And when were you promoted to sergeant? |
| 11 | A. | I was promoted September, 2021. |
| 12 | Q. | And were you promoted from patrol to sergeant? |
| 13 | A. | Yes. |
| 14 | Q. | Okay.  So those are the two positions that you've |
| 15 | | held throughout your time at the Town of |
| 16 | | Cheektowaga? |
| 17 | A. | Yes. |
| 18 | Q. | Okay.  Now, we're here today to talk about an |
| 19 | | incident that happened on November 8th of 2017. |
| 20 | | Your position at that time was patrol, is that |
| 21 | | correct? |
| 22 | A. | Yes. |
| 23 | Q. | Okay.  Are you familiar with the incident that |

8

1      took place on November 8th of 2017?

2  A.  Yes.

3  Q.  Okay.  Did you respond to an incident involving

4      Stacie McGuire and Corey McGuire?

5  A.  Yes.

6  Q.  Now, prior to your deposition testimony today,

7      did you review any documents to prepare yourself

8      for this deposition?

9  A.  Yes, I did.

10  Q.  And what documents were those?

11  A.  I reviewed the domestic incident report or police

12      report, the -- we call it a CAD card.  Basically

13      when you make the 911 call, the information and

14      the address.  And that is about it.  I don't

15      remember anything other documents, just the

16      police report.

17  Q.  Okay.  Now, do you recall what happened on

18      November 8th, 2017 and this incident involving

19      Stacie McGuire and Corey McGuire?

20  A.  I remember some of it, yes.

21  Q.  Okay.  Can you describe generally what you

22      remember?

23  A.  I remember responding to that address for a

9

```
 1        domestic disturbance.  We interviewed both
 2        parties, we ended up making an arrest of the
 3        female, Miss McGuire.  That's really the gist of
 4        it.
 5   Q.   Okay.  And when you say we received a call, who
 6        is we?
 7   A.   So on that day I rode with a partner, and that
 8        was Officer Wesoloski.  So we rode together that
 9        day.
10   Q.   And was Officer Wesoloski, was he your partner at
11        that time?
12   A.   Yes.
13   Q.   Okay.  So typically, you would ride with Officer
14        Wesoloski?
15   A.   Yes.
16   Q.   And on November 8th of 2017, you were riding with
17        Officer Wesoloski?
18   A.   Yes.
19   Q.   Now, when that call initially came in, did that
20        come in over dispatch while you were in your
21        police vehicle?
22   A.   Yes.
23   Q.   And you and Officer Wesoloski were in the vehicle
```

10

| | | |
|---|---|---|
| 1 | | at the same time when that call came in? |
| 2 | A. | Yes. |
| 3 | Q. | Do you remember what that call was from dispatch, |
| 4 | | what they said? |
| 5 | A. | I don't remember the specifics, no.  Just that it |
| 6 | | was a domestic dispute. |
| 7 | Q. | Do you recall where that domestic dispute was |
| 8 | | taking place? |
| 9 | A. | Yes.  It was 22 Christa Place. |
| 10 | Q. | Now, prior to November 8th of 2017, were there |
| 11 | | any reports of domestic disturbances at 22 |
| 12 | | Christa Place? |
| 13 | A. | That I don't know. |
| 14 | Q. | What about after November 8th of 2017? |
| 15 | A. | That I also don't know. |
| 16 | Q. | Okay.  Prior to November 8th of 2017, had you |
| 17 | | ever responded to 22 Christa Place for any calls |
| 18 | | for service? |
| 19 | A. | Not that I remember, no. |
| 20 | Q. | Okay.  When the call initially came in with you |
| 21 | | and Officer Wesoloski in the vehicle, which one |
| 22 | | of you responded to dispatch? |
| 23 | A. | I don't remember. |

11

1   Q.  Okay.  Did you have any communications with

2       dispatch on November 8th of 2017?

3   A.  Me personally or the two of us?

4   Q.  You personally.

5   A.  I don't remember.

6   Q.  Okay.  What about Officer Wesoloski, do you

7       recall any conversations that he had with

8       dispatch on November 8th of 2017?

9   A.  No, I do not.

10   Q.  Okay.  When you received that call for service

11       for a domestic disturbance, where were you?

12   A.  I don't remember.

13   Q.  Okay.  Do you recall, were you and Officer

14       Wesoloski on patrol at the time?

15   A.  Yes.

16   Q.  So you weren't responding to a different call and

17       then had to leave that call to go to that

18       domestic disturbance?

19   A.  Not that I remember, no.

20   Q.  Now, do you recall approximately how long it took

21       you from that initial call for service to

22       actually respond to 22 Christa Place?

23   A.  No, I don't.

1   Q.   And do you recall when you first initially got to

2       22 Christa Place?

3   A.   Do you mean what time?

4   Q.   Approximately what time.

5   A.   No, I don't.

6   Q.   Okay.  When you first arrived at 22 Christa

7       Place, did you and Officer Wesoloski park your

8       police vehicle?

9   A.   Yes.

10   Q.   Who was driving at that time?

11   A.   I, I don't know who was driving.

12   Q.   Okay.  Where did you park your police vehicle?

13   A.   I believe it was just in the street there in

14       front of the house.

15   Q.   And then after you parked your vehicle, did both

16       of you get out of the vehicle immediately?

17   A.   I don't remember.

18   Q.   Do you recall any conversations between you and

19       Officer Wesoloski about responding to this

20       incident?

21   A.   No.

22   Q.   And when you and Officer Wesoloski parked at 22

23       Christa Place, were there any other law

13

```
 1      enforcement officers there at that time?
 2   A.  No, not at that time.
 3   Q.  So you and Officer Wesoloski were the first two
 4      to respond to the scene?
 5   A.  Yes.
 6   Q.  Okay.  Now, you and Officer Wesoloski, I'm
 7      assuming, went from your police vehicle
 8      immediately to the front door of the house?
 9   A.  I don't remember where exactly the house -- where
10      exactly on the house we went to.
11   Q.  Okay.  Did you immediately go towards a door that
12      would enter into the house?
13   A.  Yes.
14   Q.  Okay.  And did you and Officer Wesoloski -- was
15      the door open, I guess?
16   A.  I don't remember.
17   Q.  Did you and Officer Wesoloski knock on the door
18      before entering?
19   A.  I don't remember.
20   Q.  Okay.  Did you announce yourselves as police
21      officers before entering into the house?
22   A.  I don't remember that either.
23   Q.  When you and Officer Wesoloski first went into
```

14

1      the house, what did you see?

2   A.   I don't really remember if we spoke to him first

3        or her first.  I don't remember how that came

4        about.

5   Q.   Where were they at that time?

6   A.   I don't remember that either.

7   Q.   Were they together?

8   A.   I don't believe so, but I don't, I don't

9        remember.

10  Q.   Okay.  And the first thing you said that you did

11       is you guys separated the two of them to be able

12       to speak to them?

13  A.   Yes.

14  Q.   Okay.  That would be the first thing that you

15       would do as part of your investigation?

16  A.   Correct, yes.

17  Q.   Okay.  Now, when you and Officer Wesoloski went

18       into the house, were there any other law

19       enforcement officers with you at that time?

20  A.   When we went into the house?  I don't believe so.

21       I believe it was just the two of us.

22  Q.   After you and Officer Wesoloski went into the

23       house, were there more law enforcement officers

15

1      that came?

2   A.  Eventually, yes, other law enforcement officers

3       came.

4   Q.  Who were those other law enforcement officers?

5   A.  Sergeant Wynant responded and then I believe

6       Officer Kusak also responded.

7   Q.  Were they both partners at that time?

8   A.  No.

9   Q.  Okay.  And I believe you said, were both of them

10      sergeants at that time?

11  A.  No.  Sergeant Wynant was a sergeant, and then

12      Officer Kusak was just another patrolman.

13  Q.  Okay.  Now, when responding to a domestic

14      incident, is it part of your normal procedure to

15      have a supervisor there at the scene as well?

16  A.  No.

17  Q.  Okay.  Is there any number of officers that the

18      Town of Cheektowaga typically likes to have when

19      investigating a domestic violence incident?

20  A.  There's no set number, but just as a officer

21      safety we would, obviously, have more than one

22      officer there.  That would be ideal.

23  Q.  To separate Corey and Stacie, I guess, who

16

1      ensured that the two parties were separate in

2      different places of the house?

3  A.  I guess that would be me and Officer Wesoloski.

4  Q.  Okay.  Do you recall where Stacie was separated

5      to, like where you guys placed her?

6  A.  I believe she was in the living room.

7  Q.  Okay.  And the male, Corey McGuire, where was he?

8  A.  I don't really remember, but I believe it was the

9      kitchen.

10 Q.  Okay.  Now, the living room and the kitchen, do

11     they join, do you recall?

12 A.  I believe so.

13 Q.  Okay.  If you were sitting in the living room,

14     would you be able to hear a conversation that was

15     taking place in the kitchen?

16 A.  I don't remember.

17 Q.  Okay.  What was the demeanor of Corey and Stacie

18     when you first encountered them?

19 A.  From what I remember, I believe Stacie was upset

20     and Corey was fairly calm, from what I remember.

21 Q.  Before you separated Corey and Stacie, did you

22     and Officer Wesoloski say anything to either

23     Corey or Stacie?

17

1   A.   I don't remember.

2   Q.   Okay.  Did either of them say anything to you?

3   A.   I also don't remember that.

4   Q.   Okay.  When you separated Corey and Stacie, who

5       did you speak to first?

6   A.   I don't remember, but I believe I spoke to Corey

7       first.

8   Q.   Okay.  Was Officer Wesoloski with you at that

9       time?

10   A.   No.

11   Q.   What was Officer Wesoloski doing while you spoke

12      to Corey?

13   A.   I believe he was speaking to Miss McGuire.

14   Q.   Okay.  Do you recall, what did Corey say to you?

15   A.   Not verbatim, no.

16   Q.   Generally, what did he say to you?

17   A.   Basically he said him and Miss McGuire got into a

18      verbal argument.  At some point, it turned to a

19      physical altercation and he was hit in the face

20      and his glasses were broken.  And at some point,

21      a pipe wrench was also involved in the

22      disturbance.

23   Q.   Now, did Corey say that he was hit with the pipe

18

```
 1        wrench?
 2    A.  I don't know if he said it right at that time,
 3        but eventually, yes, he did say he was hit with
 4        the pipe wrench.
 5    Q.  Did he say where he was hit on his body with the
 6        pipe wrench?
 7    A.  I believe it was the ribs.
 8    Q.  Okay.  Did you make any visual observations of
 9        where he said he was hit with the pipe wrench?
10    A.  No.
11    Q.  Did Officer Wesoloski make any observations of
12        where he was hit in the ribs?
13    A.  I don't know.
14    Q.  Approximately how long did you speak with Corey
15        McGuire for?
16    A.  I don't remember.
17    Q.  And when you were speaking with Corey McGuire,
18        were there any other officers that were with you
19        during that conversation?
20    A.  I don't remember that either.
21    Q.  Okay.  After speaking with Corey McGuire, what
22        did you do next?
23    A.  So at some point, obviously, me and Officer
```

19

| | | |
|---|---|---|
| 1 | | Wesoloski kind of discussed, compared the stories |
| 2 | | and we kind of went from there. |
| 3 | Q. | Where did your discussion with Officer Wesoloski |
| 4 | | take place when you were comparing the stories? |
| 5 | A. | I believe the kitchen. |
| 6 | Q. | Was Corey still in the kitchen at that time? |
| 7 | A. | No. |
| 8 | Q. | Where was Corey while you and Officer Wesoloski |
| 9 | | were speaking? |
| 10 | A. | I don't remember where he went, but he wasn't in |
| 11 | | the kitchen. |
| 12 | Q. | Where was Stacie at that time? |
| 13 | A. | I believe she was still in the living room. |
| 14 | Q. | All right.  Was Corey in the living room with |
| 15 | | Stacie? |
| 16 | A. | I don't remember. |
| 17 | Q. | Okay.  Did you make any visual observations of |
| 18 | | injuries to Corey McGuire that day? |
| 19 | A. | Yes. |
| 20 | Q. | What were those injuries? |
| 21 | A. | He had some scratches on his face. |
| 22 | Q. | And in describing those scratches, were they |
| 23 | | severe, were they bad, what did they look like? |

20

1   A.   I believe they were bleeding, so I can't really

2        put a word on it as severe, but I believe they

3        were bleeding.

4   Q.   Okay.  Besides those scratches on Corey, were

5        there any other injuries to him?

6   A.   I don't remember any other injuries.

7   Q.   What about for Stacie, did you observe any

8        injuries to her?

9   A.   I don't remember any injuries to Stacie, no.

10  Q.   Okay.  Did there come a time when either you or

11       Officer Wesoloski mentioned that Stacie's eye

12       appeared red?

13  A.   I don't remember a conversation, no.

14  Q.   Did there come a time where either you or Officer

15       Wesoloski asked Corey McGuire why Stacie's eye

16       was red?

17  A.   I don't remember that either.

18  Q.   Now, when you and Officer Wesoloski were speaking

19       in the kitchen, how long did you speak for?

20  A.   It was a short period of time.  I don't remember

21       exactly.  It wasn't long.

22  Q.   Okay.  And what did the two of you generally say

23       during that conversation?

1   A.   I believe the conversation was just discussing

2        what Corey had said and then what Stacie had said

3        and just kind of comparing how each story was.

4   Q.   Okay.  Now, generally speaking at the time, what

5        was the Town of Cheektowaga's policy or procedure

6        for investigating a domestic violence incident?

7   A.   As far as --

8   Q.   Generally saying, when you first arrive at the

9        scene, is there a correct policy or correct

10       procedure for officers to follow when

11       investigating alleged domestic violence?

12  A.   Yeah.  So usually when we first get there we

13       separate both parties so we can kind of get each

14       side of the story.  From there, it's usually

15       trying to find out who the primary aggressor is.

16       That's usually how we determine who we're going

17       to arrest or how we make an arrest.

18  Q.   Now, what about in terms of collecting evidence,

19       are there policies or procedures for collecting

20       evidence?

21  A.   I'm sure there's a policy for collecting

22       evidence, yeah.

23  Q.   What types of evidence would you be looking for

22

```
 1      when you're investigating a domestic violence
 2      incident?
 3   A.  Weapons, photographs, anything related to the
 4      case that would be pertinent.
 5   Q.  And photographs of what?
 6   A.  Photographs of injuries, damaged property, things
 7      of that nature.
 8   Q.  Was that done on November 8th of 2017, were
 9      photographs taken of the damages to Corey
10      McGuire's glasses, for instance?
11   A.  I don't remember.
12   Q.  What about pictures of either Stacie or Corey?
13   A.  That I also don't remember.
14   Q.  Also what about collecting either a supporting
15      deposition or an affidavit from the parties, is
16      that done by the officers?
17   A.  Yes.
18   Q.  Okay.  When is that done?
19   A.  That's done right on-scene at the time of the
20      arrest.
21   Q.  Was that done here?
22   A.  I believe so, yes.
23   Q.  Okay.  Who took the affidavit from Corey McGuire?
```

23

1   A.   I believe it was Officer Wesoloski.  I believe

2        that was his day to do reports.

3   Q.   Okay.  So when you say it was his day to do the

4        reports, as your partner at the time, did you

5        guys alternate days when you did reports?

6   A.   Yes.  We kind of took turns.  One day was one

7        person's day to do the reports, the next day

8        someone else would do that.

9   Q.   Okay.  So to the best of your recollection, on

10       November 8th, 2017, that was Officer Wesoloski's

11       day to complete the report?

12  A.   Yes.

13  Q.   What about from Stacie McGuire, do you know, did

14       anybody take an affidavit from her that day or a

15       supporting deposition?

16  A.   I don't believe so, no.

17  Q.   Okay.  Why would her statement not be notarized

18       or put into affidavit form?

19  A.   I guess -- I don't know.  Because technically,

20       she was the offender, she was arrested, so we

21       wouldn't get a statement from her.  The only

22       statements we would have is if she made like a

23       seven ten-thirty statement, but I don't believe

24

1       she made any of those.

2    Q.  When you and Officer Wesoloski were comparing

3        what Stacie and Corey told you, did you find one

4        of them to be more credible than the other?

5    A.  Yes.  We found -- I found Mr. McGuire to be a

6        little more credible.

7    Q.  What about Officer Wesoloski, did he also find

8        Corey McGuire to be more credible?

9    A.  I don't remember.  I'm not sure.

10   Q.  Okay.  Did you make the ultimate decision, then,

11       to arrest Stacie McGuire that day?

12   A.  Me personally or --

13   Q.  Yes, you personally.

14   A.  I think we as a group, me and Officer Wesoloski,

15       made that decision.

16   Q.  Okay.  But you said that you found Corey to be

17       more credible than Stacie, is that correct?

18   A.  Yes.

19   Q.  Did Officer Wesoloski agree with you that Corey

20       was more credible?

21   A.  I believe so, yes.

22   Q.  Okay.  What sort of factors or reasons did you

23       give for finding Corey McGuire to be more

```
1       credible?
2    A. Well, one, he had the injuries to his face that
3       were visible, the scratches.  He also had his
4       eyeglasses were broken.  Those were some of the
5       factors that played into us thinking he was more
6       credible.
7    Q. Did Stacie explain to you how, in her version of
8       the events, Corey's face ended up having the
9       scratches and the glasses were broken?
10   A. I don't remember.
11   Q. Okay.  Did Officer Wesoloski ever explain to you
12      what Stacie's reasoning was for why there were
13      scratches on Corey's face and his glasses were
14      broken?
15   A. I don't remember that.
16   Q. You don't remember Officer Wesoloski ever telling
17      you about Stacie's story?
18   A. He told me, but I don't remember what her story
19      was.
20   Q. Okay.  When you and Officer Wesoloski were
21      speaking, were there other Town of Cheektowaga
22      police officers that were there?
23   A. At some point Sergeant Wynant was there and was
```

26

1          also involved in our conversations.

2     Q.   Were there any other law enforcement officers

3          besides the Town of Cheektowaga that responded to

4          the scene that day?

5     A.   No.

6     Q.   Now, you said it was Sergeant Wynant that was

7          part of the conversation with you at that time?

8     A.   Eventually, yes.

9     Q.   Okay.  At what point did Sergeant Wynant become

10         part of the conversation with you and Officer

11         Wesoloski?

12    A.   Like I said, he wasn't there originally, but at

13         some point he did show up.  I don't remember how

14         far along that was, but at some point, we did

15         confirm with him as well.

16    Q.   Did Sergeant Wynant decide to speak with either

17         Corey or Stacie himself?

18    A.   I don't remember if he did.

19    Q.   Okay.  When Sergeant Wynant became part of the

20         conversation between you and Officer Wesoloski,

21         was that before or after you had made the

22         decision to arrest Stacie McGuire that night?

23    A.   That was before.

1   Q.   Okay.  Did Sergeant Wynant assist you or indicate
2        any sort of agreement to arrest Stacie McGuire?
3   A.   I would say he assisted us.  I don't think he had
4        any opposition to us arresting her.
5   Q.   Okay.  Approximately how long were you at 22
6        Christa Place before Stacie McGuire was arrested?
7   A.   I don't remember how much time it was.
8   Q.   Was Stacie McGuire placed into handcuffs that
9        night?
10  A.   Yes.
11  Q.   Okay.  Where was she handcuffed?
12  A.   On her?  What do you mean like in the house or --
13  Q.   Where in the house, was it outside the house?
14  A.   That I don't remember if it was inside or
15       outside.
16  Q.   Okay.  Who placed handcuffs on Stacie McGuire?
17  A.   I also don't remember that.
18  Q.   Whose car was she placed into?
19  A.   I believe it was Officer Kusak's car.
20  Q.   Why was it Officer Kusak's car that she was
21       placed in?
22  A.   Just a matter of we had to stay there to give
23       paperwork, so he transported her in for us.

28

1  Q.  Okay.  Who's technically the arresting officers

2      for Stacie McGuire that night?

3  A.  I guess it would be Officer Wesoloski and myself.

4  Q.  So there's no requirement that the suspect ride

5      in the car of the arresting officers?

6  A.  No.

7  Q.  Where was Stacie McGuire taken to after 22

8      Christa Place?

9  A.  She was taken to the Cheektowaga Police Station

10     at 3322 Union Road.

11 Q.  Was she taken right from 22 Christa Place to the

12     Town of Cheektowaga Police Station?

13 A.  Yes.

14 Q.  Was she placed into a holding cell?

15 A.  Yes.

16 Q.  Who placed her into the holding cell?

17 A.  That I don't know.

18 Q.  At some point, did you go back to where Stacie

19     McGuire was being kept that night?

20 A.  Yes.

21 Q.  Where was Stacie McGuire when you went back?

22 A.  In our booking room we have a holding cell.  I

23     believe she was in the female holding cell.

29

1    Q.   Was there anybody else who was in the female
2         holding cell?
3    A.   I don't remember.
4    Q.   Did you have any conversations with Stacie
5         McGuire?
6    A.   I don't remember.  I don't think so.
7    Q.   At any point, did Stacie McGuire complain to you
8         that she was being falsely arrested?
9    A.   I don't remember.
10   Q.   At any point, did Stacie McGuire complain to you
11        or other officers about pain to her eye?
12   A.   I don't remember that.
13   Q.   Now, what was some of the paperwork that you and
14        Officer Wesoloski were completing at 22 Christa
15        Place?
16   A.   The domestic incident report.
17   Q.   And what is the domestic incident report, what
18        does that consist of?
19   A.   So pedigree information, there's some
20        standardized state questions involving domestic
21        violence, questions about weapons.  And then it's
22        also -- the form also has the supporting
23        deposition that we get from the victim and

30

1     there's also some victim rights phone numbers and

2     information.

3  Q.  Now, the supporting deposition that goes along

4     with that domestic incident report, are there any

5     other affidavits or supporting depositions that

6     you look to take from a victim of domestic

7     violence?

8  A.  No.

9  Q.  Okay.  So that would be the primary form that you

10    would use to take a statement from the victim of

11    domestic violence?

12 A.  Yes.

13 Q.  Okay.  And that was the policy at the time for

14    the Town of Cheektowaga Police Department?

15 A.  I believe so, yes.

16 Q.  Okay.  Is that the same policy today?

17 A.  Yes.

18 Q.  Okay.

19 MR. DAVENPORT:  I'm going to have a couple of

20    exhibits marked.

21

22        (Whereupon, seven Photographs were then

23    received and marked as Exhibits 1 through 7, for

31

1    identification.)

2

3   BY MR. DAVENPORT:

4   Q.   All right.  Officer, I'm going to show you what's

5        been marked as Exhibit 1.  Take some time to

6        review it.  Now, do you recognize the individual

7        that you see in this photograph?

8   A.   I mean, it's been a long time.  I'm assuming

9        that's Corey McGuire.

10  MR. HRICZKO:  Don't assume.  If you can't tell that

11       that's him, you can tell Mr. Davenport that.

12  THE WITNESS:  Yeah, I don't remember.

13  BY MR. DAVENPORT:

14  Q.   Okay.  You don't remember if that's Corey or not?

15  A.   Yeah.

16  Q.   Okay.  All right.  I'll take that back.  Thanks.

17       Now, when you're going to a domestic violence

18       incident, is there any effort that's made by

19       officers to see whether there's been any calls

20       for service at that address when you're

21       responding?

22  A.   Usually, yes.

23  Q.   Okay.  How is that information gathered or

32

1    obtained?

2  A.  We can either obtain it from dispatch by asking

3      or in the car there's a button you hit that says

4      history and it will show previous calls to that

5      address.

6  Q.  Now, at the time, November 8th of 2017, did you

7      have a standard procedure that you would use?

8      Did you request that information from dispatch or

9      did you typically press that button to obtain the

10     information yourself?

11 A.  Me personally, I would usually just press the

12     button and find it out for myself.

13 Q.  Did you do that before responding to this

14     domestic violence incident at 22 Christa Place?

15 A.  I don't remember.

16 Q.  Okay.  Do you know, did Officer Wesoloski obtain

17     any information regarding previous calls?

18 A.  I don't know that either.

19 Q.  Okay.  When responding to this call, did you come

20     to learn of any other previous calls from service

21     made by Stacie McGuire regarding her husband --

22 A.  No.

23 Q.  -- at 22 Christa Place?

33

1    MR. DAVENPORT:  I'm going to have this marked.

2

3           (Whereupon, a three-page Cheektowaga Police

4       Department Complaint Information was then

5       received and marked as Exhibit 8, for

6       identification.)

7

8    BY MR. DAVENPORT:

9    Q.   So I'm going to show you what's been marked as

10       Exhibit 8.  Do you recognize that document?

11   A.   This specific document or just the form, I guess?

12   Q.   I would say start with the form.  Do you

13       recognize that?

14   A.   Yes.

15   Q.   And what generally is this document?

16   A.   It's when you call 911, this is a complaint form

17       that's generated.

18   Q.   Okay.

19   A.   Or, any call, I should say.  Not just 911.

20   Q.   Now, in reviewing this document, does it appear

21       that this was a 911 call for a call for service

22       at 22 Christa Place?

23   A.   Yes.

34

1   Q.  Okay.  And what was that date that that call was

2      made?

3   A.  It says on here July 9th, 2017.

4   Q.  Okay.  Now, when you were saying that officers

5      may be able to obtain information about prior

6      calls at a certain location, would this be the

7      type of information that you and other officers

8      would be able to see?

9   A.  Yes.

10  Q.  Okay.  Who was the individual who made that call

11      for 911 service?

12  A.  I can't tell from looking at this.

13  Q.  Does it appear that Stacie McGuire was the one

14      who initiated that call?

15  A.  Yes.

16  Q.  Okay.  And in looking at that first line, the

17      narrative, does it give the reason why Stacie

18      McGuire called 911 that day?

19  A.  Yes.

20  Q.  Okay.  What was that reason?

21  A.  Says she was afraid of her husband and he was out

22      of control, PTSD.

23  Q.  Okay.  And does it say lower on that first entry

35

1      that a male voice could be heard in the

2      background saying who are you on the phone with?

3   A.  It says that a female also stated the male did

4      not know who she was on the phone with.

5   Q.  Okay.  Does it say that after there was a male

6      voice asking who she was on the phone with that

7      she hung up?

8   A.  Yes.

9   Q.  Okay.  Now, in responding to a domestic violence

10      incident, would you be looking at this type of

11      information about previous calls at an address

12      before making an arrest for a domestic violence

13      incident?

14   A.  I guess it depends.

15   Q.  Okay.  Now, prior to arresting Stacie McGuire on

16      November 8th, 2017, did you or any of your other

17      officers review this complaint form or this 911

18      call?

19   A.  Myself, no.  I can't speak for the other

20      officers.

21   Q.  Okay.  Was there any discussion about this

22      previous call for service?

23   A.  No.

36

1   Q.   In reviewing that previous 911 call, would it

2        give you and other officers concern that she had

3        called previously for her husband and his out of

4        control PTSD?

5   MR. HRICZKO:   Form.   You can answer.

6   THE WITNESS:   I can answer?   I'm sorry.   Would you

7        say it again?

8   MR. HRICZKO:   Sorry.

9   THE WITNESS:   No, that's okay.

10  BY MR. DAVENPORT:

11  Q.   In responding to a domestic violence incident,

12       would it give you and other officers with the

13       Town of Cheektowaga concern that there had been a

14       prior call for service for her husband's out of

15       control PTSD?

16  MR. HRICZKO:   Form.

17  THE WITNESS:   Not necessarily, no.

18  BY MR. DAVENPORT:

19  Q.   In evaluating who the primary aggressor was,

20       would you take into consideration this prior call

21       for service?

22  A.   I guess it depends.   It's hard to -- it depends.

23  Q.   Is it concerning at all that this individual

37

1      seems to be hiding her call to 911 from her

2      husband?

3    MR. HRICZKO:   Form.

4    THE WITNESS:   It's hard because I don't know the

5      outcome of this call or how this was handled.   So

6      I can't -- just because it says this, I don't

7      know if that's necessarily what ended up

8      happening after they went to that call, if that

9      makes sense.

10   BY MR. DAVENPORT:

11   Q.   Now, at the bottom of that sheet, does it say

12     that it ended with officers being advised?

13   A.   They were -- the two parties were advised, it

14     says.   Stacie and Corey.

15   Q.   Okay.   That means that there was no arrest that

16     day, right?

17   A.   Correct.

18   Q.   So when you review that 911 call, it tells you

19     who the other officers were that responded to

20     that previous call, correct?

21   A.   Yes.

22   Q.   So would you or other officers, in reviewing this

23     911 call, make efforts to contact these officers

38

```
 1       who responded to this previous call for service?
 2   A.  It, again, it depends if it was pertinent to what
 3       they were dealing with.
 4   Q.  Well, do you think that a prior call from the
 5       wife about her husband's out of control PTSD
 6       might be pertinent to decide who was the
 7       aggressor in a domestic violence incident?
 8   MR. HRICZKO:  Form.
 9   THE WITNESS:  I'm not sure how to answer that.  I
10       mean, I don't know if that was the complaint that
11       night that we went there, that his PTSD was out
12       of control, so it's hard to --
13   BY MR. DAVENPORT:
14   Q.  And that night that you're referring to is
15       November 8th of 2017, correct?
16   A.  Yes.
17   Q.  You were responding to a call for service from
18       the husband saying that the wife had struck him
19       first, correct?
20   A.  Yes.
21   Q.  So you knew that you were responding to a
22       domestic violence incident, correct?
23   A.  Yes.
```

39

1    Q.   Now, in knowing that you're responding to this

2         domestic violence incident where the husband is

3         claiming that the wife is the primary aggressor,

4         would you want to look at prior calls for service

5         and who made those prior calls for service?

6    A.   I mean, you could look, yes.

7    Q.   Would that be something that you would want to do

8         to learn the truth and uncover the truth as part

9         of your investigation?

10   A.   Each call is different, so it's hard to say what

11        happens in the past here -- you know what I mean?

12        So it's hard to answer that.

13   Q.   Right.  Because I understand that the wife wasn't

14        making complaints about her husband's PTSD, but

15        she was making complaints on November 8th, 2017

16        that her husband struck her, correct?

17   A.   Correct.

18   Q.   And choked her?

19   A.   Oh, I don't know about the choking.

20   MR. DAVENPORT:   I'll have this marked.

21

22        (Whereupon, a three-page New York State

23        Domestic Incident Report was then received and

40

1       marked as Exhibit 9, for identification.)

2

3   BY MR. DAVENPORT:

4   Q.   All right.  Officer, I'm going to show you what's

5        been marked as Exhibit 9.  Do you recognize

6        generally what this document is?

7   A.   Yes.

8   Q.   And what do you recognize it to be?

9   A.   It's a domestic incident report.

10  Q.   Okay.  Now, in a domestic incident report, does

11       it state who the individual is that is the victim

12       or the accuser?

13  A.   Yes.

14  Q.   Okay.  And that domestic incident report, does it

15       state who the victim or accuser is?

16  A.   No.

17  Q.   Okay.  Who completed the narrative?

18  A.   Looks like a dispatcher.

19  Q.   Okay.  Is there a statement that's on the bottom

20       of the second page of Exhibit 9?

21  A.   Yes.

22  Q.   Okay.  Who is that statement given by?

23  A.   Stacie McGuire.

41

| 1 | Q. | Okay.  And in that section on page two of that |
| 2 | | domestic incident report, is that typically where |
| 3 | | a statement would be written for a victim or an |
| 4 | | accuser of a domestic incident? |
| 5 | A. | Yes. |
| 6 | Q. | Okay.  So would it be fair to say that Stacie |
| 7 | | McGuire is the individual who is the victim or |
| 8 | | accuser completing this domestic incident report? |
| 9 | A. | Yes. |
| 10 | Q. | Okay.  Now, could you take just a moment to read |
| 11 | | her narrative?  And then just let me know when |
| 12 | | you're done. |
| 13 | A. | I can't read the like last line here. |
| 14 | Q. | Okay.  That's okay.  I'm not going to be asking |
| 15 | | you questions about the last line. |
| 16 | A. | Okay. |
| 17 | Q. | In that affidavit or in that section of the |
| 18 | | report, she generally describes what Corey |
| 19 | | McGuire did to her on November 9th of -- or, |
| 20 | | November 8th of 2017, is that correct? |
| 21 | A. | No.  It's just like everything that happened |
| 22 | | after. |
| 23 | Q. | Okay.  What about on the first page? |

42

1   A.   What am I looking for?

2   Q.   Now, on the first page, is there a date for when

3        this domestic incident took place?

4   A.   There's a reported date and occurred date.

5   Q.   Okay.  What's the occurred date?

6   A.   This says November 9th.

7   Q.   November 9th?  And then in the narrative section

8        on that first page for Exhibit 9, who completes

9        that?

10  A.   This part here?

11  Q.   Yes.

12  A.   That would be the whoever took the report.

13  Q.   Okay.  The information that that individual puts

14       in that section, where do they get it from?

15  A.   This information?

16  Q.   Yes.

17  A.   They get it from the victim or whoever is filing.

18  Q.   Okay.  So that's the officer's narrative based

19       off of what the victim tells them?

20  A.   Yes.

21  Q.   Okay.  Now, I guess in that Section of that first

22       page of Exhibit 9, does it generally describe

23       what Stacie McGuire alleges that Corey McGuire

43

1      did to her in November of 2017?

2   A.  Yes.

3   Q.  Okay.

4   MR. HRICZKO:  Can we just put something on the

5      record?  For Exhibit 9, the report date is

6      December 20th, 2017 for Exhibit 9.

7   MR. DAVENPORT:  Sure.  No objection.

8   BY MR. DAVENPORT:

9   Q.  Now, in that narrative section, does it describe

10      generally what Stacie McGuire alleges that Corey

11      McGuire did to her in November of 2017?

12  A.  Yes.

13  Q.  Does it describe Corey McGuire choking her,

14      punching her?

15  A.  It says choking and striking.

16  Q.  Okay.  And when you hear striking, does that also

17      refer to maybe somebody punching somebody?

18  A.  It could be, yes.

19  Q.  Okay.

20  MR. HRICZKO:  Form.  To that last question.  Sorry.

21  BY MR. DAVENPORT:

22  Q.  Now, the choking and the punching, was that

23      something that was described or talked about by

44

1      you and Officer Wesoloski on November 8th of 2017

2      when you responded to this incident?

3   A.   I don't remember.

4   Q.   Okay.  Where would you put information that was

5      told to you by the victim and the perpetrator to

6      you and Officer Wesoloski, where would you put

7      that information?

8   A.   When a DIR is completed, we would put that in our

9      narrative.

10  Q.   And you said, I think, DIR?

11  A.   It's a short term for domestic incident report.

12      Sorry.

13  Q.   What about a police report?

14  A.   So basically, the way it works is the DIR is

15      basically the police report.  It's just another

16      name for it.

17  MR. DAVENPORT:  Okay.  I'm going to have this marked

18      as Exhibit 10.

19

20      (Whereupon, a two-page Cheektowaga Police

21      Report was then received and marked as Exhibit

22      10, for identification.)

23

45

BY MR. DAVENPORT:

1

2 Q.  So, Officer, I'm going to show you what's been

3      marked as Exhibit 10.  Do you recognize generally

4      what that document is?

5 A.  Yes.

6 Q.  And what do you recognize that to be?

7 A.  This is a computerized version of the domestic

8      incident report.

9 Q.  So when we were talking before about where you

10     would include information that was told to you by

11     Corey McGuire and Stacie McGuire, that was the

12     document that you were referring to?

13 A.  Yes.

14 Q.  Okay.  Who completed this DIR report?

15 A.  That was Officer Wesoloski.

16 Q.  Okay.  Is there a handwritten form of that as

17     well?

18 A.  Yes.

19 Q.  Okay.  And the officers complete that handwritten

20     form?

21 A.  Yes.

22 Q.  Is that something that you complete at the scene

23     of an incident?

46

1   A.   Yes.

2   Q.   Okay.  And then do you take that handwritten

3        form, bring it to your station and somebody

4        transcribes for you?

5   A.   Eventually, yes.

6   Q.   Okay.  Now, there's an individual named Lynn

7        who's identified as the typist.  Is she the

8        individual that transcribed what Officer

9        Wesoloski wrote?

10  A.   Yes.

11  Q.   Is Lynn somebody who worked with the Town of

12       Cheektowaga Police Department at the time?

13  A.   Yes.

14  Q.   And is she somebody who would typically

15       transcribe an officer's written DIR report?

16  A.   Yes.

17  Q.   Okay.  Now, I want you to take some time to read

18       that narrative that was completed by Officer

19       Wesoloski, and then just let me know when you're

20       done.

21  A.   Okay.

22  Q.   Okay.  Now, do you see in that narrative section

23       where Officer Wesoloski talks about redness to

47

1      Stacie McGuire's eye?

2  A.   I did see that, yes.

3  Q.   Was that an observation that Officer Wesoloski

4       made?

5  MR. HRICZKO:   Form.   If you know.

6  THE WITNESS:   I don't know that.

7  BY MR. DAVENPORT:

8  Q.   Okay.   Was that something that you and Officer

9       Wesoloski discussed that night, redness to Stacie

10      McGuire's eye?

11 A.   If it was, I don't remember.

12 Q.   Okay.   And do you see in that narrative section

13      where Officer Wesoloski says that he asked Corey

14      McGuire about the redness to Stacie McGuire's

15      eye?

16 A.   Yes.

17 Q.   Were you there when Officer Wesoloski asked Corey

18      McGuire about the redness to Stacie McGuire's

19      eye?

20 A.   I don't remember.

21 Q.   Okay.   Does it appear from that police report

22      that Corey McGuire told Officer Wesoloski that

23      the redness to Stacie McGuire's eye was caused by

48

1    a struggle for the pipe wrench?

2  A.  Yes.

3  Q.  Okay.  And does Corey McGuire, according to

4      Officer Wesoloski, deny punching Stacie McGuire?

5  A.  Yes.  He had denied it.

6  Q.  Now, had you known about the redness to Stacie

7      McGuire's eye, what steps would you have taken to

8      verify Corey McGuire's account of how that

9      redness occurred?

10 A.  I'm not sure what we could have done.

11 Q.  Could you maybe have asked Stacie McGuire what

12     her account was for how that redness occurred?

13 A.  Yes.

14 Q.  Okay.  Because according to the narrative, it

15     doesn't appear that anybody asked Stacie McGuire

16     how her eye became red.

17 A.  I don't know if that happened or not.

18 Q.  Okay.  Now, in that narrative section, Officer

19     Wesoloski writes that he and other officers

20     determined that Corey's account was more accurate

21     and/or consistent with the injuries in evidence.

22     Do you see that?

23 A.  Yes.

49

| | | |
|---|---|---|
| 1 | Q. | Okay.  As you sit here today, how was that |
| 2 | | determination made, if you can recall? |
| 3 | A. | I just want to look at the line real quick, if |
| 4 | | you don't -- |
| 5 | Q. | Sure. |
| 6 | A. | I believe it was just the totality of everything |
| 7 | | there. |
| 8 | Q. | Okay.  Now, when you say the totality, I mean, |
| 9 | | that narrative, it refers to injuries, correct? |
| 10 | A. | Yes. |
| 11 | Q. | So I guess, what were those injuries that led you |
| 12 | | and Officer Wesoloski and others to believe that |
| 13 | | Corey McGuire was more credible? |
| 14 | A. | The scratches to his face and broken glasses. |
| 15 | Q. | So that was used to determine that Corey McGuire |
| 16 | | was more credible because he had scratches to his |
| 17 | | face? |
| 18 | A. | Part of it. |
| 19 | Q. | Okay.  And I guess, was that also taken into |
| 20 | | consideration for whether Stacie McGuire was |
| 21 | | credible, the redness to her eye?  Was that |
| 22 | | injury taken into account for her credibility? |
| 23 | A. | I don't remember the redness to her eye, so -- |

50

1   Q.  Okay.  Now, in addition to -- and I guess when

2       you say the injuries for Corey McGuire, it was

3       just the scratches to his face?

4   A.  Yes.

5   Q.  Okay.  And then it also says that Corey's account

6       was more accurate or consistent with injuries

7       and/or evidence.

8          So I guess, what was that evidence that

9       Officer Wesoloski was referring to?

10  A.  I'm not sure.

11  Q.  Okay.  Was there any evidence at that scene for

12      that incident?

13  A.  Just the pipe wrench.

14  Q.  Okay.  Where was that pipe wrench found?

15  A.  I don't remember where it was found.

16  Q.  Okay.  Was there any efforts to collect that pipe

17      wrench to be used in a court of law?

18  A.  I don't remember.

19  Q.  What would be the typical steps that you as a

20      Town of Cheektowaga Police Officer would take to

21      protect evidence to be used in a court

22      proceeding?

23  A.  Either photography or collecting evidence.

51

1   Q.  There were no photographs taken of the pipe

2       wrench that night, correct?

3   A.  I don't believe so.

4   Q.  Okay.  Why were there no photographs taken of the

5       pipe wrench?

6   A.  Yeah, I don't know.

7   Q.  Okay.  Why was the pipe wrench not collected for

8       evidence?

9   A.  I don't know.

10  Q.  In arresting Stacie McGuire, the intention was to

11      prosecute her for criminal charges, correct?

12  A.  Yes.

13  Q.  As an officer, you know that to convict somebody

14      in a court of law you must prove beyond a

15      reasonable doubt that that person is guilty,

16      correct?

17  A.  Yes.

18  Q.  And there needs to be evidence to support that

19      finding?

20  A.  Yes.

21  Q.  In initiating charges against Stacie McGuire,

22      what was the evidence that you were going to

23      provide to prosecutors to help them to convict

52

| | | |
|---|---|---|
| 1 | | Stacie McGuire? |
| 2 | A. | The statement of the victim, Corey McGuire. |
| 3 | Q. | No further evidence would be used? |
| 4 | A. | I guess just officer testimony as well. |
| 5 | Q. | None of the officers were there to witness what |
| 6 | | took place between Corey and Stacie, correct? |
| 7 | A. | No. |
| 8 | Q. | So what would officer testimony provide in terms |
| 9 | | of proving these charges? |
| 10 | A. | Yeah, I'm not sure. |
| 11 | Q. | Okay.  Now, at the time of this incident, you had |
| 12 | | been on the force for approximately eleven years, |
| 13 | | correct? |
| 14 | A. | Yes. |
| 15 | Q. | Had you ever filed charges against an individual |
| 16 | | related to a domestic violence incident |
| 17 | | previously? |
| 18 | A. | Yes. |
| 19 | Q. | Did any of those charges result in successful |
| 20 | | convictions? |
| 21 | A. | I would imagine so.  I don't know. |
| 22 | Q. | Do you know, did these criminal charges result in |
| 23 | | a successful conviction of Stacie McGuire? |

53

1    A.   I don't know.

2    Q.   As you sit here today, do you know what that

3         outcome was from that criminal prosecution of

4         Stacie McGuire?

5    A.   I don't.

6    Q.   In that DIR report it also lists officers who

7         were involved in this incident, correct?

8    A.   Yes.

9    Q.   And there's four officers that are listed?

10   A.   Correct.

11   Q.   You're one of them?

12   A.   Yes.

13   Q.   Which officer are you?

14   A.   I'm badge number nine o four, Domenech.

15   Q.   Is there a fifth officer who's also listed on

16        this DIR report?

17   A.   Yes.

18   Q.   Okay.  Who is the fifth officer?  I believe he

19        was marked as your supervisor on the DIR.

20   A.   That would be Lieutenant Chludzinski.

21   Q.   Okay.  Why is he marked on a DIR report?

22   A.   I don't know.  I don't know why he's on this one.

23   Q.   Okay.  Now, a supervisor for a DIR report, are

54

```
 1      they the ones who check over the report to make
 2      sure it's done correct and accurately?
 3   A. Yes.
 4   Q. Besides checking over the report for accuracy and
 5      completeness, is there any other role that a
 6      supervisor would play in this DIR report or this
 7      incident?
 8   A. No.
 9   Q. Okay.  I think you said that you were promoted to
10      -- is it sergeant?
11   A. Yes.
12   Q. Sergeant?  So oftentimes, you are probably listed
13      as the supervisor for these types of DIR reports,
14      correct?
15   A. Yes.
16   Q. Okay.  And when you're listed as a supervisor,
17      that's to indicate that you reviewed that report
18      and you checked it, correct?
19   A. Yes.
20   Q. Okay.  And you're responsible for its
21      completeness and accuracy?
22   A. Yes.
23   Q. Okay.  Now, Officer Pat, I'm going to call him
```

55

1          Pat because I cannot say his last name.

2     A.   It's Chludzinski.

3     Q.   Chludzinski?  So Officer Chludzinski, did he ever

4          speak to the officers about the witness accounts

5          and who was more credible?

6     A.   No.

7     Q.   Was there any discussion with Officer Chludzinski

8          about this specific incident?

9     A.   No.

10    Q.   Okay.  Now, standard procedure at this time, you

11         or Officer Wesoloski would hand in your paperwork

12         for Officer Chludzinski, correct?

13    A.   You turn it into a box and then -- like a mailbox

14         and he retrieves it at some point.

15    Q.   Okay.  And after he retrieves it, are there any

16         follow-up conversations with either you or

17         Officer Wesoloski about the incident?

18    A.   No.

19    Q.   Typically, would there only be a follow-up

20         conversation if there was something wrong the

21         report?

22    A.   Yeah.  Yes.

23    Q.   Okay.  Do you recall, were there any follow-up

56

| | | |
|---|---|---|
| 1 | | conversations with Officer Chludzinski about this |
| 2 | | specific incident on November 8th of 2017? |
| 3 | A. | No. |
| 4 | Q. | Okay.  Now, in completing this narrative, did |
| 5 | | Officer Wesoloski, would he typically confer with |
| 6 | | you? |
| 7 | A. | It depends.  Yeah. |
| 8 | Q. | Would he ask if his narrative was consistent with |
| 9 | | your recollection of the incident? |
| 10 | A. | Sometimes. |
| 11 | Q. | Did he confer with you before turning in this DIR |
| 12 | | report? |
| 13 | A. | I don't remember. |
| 14 | Q. | Now, in this incident, it lists a victim and a |
| 15 | | Defendant, correct? |
| 16 | A. | Yes. |
| 17 | Q. | Okay.  Who was the victim? |
| 18 | A. | The victim here is Corey McGuire. |
| 19 | Q. | And the Defendant was Stacie McGuire, correct? |
| 20 | A. | It's sealed on this document, so -- |
| 21 | Q. | Okay.  Now, the individual who's listed as a |
| 22 | | Defendant, that's typically the individual who's |
| 23 | | being charged criminally, correct? |

57

1   A.   Yes.

2   Q.   And the Defendant in this case was charged?

3   A.   Yes.

4   Q.   Okay.  What was the defender charged with?

5   A.   Criminal mischief and assault in the third

6        degree.

7   Q.   Okay.  And that was based off of a statement that

8        was given from a statement from Corey McGuire

9        that Stacie McGuire, or the Defendant, scratched

10       and punched Corey McGuire, is that correct?

11  A.   I believe she hit him with a wrench too.  I think

12       that was part of it.

13  Q.   Were one of those charges that were brought

14       against Stacie McGuire specific to her allegedly

15       hitting Corey McGuire with a pipe wrench?

16  A.   I believe so, yes.

17  Q.   Okay.  Which criminal charge was that?

18  A.   I believe assault.

19  Q.   Now, in order to prove this assault charge, would

20       it be required to prove that Corey McGuire was

21       actually hit with a pipe wrench that night?

22  A.   If he had injuries, it would prove the assault.

23  Q.   But you never checked him for injuries, is that

58

1      correct?

2  A.   Just visually what I could see on his face.

3  Q.   But in terms of the pipe wrench, he said he was

4      hit in the ribs, correct?

5  A.   Yes.

6  Q.   And that assault charge is based off of Stacie

7      McGuire allegedly hitting Corey McGuire in the

8      ribs with the pipe wrench, correct?

9  A.   Yes.

10 Q.   Okay.  So how would you or other officers be able

11     to prove or have a prosecutor prove that Corey

12     McGuire was actually hit in the ribs with a pipe

13     wrench?

14 A.   Yeah, I don't know.

15 MR. DAVENPORT:  Okay.  I'm going to have this marked

16     as Exhibit 11.

17

18         (Whereupon, a two-page Domestic Incident

19     Report was then received and marked as Exhibit

20     11, for identification.)

21

22 MR. DAVENPORT:  Thank you.

23 BY MR. DAVENPORT:

59

1   Q.   So, Officer, I'm going to show you what's been

2        marked as Exhibit 11.  Do you generally recognize

3        what that document is?

4   A.   Yes.

5   Q.   And what is it?

6   A.   It's a domestic incident report.

7   Q.   Okay.  In reviewing this domestic incident

8        report, are you able to determine who the alleged

9        victim was?

10  A.   Yes.

11  Q.   Okay.  Who was the alleged victim?

12  A.   Corey McGuire.

13  Q.   Okay.  And who was the alleged Defendant or

14       perpetrator?

15  A.   Stacie McGuire.

16  Q.   And then just take a moment to review the

17       narratives.

18  A.   Do you want me to read this too or --

19  Q.   If you'd like.  So I guess I'm going to ask my

20       question first and then you can decide --

21  A.   Okay.

22  Q.   -- if you want to review his narrative portion.

23       Who completed this DIR report -- or, I'm sorry.

60

1        This domestic incident report?

2    A.  This is Officer Wesoloski.

3    Q.  How are you able to determine that that was

4        Officer Wesoloski that completed this report?

5    A.  His name is on it under reporting officer.

6    Q.  Okay.  Does it also give his badge number?

7    A.  Yes.

8    Q.  Okay.  What was his badge number at the time?

9    A.  Nine zero five.

10   Q.  When would that report typically be completed by

11       the officer and the victim?

12   A.  At the scene.

13   Q.  Okay.  Do you know, was this report completed at

14       the scene on November 8th of 2017?

15   A.  To the best of my knowledge, yes.

16   Q.  Were you there present when this report was being

17       completed?

18   A.  Yes.

19   Q.  Okay.  While this report is being filled out,

20       what were you doing at that time?

21   A.  I don't remember.

22   Q.  Okay.  How is a report like this completed, does

23       the victim typically fill out most of the

61

1   information?

2  A.  No.

3  Q.  Okay.  What part of that report does the victim

4      fill out?

5  A.  If any, it would be the statement.

6  Q.  And then the rest of the report is completed by

7      the officer who's completing the report?

8  A.  Yes.

9  Q.  So in this case for Exhibit 11, that was

10     completed by Officer Wesoloski?

11 A.  Yes.

12 Q.  Okay.  Now, in reviewing -- I'd like you to

13     review Corey's statement really quick.

14 A.  Okay.

15 Q.  So nowhere in Corey McGuire's statement does he

16     indicate that he either struck Stacie McGuire or

17     strangled her, correct?

18 A.  No.

19 Q.  And then you had previously reviewed the first

20     page of Exhibit 11 where the narrative that's

21     written, that would have been completed by

22     Officer Wesoloski, correct?

23 A.  Yes.

62

1    Q.   And that would be based on information that was
2         provided to him by Corey McGuire, correct?
3    A.   Yes.
4    Q.   Okay.  And in that portion on page one of Exhibit
5         11, nowhere in there does Officer Wesoloski write
6         that Corey McGuire told him that he struck Stacie
7         McGuire in the face or attempted to choke her,
8         correct?
9    A.   Correct.
10   Q.   And nowhere in either Corey McGuire's statement
11        or Officer Wesoloski's statement do either of
12        them write about any redness to Stacie McGuire's
13        eye, correct?
14   A.   Do they write about it?  Write about the redness
15        to her face?
16   Q.   Yes.  Write about it, identify it in that report.
17   MR. HRICZKO:  I do think it's in there.
18   THE WITNESS:  It's in that report.
19   BY MR. DAVENPORT:
20   Q.   It's in the other DIR report that was previously
21        marked, correct?
22   A.   Yes.
23   Q.   But in Exhibit 11, you don't see any redness

63

1      identified by either Officer Wesoloski or Corey

2      McGuire on Exhibit 11, correct?

3   A.  This is missing a page.

4   Q.  Okay.  So that was what was provided to us.  I'm

5      going to make a request on the record that the

6      DIR report that was completed by Corey McGuire in

7      the November 8th, 2017 incident, that we get the

8      full report.

9   MR. HRICZKO:  Could we just take a break?  I'm going

10      to go --

11  MR. DAVENPORT:  Sure.  Thank you.

12          (Whereupon, a short recess was then taken.)

13  BY MR. DAVENPORT:

14  Q.  So, Officer, I understand that there may be a

15      page missing on Exhibit 11.  But based off of

16      what you can see between the narrative written

17      between Officer Wesoloski and what is written by

18      Corey McGuire in front of you, you don't see any

19      mention of redness to Stacie McGuire's eye,

20      correct?

21  A.  With the documents provided, no.

22  Q.  Okay.  Now, when completing -- you've completed

23      these reports before, correct?

64

1   A.   Yes.

2   Q.   Okay.  In completing this report, are there times

3        where there are physical injuries to both the

4        victim as well as the alleged perpetrator?

5   A.   Yes.

6   Q.   Okay.  Do you typically mark down those injuries

7        to both parties in your narrative or somewhere on

8        this form?

9   A.   In the narrative.

10  Q.   Okay.  So that would be your typical practice is

11       to identify the injuries to both parties,

12       correct?

13  A.   Yes.

14  Q.   Okay.  Are there any exceptions to that general

15       practice by you?

16  A.   I don't know.  I would have to think of a

17       circumstance where I would.  I don't know.

18  Q.   Was that something that you were trained to do

19       when completing these reports, to include the

20       injuries to both parties?

21  A.   I wouldn't say trained to do, but experience is a

22       lesson.

23  MR. DAVENPORT:  Okay.  I'm going to have this marked

65

1      as Exhibit 12.

2

3           (Whereupon, a Cheektowaga Police Department

4      Complaint Information dated 11/8/17 was then

5      received and marked as Exhibit 12, for

6      identification.)

7

8   MR. DAVENPORT:   Thank you.

9   BY MR. DAVENPORT:

10  Q.  Just really quickly, Officer.  There was a

11      discussion off the record about Exhibit 11 and

12      Exhibit 10.  What you said is that Exhibit 11 is

13      a handwritten version of what we see in Exhibit 10?

14  A.  Yes.

15  Q.  Okay.

16  MR. HRICZKO:   Thanks.

17  BY MR. DAVENPORT:

18  Q.  I'm going to show you what's been marked as

19      Exhibit 12.  Do you generally recognize what that

20      document is?

21  A.  Yes.

22  Q.  What is that document?

23  A.  It's -- we call it a complaint card, the card

66

```
 1        that's generated when a 911 call or call for

 2        service is made.

 3    Q.  And does that complaint card identify all

 4        officers who responded to an incident?

 5    A.  Generally, yes.

 6    Q.  Okay.  And in reviewing Exhibit 12, does this

 7        appear to be a complaint card pertaining to the

 8        incident that we're discussing on November 8th of

 9        2017?

10    A.  Yes.

11    Q.  Okay.  In reviewing the complaint card, who does

12        it state are the officers who responded to this

13        call for service?

14    A.  There's myself, Officer Wesoloski, Sergeant

15        Wynant and Officer Kusak.

16    Q.  Okay.  As you sit here today, are there any other

17        officers who responded to this incident that are

18        not identified in Exhibit 12?

19    A.  Not that I remember, no.

20    Q.  Okay.  Now, it states lower in the remarks

21        section that the sub called.  Do you see that?

22    A.  Yes.

23    Q.  Okay.  What is a sub, what does that mean?
```

67

1   A.   Just another party, just a term used to describe

2        somebody that calls.

3   Q.   Okay.  Is it like short for anything?

4   A.   Short for subject.

5   Q.   Okay.  And then is there another way to respond

6        to any other individuals who are not subjects on

7        the call?

8   A.   Yes.

9   Q.   Okay.  What else would you use on that sheet to

10       refer to other individuals?

11   A.   Complainant, offenders.

12   Q.   Is there a complainant that's identified?

13   A.   Yes.

14   Q.   Okay.  Who is the complainant?

15   A.   Corey McGuire.

16   Q.   So Corey McGuire was the complainant and

17       according to this document, Exhibit 12, Stacie

18       McGuire was the sub, which is the subject,

19       correct?

20   A.   They have her here as offender, so --

21   Q.   Okay.  Offender.  Now, in the remarks section

22       there's a notation for AMR staging.  Do you see

23       that?

68

1   A.   Yes.

2   Q.   What is that, what does that mean?

3   A.   That's an ambulance.

4   Q.   Okay.  What does it mean to stage an ambulance?

5   A.   Basically means to have an ambulance on standby.

6        Once officers made the scene safe, then they can

7        come in.

8   Q.   Is that typical practice when responding to a

9        domestic incident to have an ambulance on

10       standby?

11  A.   I wouldn't say typical, no.

12  Q.   Okay.  Is it typical when responding to a

13       domestic violence incident to have an ambulance

14       on standby?

15  A.   No.

16  Q.   Who makes that call to have an ambulance on

17       standby?

18  A.   I don't really know.  Anybody could make that

19       call, a dispatcher if they saw fit or an officer.

20  Q.   In reviewing Exhibit 12, are you able to identify

21       who decided to have an ambulance on standby?

22  A.   No.

23  Q.   Okay.  In the remarks section, do you see in the

69

| | | |
|---|---|---|
| 1 | | middle column where it provides numbers? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  What are those numbers, what does that |
| 4 | | refer to? |
| 5 | A. | Those are dispatcher badge numbers. |
| 6 | Q. | Is your badge number listed? |
| 7 | A. | No.  Oh, I'm sorry. |
| 8 | Q. | Okay.  So I think you were about to tell me that |
| 9 | | your badge number is listed.  Where is it listed? |
| 10 | A. | It's listed in the officer's section. |
| 11 | Q. | Okay.  In reviewing that number, are you able to |
| 12 | | identify who made that request for an ambulance |
| 13 | | to be staged? |
| 14 | A. | No. |
| 15 | Q. | Okay.  What is the number that's next to AMR |
| 16 | | staging? |
| 17 | A. | It's six six one. |
| 18 | Q. | Does that refer to -- is that the number or call |
| 19 | | sign for any of the officers who responded to the |
| 20 | | scene? |
| 21 | A. | No. |
| 22 | Q. | If that number does not correspond with the |
| 23 | | officers who were at the scene, would it be safe |

70

```
 1        to assume that it was a dispatcher who requested

 2        that an ambulance be staged?

 3   A.   I don't know.

 4   Q.   Okay.  Do you know who that call sign belongs to?

 5   A.   The six six one?

 6   Q.   Yes.

 7   A.   Yes.

 8   Q.   Who does that belong to?

 9   A.   It's Dispatcher Weich, W-E-I-C-H.

10   Q.   If Dispatcher Weich's call sign is next to AMR

11        staging, is he the individual who recommended or

12        decided to have an ambulance on standby?

13   A.   No, not necessarily.

14   Q.   Why would his number be listed next to AMR

15        staging, then?

16   A.   That is the person who is inputting that in the

17        computer on the actual card.

18   MR. HRICZKO:  And just for the record, I think Weich

19        is a female.

20   THE WITNESS:  Yes.

21   MR. DAVENPORT:  Okay.  Sorry about that.

22   MR. HRICZKO:  No, you're good.

23   BY MR. DAVENPORT:
```

71

1   Q.   So besides that number for who input that data,
2        we're not able to determine who the individual
3        was that decided to have an ambulance on the
4        scene, correct?
5   A.   Correct.
6   Q.   Okay.  At least not using Exhibit 12?
7   A.   No.
8   Q.   Okay.  Now, do you know why they decided to have
9        an ambulance on standby for this call?
10  A.   I don't.
11  Q.   Was it due to any injuries that were observed of
12       either Stacie or Corey McGuire?
13  A.   I don't know that.
14  Q.   As you sit here today, do you know, did Stacie
15       McGuire have an injury to her eye?
16  A.   I don't remember.
17  Q.   Now, there's also a notation in the remarks
18       section for OPS.  Do you see that?
19  A.   Yes.
20  Q.   Okay.  What does OPS refer to?
21  A.   That refers to orders of protection.
22  Q.   Okay.  And by noting OPS, orders of protection,
23       what does that remark mean, what does that

72

1       notation mean?

2   A.  That means the two parties involved don't have an

3       order of protection.

4   Q.  So at the time you responded on November 8th,

5       2017, that notation indicates to you that there

6       were no orders of protection from either Corey or

7       Stacie McGuire?

8   A.  Correct.

9   Q.  And would that be information that would be

10      provided to you, the officers at the scene?

11  A.  Yes.

12  Q.  That would be typical for officers to know when

13      responding to a domestic violence incident?

14  A.  Yes.

15  MR. DAVENPORT:  Okay.  Can I have this marked as

16      Exhibit 13?  Actually, we'll mark two documents.

17

18          (Whereupon, a Town of Cheektowaga Police

19      Department Order of Protection Policy was then

20      received and marked as Exhibit 13,

21          and a two-page Town of Cheektowaga Police

22      Department Procedure for Handling Prisoners with

23      Medications was then received and marked as

73

1      Exhibit 14, for identification.)

2

3   BY MR. DAVENPORT:

4   Q.   So, Officer, in front of you is an exhibit that

5        had been marked as Exhibit 13, do you see that?

6   A.   Yes.

7   Q.   Do you generally recognize what that document is?

8   A.   Yes.

9   Q.   What is that?

10  A.   It's a policy on domestic violence.

11  Q.   Did you receive any training on that policy?

12  A.   Yes.

13  Q.   How often did you receive training on that

14       policy?

15  A.   I'm not sure.

16  Q.   Okay.  Is there a set number of times that you as

17       officers would receive training responding to

18       domestic violence incidents just in general?

19  A.   I'm not sure if there's a set number, no.

20  Q.   Do you know approximately how many times you have

21       received training on responding to domestic

22       violence calls?

23  A.   No.

74

1   Q.   Have you received training on domestic violence
2        calls?
3   A.   Yes.
4   Q.   Has it been once or more than once?
5   A.   More than once.
6   Q.   Okay.  Did you receive training on responding to
7        domestic violence calls before November 8th 2017?
8   A.   Yes.
9   Q.   Okay.  So you were generally familiar with what
10       this policy was and what it required, correct?
11  A.   Yes.
12  Q.   Okay.  So on the first page of Exhibit 13, do you
13       see towards the middle under policy where it says
14       standard operating procedure in response to
15       domestic incidents slash violence calls?
16  A.   Yes.
17  Q.   Okay.  Now, under sub section one, are these the
18       steps that you as officers would expect to go
19       through as part of responding to a domestic
20       violence call?
21  A.   This is more so for the dispatcher.
22  Q.   Okay.  Now, do you see under the standard
23       operating procedure where it asks the dispatcher

1       to obtain the complaint history at that location?

2   A.  Yes.

3   Q.  Okay.  Do you know if that was done here on

4       November 8th, 2017 for 22 Christa Place?

5   A.  I don't.

6   Q.  Okay.  Did you know of any complaint history at

7       22 Christa Place when you responded on November

8       8th, 2017?

9   A.  I did not.

10  Q.  But that is part of the standard procedure for

11      responding to domestic incidents slash violence

12      calls, correct?

13  A.  For the dispatchers, yes.

14  Q.  Okay.  And when the dispatchers obtain that

15      information, part of that standard procedure is

16      to provide that information to officers, correct?

17  A.  Yes.

18  Q.  Okay.  Now, on page two of Exhibit 13, sub

19      section three says that an officer will restore

20      order by gaining control of the situation and

21      separating parties.

22          Do you see that?

23  A.  Yes.

76

1    Q.   Okay.  And based off of the narrative that you

2         gave before, that was done, Corey McGuire and

3         Stacie McGuire were separated, correct?

4    A.   Yes.

5    Q.   At the time when you responded to this incident,

6         I mean, were Stacie and Corey McGuire still going

7         at it, were they still fighting with each other?

8    A.   I don't know.

9    Q.   Was there any need to take any other steps to

10        restore order to the situation other than

11        separating the two parties?

12   A.   No.

13   Q.   Okay.  The second sentence says that the officers

14        will take control of the weapons used or

15        threatened to be used.

16            Do you see that?

17   A.   Yes.

18   Q.   And in this case, Corey McGuire alleged that

19        there was a weapon that was used, correct?

20   A.   Yes.

21   Q.   And what was that weapon?

22   A.   A pipe wrench.

23   Q.   Okay.  Did officers or you take control of that

77

1      pipe wrench?

2  A.  I don't remember.

3  Q.  Okay.  Do you know where that pipe wrench was?

4  A.  No, I don't remember.

5  Q.  Now, the next sentence says that officers will

6      visibly check occupants including children and

7      other adults in the household as for their safety

8      and well-being when reasonable and possible.

9          Do you see that?

10  A.  Yes.

11  Q.  Now, were there any children or other adults

12      there besides Stacie and Corey McGuire on

13      November 8th of 2017?

14  A.  No.

15  Q.  Number four on page two says that officers or

16      someone will obtain medical treatment for the

17      victim when appropriate.

18          Do you see that?

19  A.  Yes.

20  Q.  Was there any medical treatment that was obtained

21      either for Corey or Stacie McGuire on November

22      8th, 2017?

23  A.  No.

78

1   Q.  Okay.  So even though an ambulance was staged,

2       there were no other steps that were taken to

3       obtain medical treatment for either Corey or

4       Stacie, correct?

5   A.  Correct.

6   Q.  And when an ambulance is staged, where is it

7       staged, is it staged at the scene?

8   A.  No, but close proximity.

9   Q.  I guess, what does that mean, close proximity?

10      Does that mean that the ambulance is on the way?

11  A.  No.  It could mean they're around the corner or

12      down the street, just not at the scene.

13  Q.  Is there any reason why they would stay around

14      the corner or down the street rather than right

15      at the scene?

16  A.  I believe their policies are they have to wait

17      until the scene is safe, until police make the

18      scene safe.

19  Q.  All right.  The next sub section on page two is

20      that officers will conduct interviews.

21         Do you see that?

22  A.  Yes.

23  Q.  Okay.  Interviews were conducted of Corey and

79

1      Stacie, correct?

2  A.  Yes.

3  Q.  And for you, you conducted an interview of Corey

4      McGuire, but not Stacie McGuire, correct?

5  A.  Correct.

6  Q.  The next step is collecting evidence including

7      sworn affidavits whenever possible, and where

8      appropriate, to take photographs of injuries

9      and/or property damage.

10         Do you see that?

11 A.  Yes.

12 Q.  Now, that section when you were trained, is it

13     the expectation that officers take sworn

14     affidavits from both the victim and the

15     Defendant?

16 A.  No.

17 Q.  Okay.  Why are sworn statements not taken from

18     the Defendant or the perpetrator?

19 A.  There's, obviously, Miranda issues.  They would

20     have to waive their Miranda rights.

21 Q.  Is there any effort to ask the Defendant if they

22     would like to waive their Miranda rights and

23     provide a statement?

80

1    A.   No.

2    Q.   It also says in part five of page two to take

3         photographs of the injuries and/or property

4         damage.

5              Do you see that?

6    A.   Yes.

7    Q.   Okay.  That wasn't done here, correct?

8    A.   To my knowledge, no.

9    Q.   Okay.  You didn't take any photographs of the

10        injuries or property damage, correct?

11   A.   I did not.

12   Q.   Okay.  And there was property damage because

13        Corey McGuire alleged that his glasses were

14        broken?

15   A.   Yes.

16   Q.   And he also alleged injuries to his face as well

17        as his ribs, correct?

18   A.   Yes.

19   Q.   But photographs were not taken of either of those

20        injuries, correct?

21   A.   To my knowledge, no.

22   Q.   And there was also indications that Officer

23        Wesoloski or other officers noticed redness to

81

1      Stacie McGuire's eye, correct?

2  A.  In the report, yes.

3  Q.  Okay.  And as part of your training, would that

4      trigger an obligation or a duty for the officers

5      to take photographs of the redness to her eye?

6  A.  I'm not sure.

7  Q.  If it was part of the domestic incident, the

8      violence, the struggle between the two parties,

9      would officers take photographs of the redness to

10     Stacie McGuire's eye?

11 A.  Yes.

12 Q.  That would have been something that you would

13     have been trained on to do?

14 A.  Yes.

15 Q.  Okay.  But that wasn't done here either, right?

16 A.  To my knowledge, no.

17 Q.  Okay.  So I'm going to ask you to turn to page

18     three.  Now, do you see number two, the number

19     two on there?

20 A.  Yes.

21 Q.  And do you see where it lists primary aggressor?

22 A.  Yes.

23 Q.  Okay.  Sub section A says that officers are not

82

1        required to arrest both or all parties involved

2        in a domestic, however the, in quotes, primary

3        physical aggressor shall be arrested.

4             Do you see that?

5    A.   Yes.

6    Q.   Now, I think you talked about this a little

7        earlier, that part of your standard procedure is

8        to arrest the primary physical aggressor.

9        Correct?

10   A.   Yes.

11   Q.   So that was something that you were trained on,

12       correct?

13   A.   Yes.

14   Q.   Okay.  Are there steps that you as officers take

15       to determine who the primary physical aggressor

16       is?

17   A.   Yeah.

18   Q.   Okay.  Do you know off the top of your head what

19       factors or steps you take to determine who the

20       primary physical aggressor is?

21   A.   Just off the top of my head, obviously, injuries

22       would be the -- one of the key factors in it.  I

23       can't think of anything else.

83

1  Q.  Now, does the primary physical aggressor refer to

2      the person who first uses physical violence?

3  A.  No.

4  Q.  Okay.  Could it be possible that the person who

5      first used physical violence is not the primary

6      physical aggressor?

7  A.  Yes.

8  Q.  And would that, in those circumstances where

9      somebody initially uses physical violence, would

10     the primary physical aggressor -- could the

11     primary physical aggressor be the person who uses

12     violence and escalates it, escalates the

13     situation?

14 A.  Yes.

15 Q.  Uses more physical violence than what the initial

16     physical aggressor used?

17 A.  Yes.

18 Q.  Okay.  Now, on page seven to eight at the very

19     bottom as part of this Exhibit 13, it lists

20     primary aggressor.  Do you see that?

21 A.  Yes.

22 Q.  And it gives a definition for what a primary

23     aggressor is?

84

1   A.   Um-hum.  Yes.  I'm sorry.

2   Q.   Okay.  And it was kind of what you were talking

3        about before where the primary physical aggressor

4        is not necessarily the person who was first to

5        use force?

6   A.   Correct.

7   Q.   So you agree with that?

8   A.   Yes.

9   Q.   Okay.  Now, the next sentence says during the

10       officer's investigation to determine who was the

11       primary physical aggressor, the officer shall

12       consider -- on page seven of Exhibit 13, the next

13       sentence says during the officer's investigation

14       to determine who was the primary physical

15       aggressor, the officer shall consider the

16       following.

17            You see that, correct, Officer?

18  A.   Yes.

19  Q.   And on page eight it gives four factors?

20  A.   Yes.

21  Q.   Now, I'm going to just ask you to review those

22       four factors, I won't read them.

23  A.   Okay.

85

1   Q.  Now, in reviewing these four factors, would you

2       say that you used these four factors when

3       determining who was the primary physical

4       aggressor in this case?

5   A.  Yes.

6   Q.  Ultimately you determined that Stacie McGuire was

7       the primary physical aggressor, correct?

8   A.  As a group, yes.  As the other officers there,

9       yes, we determined that.

10  Q.  You were part of that group that ultimately

11      determined that Stacie McGuire was the primary

12      aggressor, correct?

13  A.  Yes.

14  Q.  What factors did you use to determine that Stacie

15      McGuire was the primary physical aggressor?

16  A.  Mostly the injuries to Mr. McGuire and the

17      property damage.  That's mainly it.

18  Q.  Okay.  So there was no consideration of the third

19      factor whether any person had a prior history of

20      domestic violence that the officer can reasonably

21      obtain, ascertain?

22  A.  I don't remember if we had that information at

23      the time or not.

86

1  Q.  Okay.  But normally that would be the information

2      that would be used by officers to determine who

3      the primary physical aggressor is?

4  A.  If you have that information.

5  Q.  That prior call that we looked at, July 9th,

6      2017, it's marked as Exhibit 8, would that prior

7      call be used to determine who the primary

8      physical aggressor was?

9  A.  I wouldn't know.

10 Q.  Okay.  Even though Stacie McGuire is noting that

11     she is fearful for her husband who has PTSD?

12 A.  I wasn't at that one, so I don't know the ins and

13     outs of what happened there, so --

14 Q.  But that would have been a call that was

15     available to you or could have been available to

16     you and the other officers who responded to the

17     call, correct?

18 A.  Yeah.  We can see this, yes.

19 Q.  Okay.  Are there times that you respond to a

20     domestic incident or domestic violence call and

21     there's a prior DV complaint that involved

22     officers that responded that didn't include you?

23 A.  Yes.

87

1    Q.   Okay.  Would you still use those prior complaints

2         even though you didn't respond to that call?

3    A.   Depending on what the complaints were, yes.

4    Q.   Okay.  And you would use those to determine,

5         those prior complaints, to determine who the

6         primary physical aggressor was for the incident

7         that you were responding to, correct?

8    A.   Possibly.

9    Q.   If you wanted more information on the outcome of

10        a prior call, would you ever call up officers who

11        actually responded to the call to get their input

12        and their take on what actually happened?

13   A.   Yes.

14   Q.   Have you done that before when investigating a DV

15        complaint?

16   A.   I can't think of a specific time, so I guess I

17        don't remember.  Not really sure.

18   Q.   Okay.  Now, the last bullet point is whether any

19        such person acted defensively to protect himself

20        or herself or a third person from injury.

21             Do you see that?

22   A.   Yes.

23   Q.   And you said before that was not considered by

88

1       you or the other officers in determining who was

2       the primary physical aggressor?

3   A.  Just in the case of Corey, he was defending

4       himself.

5   Q.  What about for Stacie and her claim that she was

6       defending herself from Corey who was physically

7       aggressive towards her?

8   A.  Yeah.  I don't remember her conversation.

9   Q.  Okay.  But you also didn't have a conversation

10      with her, correct?

11  A.  I don't remember having one, no.

12  Q.  Okay.  But Officer Wesoloski did have a

13      conversation with Stacie McGuire, right?

14  A.  Yes.

15  Q.  But you don't recall whether Officer Wesoloski

16      told you that Stacie said that she was defending

17      herself, correct?

18  A.  I don't.

19  Q.  Had you known that, would that be a factor that

20      you would consider in determining who the primary

21      physical aggressor was?

22  A.  Yes.

23  Q.  Okay.  Now, you said that it was mostly the first

89

```
 1        bullet point, the first factor on page eight,
 2        that you guys considered when determining the
 3        primary physical aggressor, correct?
 4   A.   Yes.
 5   Q.   So we're looking at the comparative severity of
 6        any injuries inflicted by the parties, is that
 7        correct?
 8   A.   Yes.
 9   Q.   Okay.  So Corey McGuire alleged that he had
10        scratches on his face, right?
11   A.   Yes.
12   Q.   And you used that to compare to the injuries that
13        Stacie was alleging that she also had?
14   A.   Yes.
15   Q.   Okay.  Did you factor in at all the redness to
16        Stacie's eye when looking at this first factor?
17   A.   I don't remember seeing the redness to her eye,
18        so --
19   Q.   What about other officers at the scene, would
20        they use the redness in her eye to compare the
21        injuries of her versus Corey?
22   A.   Yes.
23   Q.   Okay.  Do you recall that taking place?
```

90

1   A.   I don't.

2   Q.   So you don't know as you sit here today whether

3        the redness in Stacie's eye was ever compared to

4        the scratches to Corey McGuire's face?

5   A.   I don't remember the redness to her eye, so --

6   Q.   Okay.  So I want you to go back to page three.

7        For number two sub section C, do you see where it

8        says the arrest of the primary physical aggressor

9        does not prohibit the officer from arresting both

10       or all parties?

11  A.   Yes.

12  Q.   Was there any discussion of arresting Corey

13       McGuire on November 8th of 2017?

14  A.   I don't remember.

15  Q.   If it was -- has there ever been a circumstance

16       or a situation where you arrested both the

17       primary physical aggressor as well as the alleged

18       victim?

19  A.   There have been incidents where I've arrested

20       both parties in a domestic, yes.

21  Q.   Did that ever happen before November 8th of 2017?

22  A.   I don't remember the date on that.

23  Q.   Now, you don't recall there being a discussion of

91

1      arresting Corey McGuire that night, correct?

2  A.  I don't.

3  Q.  Okay.  Now, if Stacie McGuire is alleging that

4      night that Corey McGuire punched her in the face,

5      would that result in officers at least having the

6      discussion of whether or not to arrest Corey

7      McGuire?

8  A.  Can you say that again?  I'm sorry.

9  Q.  If Stacie McGuire alleged in her statement that

10      Corey McGuire punched her in the face, would that

11      typically result in officers at least having the

12      conversation of whether to arrest Corey McGuire?

13  A.  Possibly.

14  Q.  But in this case, you're not sure if there was

15      any discussion whether Corey McGuire should be

16      arrested for punching Stacie McGuire in the face?

17  A.  I don't remember any conversations with Stacie.

18  Q.  Now, on page three sub section D, it says that

19      acts for which one party claims self defense as a

20      justification shall be thoroughly investigated

21      and documented by the reporting officer.

22          Do you see that?

23  A.  Yes.

92

1    Q.   Now, Stacie McGuire was claiming that she

2         scratched Corey McGuire in self defense.  How

3         would that be investigated by officers?

4    A.   I guess just comparing the two stories, and then

5         whatever physical evidence would be there.

6    Q.   And it also says that it would be documented by

7         the reporting officers, correct?

8    A.   Yes.

9    Q.   Where would it be documented?

10   A.   I would assume in the domestic incident report.

11   Q.   Okay.  And we can look at it again.  I believe

12        it's Exhibit 9 is the typed version?  Or, Exhibit

13        10 is the typed version.

14            Now, in reviewing that narrative, is there

15        any discussion about Stacie McGuire allegedly

16        scratching Corey McGuire in self defense?

17   A.   Yes.

18   Q.   Okay.  What does it say?

19   A.   Offender stated she scratched at him to get him

20        to stop.

21   Q.   Now, is there any other mention in that narrative

22        of Stacie McGuire's allegations of self defense?

23   A.   No.

93

1   Q.  Based on training that you've received on this

2       policy, would that constitute thoroughly

3       investigating and documenting a self defense as a

4       justification?

5   MR. HRICZKO:  Can you repeat his question?  I'm

6       sorry.

7           (Whereupon, the above-requested question was

8       then read back by the reporter.)

9   THE WITNESS:  Yes.

10  BY MR. DAVENPORT:

11  Q.  So that one line saying that Stacie McGuire

12      scratched Corey McGuire in self defense, that

13      would be, in your opinion, thoroughly

14      investigating and documenting her allegations of

15      self defense?

16  A.  Yes.

17  Q.  Okay.  Now, when documenting allegations of self

18      defense, would it be formality officers to also

19      include in their narrative circumstances leading

20      to that need for self defense?

21  A.  Yeah.

22  Q.  Would it also include allegations of what the

23      individual was doing to that individual who

94

1      needed to use self defense?

2  A.   Yes.

3  Q.   But those aren't included in the narrative,

4       correct?

5  A.   I don't see them, no.

6  Q.   Okay.  And based on everything that we've seen

7       here today, that isn't documented anywhere except

8       for the DIR report that was completed by Stacie

9       McGuire, correct?

10 A.   The --

11 Q.   So the DIR report that was completed by Stacie

12      McGuire or alleged to you by Stacie McGuire,

13      that's the only place where it includes Stacie

14      McGuire's allegations of Corey choking her and

15      punching her in the face, correct?

16 A.   Yes.

17 Q.   That's not documented in any other paperwork that

18      we've seen besides Stacie McGuire's DIR report,

19      correct?

20 A.   Correct.

21 Q.   Okay.  Would that be information that is

22      important when one party is claiming self defense

23      as a justification for their use of force?

1  A.  Yes.

2  Q.  Okay.  To the best of your knowledge, does the

3      domestic violence policy require officers to

4      investigate every allegation of domestic

5      violence?

6  A.  I'm not sure what you mean.

7  Q.  When an individual makes an allegation of

8      domestic violence to a Town of Cheektowaga Police

9      Officer, does your policy require officers to

10     investigate that allegation?

11 A.  Yes.

12 Q.  Okay.  As you sit here today, do you know if

13     Stacie McGuire's allegations of domestic violence

14     were ever investigated by the Town of Cheektowaga

15     Police Department?

16 A.  Which time?  This her second record.

17 Q.  The DIR report that she completed that's Exhibit 9.

18 A.  No, I don't.

19 Q.  Okay.  You don't know if those allegations were

20     ever investigated, correct?

21 A.  I don't know.

22 Q.  Okay.  When completing a DIR report for an

23     alleged victim of domestic violence, do officers

96

1    typically ask a victim whether they want to

2    pursue charges?

3  A.  It depends on what transpired.

4  Q.  Now, I'm showing you Exhibit 9 again.  Do you see

5    in the middle of the first page where someone

6    wrote victim wants to press harassment charges

7    against the suspect?

8  A.  Yes.

9  Q.  Okay.  Is that something that's typically done

10    when officers are completing these DIR reports?

11  A.  So a dispatcher completed this report, so that's

12    a little different than an officer completing

13    that report.

14  Q.  Okay.  Now, do the Town of Cheektowaga Police

15    Officers, do they receive this DIR report after

16    it's completed by a dispatcher?

17  A.  No.  A detective will receive it after it's done

18    by a dispatcher.

19  Q.  Okay.  So a Town of Cheektowaga Detective would

20    receive it?

21  A.  Should.

22  Q.  And would it then be their responsibility to

23    investigate the report?

97

1    A.   Yes.

2    Q.   Investigate the allegations?

3    A.   Yes.

4    Q.   Okay.  Do you know, as you sit here today, what a

5         detective would typically do to investigate

6         allegations contained in the DIR report?

7    A.   I can only speculate.  I don't know.

8    Q.   Okay.  Because you've never worked as a

9         detective?

10   A.   Correct.

11   Q.   Okay.  I'm going to show you what's been marked

12        as Exhibit 14.  Do you recognize that document?

13   A.   Yes.

14   Q.   What is that document?

15   A.   It's a policy on prisoner medications.

16   Q.   Okay.  Have you been trained on this policy?

17   A.   Yes.

18   Q.   Did you receive training on this policy prior to

19        November 8th of 2017?

20   A.   Yes.

21   Q.   Now, this is, as we can see underneath the

22        purpose, it appears that this policy pertains to

23        prisoners who have medication on them when

98

| | |
|---|---|
| 1 | they're taken to the holding center, is that |
| 2 | correct? |
| 3 | A. Not to the holding center, but to our facility, |
| 4 | yes. |
| 5 | Q. To your facility.  To the best of your knowledge, |
| 6 | does the Town of Cheektowaga or the Town of |
| 7 | Cheektowaga Police Department have any sort of |
| 8 | policy or procedure for prisoners who are taken |
| 9 | to your facility who don't have their medications |
| 10 | on them? |
| 11 | A. I'm not aware. |
| 12 | Q. Okay.  In your experience as a Town of |
| 13 | Cheektowaga Police Officer, have you ever had |
| 14 | individuals taken to your facility who have a |
| 15 | need for serotonins or other medications for |
| 16 | mental health illness? |
| 17 | A. I don't remember. |
| 18 | Q. Okay.  Are you familiar with medications for |
| 19 | mental health illness, serotonins, for instance? |
| 20 | A. Not particularly, no. |
| 21 | Q. Are you aware that individuals who take those |
| 22 | types of medications needs to have them |
| 23 | consistently? |

99

1   A.  No.

2   Q.  Okay.  So you never received training on

3       individuals who require serotonins or other

4       medications for mental health?

5   A.  Not with as to what the medication does, no.

6   Q.  Okay.  Have you ever been trained on or has it

7       ever been explained to you by somebody with the

8       Town of Cheektowaga Police Department or Town of

9       Cheektowaga in general that individuals who take

10      serotonins or medications for mental health, they

11      need to have consistent medication?

12  A.  I don't remember.

13  Q.  If an individual who required serotonins or other

14      medications for mental health requested that you

15      or other officers obtain those medications for

16      them, would you be able to obtain that

17      medication?

18  A.  If it was reasonable, yes.

19  Q.  And how would you go about obtaining that

20      medication?

21  A.  Well, if they had it prescribed to them, they

22      just needed us to run to their house to get it,

23      we could do that.

100

1   Q.  Okay.  So if an individual, let's say, was in the

2       back of your police vehicle and told you that

3       they needed their serotonins or mental health

4       medication, you would be able to put in a request

5       that officers go back to their house to obtain

6       that medication?

7   A.  Yes.

8   Q.  And then would that medication be administered to

9       that person while they're being held in the

10      holding center facility?

11   A.  That depends.

12   Q.  What does that depend on?

13   A.  Well, we can't administer medicine, so we have to

14      request an ambulance to come do that and that's

15      up to them.

16   Q.  Okay.  So I guess the sequence of events would

17      work that a person makes a request in your

18      vehicle while they're being transported for

19      medications.  You would then put a request out

20      that an officer go back to their house?

21   A.  As long as it's reasonable, yes.

22   Q.  Would you personally go if you were driving the

23      suspect?

101

1    A.   No.

2    Q.   Okay.  And then after, if those medications are

3         found at the person's house by a police officer

4         with the Town of Cheektowaga, what would the next

5         step be?

6    A.   They can bring those medicines to our facility.

7    Q.   And then would that officer just drop off the

8         medications at the facility?

9    A.   Generally.

10   Q.   And then would the request be made by you or the

11        officers who picked up the medications to have

12        somebody come and administer the medications?

13   A.   It would depend on -- we have matrons and

14        attention officers.  We would actually explain

15        that situation to them and then they would make

16        that determination.

17   Q.   But there is the ability at your facility for

18        either a matron or somebody else to administer

19        those medications if necessary?

20   A.   No.  We can't administer any medication.

21   Q.   Who would be the individual that would administer

22        the medication?

23   A.   So how it goes is we contact AMR, the ambulance

102

1      company.  They come out and they administer the

2      meds.

3  Q.  Okay.  So does the matron make the determination

4      that the medication is appropriate?

5  A.  No.

6  Q.  I guess, so what role does the matron play, then?

7  A.  She's the go between.  If somebody requests the

8      medicine, then she needs to contact the

9      supervisor who will then contact our dispatch to

10     get ahold of AMR to determine whether the

11     medication is to be given or not.

12 Q.  Okay.  Now, as you sit here today, do you know,

13     did Stacie McGuire make any requests for her

14     medication on November 8th of 2017?

15 A.  That I don't know.

16 Q.  Okay.  At any time while you were responding to

17     the scene, did she make any statements about her

18     being on medications?

19 A.  I don't remember.

20 Q.  Did she ever make any statements about her being

21     mentally disabled?

22 A.  I don't remember.

23 Q.  Okay.  As you sit here today, do you know if

103

1      Stacie McGuire is mentally disabled in any way?

2  A.  No, I don't.

3  Q.  Okay.  Do you know, does Corey McGuire have any

4      mental disability in any way?

5  A.  Not that I'm aware of.

6  Q.  In talking with Corey McGuire, he never told you

7      that he's mentally ill or anything like that?

8  A.  Not that I remember.

9  Q.  Do you know when Stacie McGuire was arraigned for

10     these criminal charges?

11  A.  I don't know.

12  Q.  Do you know, was she held overnight at your

13     facility?

14  A.  Yes.

15  Q.  Okay.  Are you familiar with an individual named

16     Jeanette?

17  A.  I believe so.

18  Q.  Is she somebody that works with the Town of

19     Cheektowaga Police Department?

20  A.  Do you know her title, by chance?

21  Q.  I want to say that she's a domestic violence

22     counselor?

23  A.  Okay.  Yes.

104

1   Q.   And she works with the Town of Cheektowaga Police
2        Department or worked with the Town of Cheektowaga
3        Police Department?
4   A.   Yes.
5   Q.   Okay.  Do you know, was she involved at all with
6        this incident?
7   A.   I have no idea.
8   Q.   Okay.  Was there any discussion between you and
9        Jeanette about Stacie or Corey McGuire?
10  A.   No.
11  Q.   Have you ever had any conversations with
12       Jeanette?
13  MR. HRICZKO:  About this case or at all?
14  MR. DAVENPORT:  In general.
15  THE WITNESS:  In general, yes.
16  BY MR. DAVENPORT:
17  Q.   Okay.  And typically when you have those
18       conversations, do they pertain to domestic
19       violence incidents?
20  A.   Yes.
21  Q.   Do you know what her role or responsibility is?
22  A.   I just know she's an advocate for victims of
23       domestic violence.

105

1   Q.  In this specific case, do you know, was Jeanette

2       an advocate for either Corey or Stacie?

3   A.  I don't know.

4   Q.  Now, in your time with the Town of Cheektowaga

5       Police Department, has it ever occurred where you

6       arrested somebody that you believed to be the

7       primary physical aggressor and it's later

8       determined that the other person involved, the

9       alleged victim, was the primary physical

10      aggressor?

11  A.  No, not that I remember.

12  Q.  Okay.  Do you know if that happened in this case?

13  A.  What's that?

14  Q.  Do you know if that happened in this case?

15  A.  No.

16  MR. DAVENPORT:  All right.  No further questions.

17  MR. HRICZKO:  Okay.  That's it.  You're done.

18

19             *    *    *    *    *

20

21

22

23

106

1          I HEREBY CERTIFY that I have read the

2     foregoing 105 pages and that, except as to those

3     changes set forth in the attached errata form(s),

4     they are a true and accurate transcript of the

5     testimony given by me in the above-entitled

6     action on October 21, 2022.

7

8

9

10                    _____

11                         JOSE DOMENECH

12

13

14     Sworn to before me this

15

16     _____ day of _____ 2022.

17

18

19     _____

20          Notary Public.

21

22

23

107

```
1        STATE OF NEW YORK)

2                    SS:

3        COUNTY OF ERIE)

4

5             I, Leslie E. Pinzone, a Notary Public in and

6        for the State of New York, County of Erie, DO

7        HEREBY CERTIFY that the testimony of JOSE

8        DOMENECH was taken down by me in a verbatim

9        manner by means of Machine Shorthand, on October

10       21, 2022.  That the testimony was then reduced

11       into writing under my direction.  That the

12       testimony was taken to be used in the

13       above-entitled action.  That the said deponent,

14       before examination, was duly sworn by me to

15       testify to the truth, the whole truth and nothing

16       but the truth, relative to said action.

17            I further CERTIFY that the above-described

18       transcript constitutes a true and accurate and

19       complete transcript of the testimony.

20

21       _____
                         LESLIE E. PINZONE,
22                       Notary Public.

23
```

Sue Ann Simonin Court Reporting

ERRATA FORM

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

PAGE _____     LINE _____     CORRECTION: _____

_____

REASON: _____

## 1

**1** [3] - 2:5, 30:23, 31:5
**10** [7] - 2:10, 44:18, 44:22, 45:3, 65:12, 65:13, 92:13
**1000** [2] - 1:17, 4:7
**105** [1] - 106:2
**10:05** [1] - 1:19
**11** [12] - 2:11, 58:16, 58:20, 59:2, 61:9, 61:20, 62:5, 62:23, 63:2, 63:15, 65:11, 65:12
**11/8/17** [2] - 2:14, 65:4
**12** [9] - 2:13, 65:1, 65:5, 65:19, 66:6, 66:18, 67:17, 68:20, 71:6
**13** [8] - 2:15, 72:16, 72:20, 73:5, 74:12, 75:18, 83:19, 84:12
**14** [3] - 2:17, 73:1, 97:12
**14202** [2] - 4:4, 4:8
**14227** [1] - 4:20
**1600** [1] - 4:3

## 2

**2000's** [1] - 7:1
**2006** [1] - 7:2
**2017** [37] - 3:5, 7:19, 8:1, 8:18, 9:16, 10:10, 10:14, 10:16, 11:2, 11:8, 22:8, 23:10, 32:6, 34:3, 35:16, 38:15, 39:15, 41:20, 43:1, 43:6, 43:11, 44:1, 56:2, 60:14, 63:7, 66:9, 72:5, 74:7, 75:4, 75:8, 77:13, 77:22, 86:6, 90:13, 90:21, 97:19, 102:14
**2021** [1] - 7:11
**2022** [4] - 1:19, 106:6, 106:16, 107:10
**20th** [1] - 43:6
**21** [3] - 1:19, 106:6, 107:10
**22** [16] - 10:9, 10:11, 10:17, 11:22, 12:2, 12:6, 12:22, 27:5, 28:7, 28:11, 29:14, 32:14, 32:23, 33:22, 75:4, 75:7

## 3

**30** [1] - 2:5
**31** [1] - 1:16
**3223** [1] - 4:20
**33** [1] - 2:6
**3322** [1] - 28:10
**39** [1] - 2:8

## 4

**4** [1] - 3:5
**424** [1] - 4:4
**438** [2] - 1:18, 4:7
**44** [1] - 2:10

## 5

**58** [1] - 2:11

## 6

**63** [1] - 3:5
**65** [1] - 2:13

## 7

**7** [2] - 2:5, 30:23
**72** [2] - 2:15, 2:17

## 8

**8** [4] - 2:6, 33:5, 33:10, 86:6
**8th** [32] - 3:5, 7:19, 8:1, 8:18, 9:16, 10:10, 10:14, 10:16, 11:2, 11:8, 22:8, 23:10, 32:6, 35:16, 38:15, 39:15, 41:20, 44:1, 56:2, 60:14, 63:7, 66:8, 72:4, 74:7, 75:4, 75:8, 77:13, 77:22, 90:13, 90:21, 97:19, 102:14

## 9

**9** [11] - 2:8, 40:1, 40:5, 40:20, 42:8, 42:22, 43:5, 43:6, 92:12, 95:17, 96:4
**911** [12] - 8:13, 33:16, 33:19, 33:21, 34:11, 34:18, 35:17, 36:1, 37:1, 37:18, 37:23, 66:1
**9th** [5] - 34:3, 41:19, 42:6, 42:7, 86:5

## A

**A.M** [1] - 1:19
**ability** [1] - 101:17
**able** [12] - 14:11, 16:14, 34:5, 34:8, 58:10, 59:8, 60:3, 68:20, 69:11, 71:2, 99:16, 100:4
**above-described** [1] - 107:17
**above-entitled** [2] - 106:5, 107:13
**above-requested** [1] - 93:7
**according** [3] - 48:3, 48:14, 67:17
**account** [5] - 48:8, 48:12, 48:20, 49:22, 50:5
**accounts** [1] - 55:4
**accuracy** [2] - 54:4, 54:21
**accurate** [4] - 48:20, 50:6, 106:4, 107:18
**accurately** [1] - 54:2
**accuser** [4] - 40:12, 40:15, 41:4, 41:8
**acted** [1] - 87:19
**action** [3] - 106:6, 107:13, 107:16
**acts** [1] - 91:19
**actual** [1] - 70:17
**addition** [1] - 50:1
**address** [5] - 8:14, 8:23, 31:20, 32:5, 35:11
**administer** [6] - 100:13, 101:12, 101:18, 101:20, 101:21, 102:1
**administered** [1] - 100:8
**adults** [2] - 77:7, 77:11
**advised** [2] - 37:12, 37:13
**advocate** [2] - 104:22, 105:2
**affidavit** [5] - 22:15, 22:23, 23:14, 23:18, 41:17
**affidavits** [3] - 30:5, 79:7, 79:14
**afraid** [1] - 34:21
**aggressive** [1] - 88:7
**aggressor** [33] - 21:15, 36:19, 38:7, 39:3, 81:21, 82:3, 82:8, 82:15, 82:20, 83:1, 83:6, 83:10, 83:11, 83:16, 83:20, 83:23, 84:3, 84:11, 84:15, 85:4, 85:7,

85:12, 85:15, 86:3, 86:8, 87:6, 88:2, 88:21, 89:3, 90:8, 90:17, 105:7, 105:10
**agree** [2] - 24:19, 84:7
**agreement** [1] - 27:2
**ahold** [1] - 102:10
**allegation** [3] - 95:4, 95:7, 95:10
**allegations** [9] - 92:22, 93:14, 93:17, 93:22, 94:14, 95:13, 95:19, 97:2, 97:6
**alleged** [14] - 21:11, 59:8, 59:11, 59:13, 64:4, 76:18, 80:13, 80:16, 89:9, 90:17, 91:9, 94:12, 95:23, 105:9
**allegedly** [3] - 57:14, 58:7, 92:15
**alleges** [2] - 42:23, 43:10
**alleging** [2] - 89:13, 91:3
**altercation** [1] - 17:19
**alternate** [1] - 23:5
**ambulance** [17] - 68:3, 68:4, 68:5, 68:9, 68:13, 68:16, 68:21, 69:12, 70:2, 70:12, 71:3, 71:9, 78:1, 78:6, 78:10, 100:14, 101:23
**AMR** [6] - 67:22, 69:15, 70:10, 70:14, 101:23, 102:10
**announce** [1] - 13:20
**answer** [4] - 36:5, 36:6, 38:9, 39:12
**appear** [5] - 33:20, 34:13, 47:21, 48:15, 66:7
**APPEARANCES** [1] - 4:1
**appeared** [1] - 20:12
**Appearing** [1] - 4:5
**appearing** [1] - 4:8
**appropriate** [3] - 77:17, 79:8, 102:4
**argument** [1] - 17:18
**arraigned** [1] - 103:9
**arrest** [14] - 9:2, 21:17, 22:20, 24:11, 26:22, 27:2, 35:12, 37:15, 82:1, 82:8, 90:8, 91:6, 91:12
**arrested** [8] - 23:20, 27:6, 29:8, 82:3,

90:16, 90:19, 91:16, 105:6
**arresting** [8] - 27:4, 28:1, 28:5, 35:15, 51:10, 90:9, 90:12, 91:1
**arrive** [1] - 21:8
**arrived** [1] - 12:6
**Article** [1] - 1:16
**ascertain** [1] - 85:21
**assault** [5] - 57:5, 57:18, 57:19, 57:22, 58:6
**assist** [1] - 27:1
**assisted** [1] - 27:3
**assume** [3] - 31:10, 70:1, 92:10
**assuming** [2] - 13:7, 31:8
**attached** [1] - 106:3
**attempted** [1] - 62:7
**attention** [1] - 101:14
**attorney** [1] - 1:16
**available** [2] - 86:15
**aware** [3] - 98:11, 98:21, 103:5

## B

**BAASE** [1] - 4:2
**Baase** [1] - 5:5
**background** [1] - 35:2
**bad** [2] - 6:3, 19:23
**badge** [6] - 53:14, 60:6, 60:8, 69:5, 69:6, 69:9
**based** [8] - 42:18, 57:7, 58:6, 62:1, 63:15, 76:1, 93:1, 94:6
**bathroom** [1] - 6:12
**became** [2] - 26:19, 48:16
**become** [1] - 26:9
**belong** [1] - 70:8
**belongs** [1] - 70:4
**best** [4] - 23:9, 60:15, 95:2, 98:5
**between** [9] - 4:12, 12:18, 26:20, 52:6, 63:16, 63:17, 81:8, 102:7, 104:8
**beyond** [1] - 51:14
**bit** [1] - 5:4
**bleeding** [2] - 20:1, 20:3
**body** [1] - 18:5
**booking** [1] - 28:22
**bottom** [3] - 37:11,

40:19, 83:19
**box** [1] - 55:13
**break** [2] - 6:9, 63:9
**BRIAN** [1] - 1:7
**bring** [2] - 46:3,
101:6
**broken** [6] - 17:20,
25:4, 25:9, 25:14,
49:14, 80:14
**brought** [1] - 57:13
**Buffalo** [3] - 1:18,
4:4, 4:8
**Building** [3] - 1:18,
4:3, 4:7
**bullet** [2] - 87:18,
89:1
**button** [3] - 32:3,
32:9, 32:12
**BY** [22] - 5:1, 31:3,
31:13, 33:8, 36:10,
36:18, 37:10, 38:13,
40:3, 43:8, 43:21,
45:1, 47:7, 58:23,
62:19, 63:13, 65:9,
65:17, 70:23, 73:3,
93:10, 104:16

**C**

**CAD** [1] - 8:12
**calm** [1] - 16:20
**cannot** [1] - 55:1
**capacity** [5] - 1:7,
1:8, 1:9, 1:10, 1:11
**car** [5] - 27:18,
27:19, 27:20, 28:5,
32:3
**card** [7] - 8:12,
65:23, 66:3, 66:7,
66:11, 70:17
**case** [11] - 22:4,
57:2, 61:9, 76:18,
85:4, 88:3, 91:14,
104:13, 105:1,
105:12, 105:14
**caused** [1] - 47:23
**cell** [5] - 28:14,
28:16, 28:22, 28:23,
29:2
**center** [3] - 98:1,
98:3, 100:10
**certain** [1] - 34:6
**certification** [1] -
4:14
**CERTIFY** [3] - 106:1,
107:7, 107:17
**CHAD** [1] - 4:2
**Chad** [1] - 5:3
**chance** [1] - 103:20
**changes** [1] - 106:3

**charge** [3] - 57:17,
57:19, 58:6
**charged** [3] - 56:23,
57:2, 57:4
**charges** [10] - 51:11,
51:21, 52:9, 52:15,
52:19, 52:22, 57:13,
96:2, 96:6, 103:10
**check** [2] - 54:1, 77:6
**checked** [2] - 54:18,
57:23
**checking** [1] - 54:4
**CHEEKTOWAGA** [1]
- 1:6
**Cheektowaga** [43] -
1:7, 1:8, 1:9, 1:10,
1:11, 2:6, 2:10, 2:13,
2:15, 2:18, 4:20, 6:18,
6:21, 7:4, 7:16, 15:18,
25:21, 26:3, 28:9,
28:12, 30:14, 33:3,
36:13, 44:20, 46:12,
50:20, 65:3, 72:18,
72:21, 95:8, 95:14,
96:14, 96:19, 98:6,
98:7, 98:13, 99:8,
99:9, 101:4, 103:19,
104:1, 104:2, 105:4
**Cheektowaga's** [1] -
21:5
**CHELUS** [2] - 1:17,
4:6
**children** [2] - 77:6,
77:11
**Chludzinski** [7] -
53:20, 55:2, 55:3,
55:7, 55:12, 56:1
**CHLUDZINSKI** [1] -
1:10
**choke** [1] - 62:7
**choked** [1] - 39:18
**choking** [5] - 39:19,
43:13, 43:15, 43:22,
94:14
**Christa** [16] - 10:9,
10:12, 10:17, 11:22,
12:2, 12:6, 12:23,
27:6, 28:8, 28:11,
29:14, 32:14, 32:23,
33:22, 75:4, 75:7
**circumstance** [2] -
64:17, 90:15
**circumstances** [2] -
83:8, 93:19
**Civil** [1] - 1:16
**claim** [1] - 88:5
**claiming** [3] - 39:3,
92:1, 94:22
**claims** [1] - 91:19
**close** [2] - 78:8, 78:9

**collect** [1] - 50:16
**collected** [1] - 51:7
**collecting** [6] -
21:18, 21:19, 21:21,
22:14, 50:23, 79:6
**column** [1] - 69:1
**commencing** [1] -
1:19
**communications** [1]
- 11:1
**company** [1] - 102:1
**comparative** [1] -
89:5
**compare** [2] - 89:12,
89:20
**compared** [2] - 19:1,
90:3
**comparing** [4] -
19:4, 21:3, 24:2, 92:4
**complain** [2] - 29:7,
29:10
**complainant** [4] -
67:11, 67:12, 67:14,
67:16
**complaint** [11] -
33:16, 35:17, 38:10,
65:23, 66:3, 66:7,
66:11, 75:1, 75:6,
86:21, 87:15
**Complaint** [4] - 2:7,
2:13, 33:4, 65:4
**complaints** [5] -
39:14, 39:15, 87:1,
87:3, 87:5
**complete** [4] - 23:11,
45:19, 45:22, 107:19
**completed** [21] - 3:5,
40:17, 44:8, 45:14,
46:18, 59:23, 60:4,
60:10, 60:13, 60:17,
60:22, 61:6, 61:10,
61:21, 63:6, 63:22,
94:8, 94:11, 95:17,
96:11, 96:16
**completeness** [2] -
54:5, 54:21
**completes** [1] - 42:8
**completing** [10] -
29:14, 41:8, 56:4,
61:7, 63:22, 64:2,
64:19, 95:22, 96:10,
96:12
**computer** [1] - 70:17
**computerized** [1] -
45:7
**concern** [2] - 36:2,
36:13
**concerning** [1] -
36:23
**conduct** [1] - 78:20

**conducted** [2] -
78:23, 79:3
**confer** [2] - 56:5,
56:11
**confirm** [1] - 26:15
**consider** [3] - 84:12,
84:15, 88:20
**consideration** [3] -
36:20, 49:20, 85:18
**considered** [2] -
87:23, 89:2
**consist** [1] - 29:18
**consistent** [4] -
48:21, 50:6, 56:8,
99:11
**consistently** [1] -
98:23
**constitute** [1] - 93:2
**constitutes** [1] -
107:18
**contact** [4] - 37:23,
101:23, 102:8, 102:9
**contained** [1] - 97:6
**control** [8] - 34:22,
36:4, 36:15, 38:5,
38:12, 75:20, 76:14,
76:23
**conversation** [13] -
16:14, 18:19, 20:13,
20:23, 21:1, 26:7,
26:10, 26:20, 55:20,
88:8, 88:9, 88:13,
91:12
**conversations** [9] -
11:7, 12:18, 26:1,
29:4, 55:16, 56:1,
91:17, 104:11, 104:18
**convict** [2] - 51:13,
51:23
**conviction** [1] -
52:23
**convictions** [1] -
52:20
**COREY** [1] - 1:11
**Corey** [99] - 3:5, 8:4,
8:19, 15:23, 16:7,
16:17, 16:20, 16:21,
16:23, 17:4, 17:6,
17:12, 17:14, 17:23,
18:14, 18:17, 18:21,
19:6, 19:8, 19:14,
19:18, 20:4, 20:15,
21:2, 22:9, 22:12,
22:23, 24:3, 24:8,
24:16, 24:19, 24:23,
26:17, 31:9, 31:14,
37:14, 41:18, 42:23,
43:10, 43:13, 45:11,
47:13, 47:17, 47:22,
48:3, 48:8, 49:13,

49:15, 50:2, 52:2,
52:6, 56:18, 57:8,
57:10, 57:15, 57:20,
58:7, 58:11, 59:12,
61:15, 62:2, 62:6,
62:10, 63:1, 63:6,
63:18, 67:15, 67:16,
71:12, 72:6, 76:2,
76:6, 76:18, 77:12,
77:21, 78:3, 78:23,
79:3, 80:13, 88:3,
88:6, 89:9, 89:21,
90:4, 90:12, 91:1,
91:4, 91:6, 91:10,
91:12, 91:15, 92:2,
92:16, 93:12, 94:14,
103:3, 103:6, 104:9,
105:2
**Corey's** [5] - 25:8,
25:13, 48:20, 50:5,
61:13
**corner** [2] - 78:11,
78:14
**correct** [85] - 6:18,
7:21, 14:16, 21:9,
24:17, 37:17, 37:20,
38:15, 38:19, 38:22,
39:16, 39:17, 41:20,
49:9, 51:2, 51:11,
51:16, 52:6, 52:13,
53:7, 53:10, 54:2,
54:14, 54:18, 55:12,
56:15, 56:19, 56:23,
57:10, 58:1, 58:4,
58:8, 61:17, 61:22,
62:2, 62:8, 62:9,
62:13, 62:21, 63:2,
63:20, 63:23, 64:12,
67:19, 71:4, 71:5,
72:8, 74:10, 75:12,
75:16, 76:3, 76:19,
78:4, 78:5, 79:1, 79:4,
79:5, 80:7, 80:10,
80:17, 80:20, 81:1,
82:9, 82:12, 84:6,
84:17, 85:7, 85:12,
86:17, 87:7, 88:10,
88:17, 89:3, 89:7,
91:1, 92:7, 94:4, 94:9,
94:15, 94:19, 94:20,
95:20, 97:10, 98:2
**correspond** [1] -
69:22
**counsel** [1] - 4:12
**counselor** [1] -
103:22
**COUNTY** [1] - 107:3
**County** [1] - 107:6
**couple** [2] - 5:12,
30:19

Jose Domenech

3

**COURT** [1] - 1:3
**court** [4] - 5:14,
50:17, 50:21, 51:14
**Court** [2] - 1:18, 4:7
**credibility** [1] - 49:22
**credible** [11] - 24:4,
24:6, 24:8, 24:17,
24:20, 25:1, 25:6,
49:13, 49:16, 49:21,
55:5
**criminal** [6] - 51:11,
52:22, 53:3, 57:5,
57:17, 103:10
**criminally** [1] - 56:23
**CUNNINGHAM** [1] -
4:2
**Cunningham** [1] -
5:5
**cut** [1] - 5:18

## D

**damage** [5] - 79:9,
80:4, 80:10, 80:12,
85:17
**damaged** [1] - 22:6
**damages** [1] - 22:9
**data** [1] - 71:1
**date** [7] - 34:1, 42:2,
42:4, 42:5, 43:5,
90:22
**dated** [2] - 2:14, 65:4
**DAVENPORT** [37] -
4:2, 5:1, 30:19, 31:3,
31:13, 33:1, 33:8,
36:10, 36:18, 37:10,
38:13, 39:20, 40:3,
43:7, 43:8, 43:21,
44:17, 45:1, 47:7,
58:15, 58:22, 58:23,
62:19, 63:11, 63:13,
64:23, 65:8, 65:9,
65:17, 70:21, 70:23,
72:15, 73:3, 93:10,
104:14, 104:16,
105:16
**Davenport** [2] - 5:3,
31:11
**days** [1] - 23:5
**dealing** [1] - 38:3
**December** [1] - 43:6
**decide** [3] - 26:16,
38:6, 59:20
**decided** [4] - 68:21,
70:12, 71:3, 71:8
**decision** [3] - 24:10,
24:15, 26:22
**Defendant** [10] -
1:15, 56:15, 56:19,
56:22, 57:2, 57:9,

59:13, 79:15, 79:18,
79:21
**Defendants** [2] -
1:12, 4:8
**defender** [1] - 57:4
**defending** [3] - 88:3,
88:6, 88:16
**defense** [11] - 91:19,
92:2, 92:16, 92:22,
93:3, 93:12, 93:15,
93:18, 93:20, 94:1,
94:22
**defensively** [1] -
87:19
**definition** [1] - 83:22
**degree** [1] - 57:6
**demeanor** [1] - 16:17
**denied** [1] - 48:5
**DENNIS** [1] - 1:9
**deny** [1] - 48:4
**Department** [19] -
2:6, 2:13, 2:16, 2:18,
6:18, 6:21, 30:14,
33:4, 46:12, 65:3,
72:19, 72:22, 95:15,
98:7, 99:8, 103:19,
104:2, 104:3, 105:5
**deponent** [1] -
107:13
**deposition** [8] - 5:8,
8:6, 8:8, 22:15, 23:15,
29:23, 30:3
**depositions** [1] -
30:5
**describe** [5] - 8:21,
42:22, 43:9, 43:13,
67:1
**described** [2] -
43:23, 107:17
**describes** [1] - 41:18
**describing** [1] -
19:22
**Description** [1] - 3:4
**detective** [3] - 96:17,
97:5, 97:9
**Detective** [1] - 96:19
**determination** [3] -
49:2, 101:16, 102:3
**determine** [15] -
21:16, 49:15, 59:8,
60:3, 71:2, 82:15,
82:19, 84:10, 84:14,
85:14, 86:2, 86:7,
87:4, 87:5, 102:10
**determined** [5] -
48:20, 85:6, 85:9,
85:11, 105:8
**determining** [4] -
85:3, 88:1, 88:20,
89:2

**different** [4] - 11:16,
16:2, 39:10, 96:12
**DIR** [25] - 3:5, 44:8,
44:10, 44:14, 45:14,
46:15, 53:6, 53:16,
53:19, 53:21, 53:23,
54:6, 54:13, 56:11,
59:23, 62:20, 63:6,
94:8, 94:11, 94:18,
95:17, 95:22, 96:10,
96:15, 97:6
**direction** [1] - 107:11
**disability** [1] - 103:4
**disabled** [2] -
102:21, 103:1
**discussed** [2] - 19:1,
47:9
**discussing** [2] -
21:1, 66:8
**discussion** [10] -
19:3, 35:21, 55:7,
65:11, 90:12, 90:23,
91:6, 91:15, 92:15,
104:8
**dispatch** [8] - 9:20,
10:3, 10:22, 11:2,
11:8, 32:2, 32:8,
102:9
**dispatcher** [9] -
40:18, 68:19, 69:5,
70:1, 74:21, 74:23,
96:11, 96:16, 96:18
**Dispatcher** [2] -
70:9, 70:10
**dispatchers** [2] -
75:13, 75:14
**dispute** [2] - 10:6,
10:7
**DISTRICT** [2] - 1:3,
1:3
**disturbance** [4] -
9:1, 11:11, 11:18,
17:22
**disturbances** [1] -
10:11
**DO** [1] - 107:6
**DOCUMENT** [1] - 3:1
**document** [15] -
33:10, 33:11, 33:15,
33:20, 40:6, 45:4,
45:12, 56:20, 59:3,
65:20, 65:22, 67:17,
73:7, 97:12, 97:14
**documented** [5] -
91:21, 92:6, 92:9,
94:7, 94:17
**documenting** [3] -
93:3, 93:14, 93:17
**documents** [5] - 8:7,
8:10, 8:15, 63:21,

72:16
**DOE(s** [1] - 1:11
**Domenech** [1] -
53:14
**DOMENECH** [5] -
1:2, 1:8, 1:15, 106:11,
107:8
**Domestic** [4] - 2:8,
2:11, 39:23, 58:18
**domestic** [65] - 8:11,
9:1, 10:6, 10:7, 10:11,
11:11, 11:18, 15:13,
15:19, 21:6, 21:11,
22:1, 29:16, 29:17,
29:20, 30:4, 30:6,
30:11, 31:17, 32:14,
35:9, 35:12, 36:11,
38:7, 38:22, 39:2,
40:9, 40:10, 40:14,
41:2, 41:4, 41:8, 42:3,
44:11, 45:7, 52:16,
59:6, 59:7, 60:1, 68:9,
68:13, 72:13, 73:10,
73:18, 73:21, 74:1,
74:7, 74:15, 74:19,
75:11, 81:7, 82:2,
85:20, 86:20, 90:20,
92:10, 95:3, 95:4,
95:8, 95:13, 95:23,
103:21, 104:18,
104:23
**done** [17] - 22:8,
22:16, 22:18, 22:19,
22:21, 41:12, 46:20,
48:10, 54:2, 75:3,
76:2, 80:7, 81:15,
87:14, 96:9, 96:17,
105:17
**door** [4] - 13:8,
13:11, 13:15, 13:17
**doubt** [1] - 51:15
**down** [4] - 64:6,
78:12, 78:14, 107:8
**driving** [3] - 12:10,
12:11, 100:22
**drop** [1] - 101:7
**due** [1] - 71:11
**duly** [2] - 4:21,
107:14
**during** [4] - 18:19,
20:23, 84:9, 84:13
**duty** [1] - 81:4
**DV** [2] - 86:21, 87:14

## E

**effort** [2] - 31:18,
79:21
**efforts** [2] - 37:23,
50:16
**eight** [3] - 83:18,

84:19, 89:1
**either** [27] - 13:22,
14:6, 16:22, 17:2,
18:20, 20:10, 20:14,
20:17, 22:12, 22:14,
26:16, 32:2, 32:18,
50:23, 55:16, 61:16,
62:10, 62:11, 63:1,
71:12, 72:6, 77:21,
78:3, 80:19, 81:15,
101:18, 105:2
**eleven** [1] - 52:12
**encountered** [1] -
16:18
**ended** [4] - 9:2, 25:8,
37:7, 37:12
**enforcement** [6] -
13:1, 14:19, 14:23,
15:2, 15:4, 26:2
**ensured** [1] - 16:1
**enter** [1] - 13:12
**entered** [1] - 4:10
**entering** [2] - 13:18,
13:21
**entitled** [2] - 106:5,
107:13
**entry** [1] - 34:23
**ERIE** [1] - 107:3
**Erie** [1] - 107:6
**errata** [1] - 106:3
**escalates** [2] - 83:12
**ESQ** [3] - 4:2, 4:3,
4:6
**evaluating** [1] -
36:19
**events** [2] - 25:8,
100:16
**eventually** [4] - 15:2,
18:3, 26:8, 46:5
**evidence** [16] -
21:18, 21:20, 21:22,
21:23, 48:21, 50:7,
50:8, 50:11, 50:21,
50:23, 51:8, 51:18,
51:22, 52:3, 79:6,
92:5
**exact** [1] - 7:2
**exactly** [3] - 13:9,
13:10, 20:21
**Examination** [1] -
1:14
**examination** [1] -
107:14
**EXAMINATION** [1] -
5:1
**except** [3] - 4:16,
94:7, 106:2
**exceptions** [1] -
64:14
**Exhibit** [48] - 31:5,

33:5, 33:10, 40:1,
40:5, 40:20, 42:8,
42:22, 43:5, 43:6,
44:18, 44:21, 45:3,
58:16, 58:19, 59:2,
61:9, 61:20, 62:4,
62:23, 63:2, 63:15,
65:1, 65:5, 65:11,
65:12, 65:13, 65:19,
66:6, 66:18, 67:17,
68:20, 71:6, 72:16,
72:20, 73:1, 73:5,
74:12, 75:18, 83:19,
84:12, 86:6, 92:12,
95:17, 96:4, 97:12
  **exhibit** [1] - 73:4
  **EXHIBITS** [1] - 2:1
  **exhibits** [1] - 30:20
  **Exhibits** [2] - 2:4,
30:23
  **expect** [1] - 74:18
  **expectation** [1] -
79:13
  **experience** [2] -
64:21, 98:12
  **explain** [3] - 25:7,
25:11, 101:14
  **explained** [1] - 99:7
  **eye** [23] - 20:1,
20:15, 29:11, 47:1,
47:10, 47:15, 47:19,
47:23, 48:7, 48:16,
49:21, 49:23, 62:13,
63:19, 71:15, 81:1,
81:5, 81:10, 89:16,
89:17, 89:20, 90:3,
90:5
  **eyeglasses** [1] - 25:4

**F**

  **face** [18] - 17:19,
19:21, 25:2, 25:8,
25:13, 49:14, 49:17,
50:3, 58:2, 62:7,
62:15, 80:16, 89:10,
90:4, 91:4, 91:10,
91:16, 94:15
  **facility** [9] - 98:3,
98:5, 98:9, 98:14,
100:10, 101:6, 101:8,
101:17, 103:13
  **factor** [5] - 85:19,
88:19, 89:1, 89:15,
89:16
  **factors** [9] - 24:22,
25:5, 82:19, 82:22,
84:19, 84:22, 85:1,
85:2, 85:14
  **fair** [1] - 41:6
  **fairly** [1] - 16:20

  **falsely** [1] - 29:8
  **familiar** [4] - 7:23,
74:9, 98:18, 103:15
  **far** [2] - 21:7, 26:14
  **fearful** [1] - 86:11
  **female** [5] - 9:3,
28:23, 29:1, 35:3,
70:19
  **fifth** [2] - 53:15,
53:18
  **fighting** [1] - 76:7
  **filed** [1] - 52:15
  **filing** [2] - 4:14,
42:17
  **fill** [2] - 60:23, 61:4
  **filled** [1] - 60:19
  **fine** [1] - 6:13
  **finish** [1] - 5:17
  **firm** [1] - 5:5
  **first** [32] - 5:7, 5:13,
12:1, 12:6, 13:3,
13:23, 14:2, 14:3,
14:10, 14:14, 16:18,
17:5, 17:7, 21:8,
21:12, 34:16, 34:23,
38:19, 41:23, 42:2,
42:8, 42:21, 59:20,
74:12, 74:14, 83:2,
83:5, 84:4, 88:23,
89:1, 89:16, 96:5
  **fit** [1] - 68:19
  **five** [2] - 60:9, 80:2
  **follow** [4] - 21:10,
55:16, 55:19, 55:23
  **follow-up** [3] - 55:16,
55:19, 55:23
  **following** [2] - 4:10,
84:16
  **follows** [1] - 4:22
  **force** [3] - 52:12,
84:5, 94:23
  **foregoing** [1] - 106:2
  **form** [18] - 4:16,
23:18, 29:22, 30:9,
33:11, 33:12, 33:16,
35:17, 36:5, 36:16,
37:3, 38:8, 43:20,
45:16, 45:20, 46:3,
47:5, 64:8
  **form(s** [1] - 106:3
  **formality** [1] - 93:18
  **forth** [1] - 106:3
  **four** [7] - 53:9, 53:14,
77:15, 84:19, 84:22,
85:1, 85:2
  **front** [4] - 12:14,
13:8, 63:18, 73:4
  **Full** [1] - 3:5
  **full** [1] - 63:8

**G**

  **gaining** [1] - 75:20
  **gathered** [1] - 31:23
  **general** [5] - 64:14,
73:18, 99:9, 104:14,
104:15
  **generally** [17] - 8:21,
17:16, 20:22, 21:4,
21:8, 33:15, 40:6,
41:18, 42:22, 43:10,
45:3, 59:2, 65:19,
66:5, 73:7, 74:9,
101:9
  **generated** [2] -
33:17, 66:1
  **gist** [1] - 9:3
  **given** [5] - 5:8,
40:22, 57:8, 102:11,
106:5
  **glasses** [6] - 17:20,
22:10, 25:9, 25:13,
49:14, 80:13
  **ground** [1] - 5:12
  **group** [3] - 24:14,
85:8, 85:10
  **guess** [20] - 13:15,
15:23, 16:3, 23:19,
28:3, 33:11, 35:14,
36:22, 42:21, 49:11,
49:19, 50:1, 50:8,
52:4, 59:19, 78:9,
87:16, 92:4, 100:16,
102:6
  **guilty** [1] - 51:15
  **guys** [4] - 14:11,
16:5, 23:5, 89:2

**H**

  **hand** [1] - 55:11
  **handcuffed** [1] -
27:11
  **handcuffs** [2] - 27:8,
27:16
  **handled** [1] - 37:5
  **Handling** [2] - 2:19,
72:22
  **handwritten** [4] -
45:16, 45:19, 46:2,
65:13
  **happy** [2] - 6:6, 6:10
  **harassment** [1] -
96:6
  **hard** [5] - 36:22,
37:4, 38:12, 39:10,
39:12
  **head** [4] - 5:22,
82:18, 82:21
  **health** [6] - 98:16,
98:19, 99:4, 99:10,

99:14, 100:3
  **hear** [2] - 16:14,
43:16
  **heard** [1] - 35:1
  **held** [3] - 7:15,
100:9, 103:12
  **help** [1] - 51:23
  **HERDZIK** [2] - 1:17,
4:6
  **hereby** [1] - 4:12
  **HEREBY** [2] - 106:1,
107:7
  **herself** [3] - 87:20,
88:6, 88:17
  **hiding** [1] - 37:1
  **himself** [3] - 26:17,
87:19, 88:4
  **his/her** [1] - 1:11
  **history** [4] - 32:4,
75:1, 75:6, 85:19
  **hit** [11] - 17:19,
17:23, 18:3, 18:5,
18:9, 18:12, 32:3,
57:11, 57:21, 58:4,
58:12
  **hitting** [2] - 57:15,
58:7
  **holding** [9] - 6:10,
28:14, 28:16, 28:22,
28:23, 29:2, 98:1,
98:3, 100:10
  **hostage** [1] - 6:11
  **house** [12] - 12:14,
13:8, 13:9, 13:10,
13:12, 13:21, 14:1,
14:18, 14:20, 14:23,
16:2, 27:12, 27:13,
99:22, 100:5, 100:20,
101:3
  **household** [1] - 77:7
  **HRICZKO** [18] - 4:6,
31:10, 36:5, 36:8,
36:16, 37:3, 38:8,
43:4, 43:20, 47:5,
62:17, 63:9, 65:16,
70:18, 70:22, 93:5,
104:13, 105:17
  **hum** [1] - 84:1
  **hung** [1] - 35:7
  **husband** [8] - 32:21,
34:21, 36:3, 37:2,
38:18, 39:2, 39:16,
86:11
  **husband's** [3] -
36:14, 38:5, 39:14

**I**

  **idea** [1] - 104:7
  **ideal** [1] - 15:22

  **Identification** [1] -
2:4
  **identification** [7] -
31:1, 33:6, 40:1,
44:22, 58:20, 65:6,
73:1
  **identified** [4] - 46:7,
63:1, 66:18, 67:12
  **identify** [5] - 62:16,
64:11, 66:3, 68:20,
69:12
  **ill** [1] - 103:7
  **illness** [2] - 98:16,
98:19
  **imagine** [1] - 52:21
  **immediately** [3] -
12:16, 13:8, 13:11
  **important** [1] - 94:22
  **incident** [59] - 3:6,
7:19, 7:23, 8:3, 8:11,
8:18, 12:20, 15:14,
15:19, 21:6, 22:2,
29:16, 29:17, 30:4,
31:18, 32:14, 35:10,
35:13, 36:11, 38:7,
38:22, 39:2, 40:9,
40:10, 40:14, 41:2,
41:4, 41:8, 42:3, 44:2,
44:11, 45:8, 45:23,
50:12, 52:11, 52:16,
53:7, 54:7, 55:8,
55:17, 56:2, 56:9,
56:14, 59:6, 59:7,
60:1, 63:7, 66:4, 66:8,
66:17, 68:9, 68:13,
72:13, 76:5, 81:7,
86:20, 87:6, 92:10,
104:6
  **Incident** [4] - 2:8,
2:12, 39:23, 58:18
  **incidents** [5] - 73:18,
74:15, 75:11, 90:19,
104:19
  **include** [5] - 45:10,
64:19, 86:22, 93:19,
93:22
  **included** [1] - 94:3
  **includes** [1] - 94:13
  **including** [2] - 77:6,
79:6
  **INDEX** [2] - 2:1, 3:1
  **indicate** [3] - 27:1,
54:17, 61:16
  **indicates** [1] - 72:5
  **indications** [1] -
80:22
  **individual** [20] -
31:6, 34:10, 36:23,
40:11, 41:7, 42:13,
46:6, 46:8, 52:15,

Jose Domenech

5

56:21, 56:22, 70:11,
71:2, 93:23, 95:7,
99:13, 100:1, 101:21,
103:15
  **Individually** [5] - 1:7,
1:8, 1:9, 1:10, 1:11
  **individuals** [6] -
67:6, 67:10, 98:14,
98:21, 99:3, 99:9
  **inflicted** [1] - 89:6
  **information** [25] -
8:13, 29:19, 30:2,
31:23, 32:8, 32:10,
32:17, 34:5, 34:7,
35:11, 42:13, 42:15,
44:4, 44:7, 45:10,
61:1, 62:1, 72:9,
75:15, 75:16, 85:22,
86:1, 86:4, 87:9,
94:21
  **Information** [4] - 2:7,
2:14, 33:4, 65:4
  **initial** [2] - 11:21,
83:15
  **initiated** [1] - 34:14
  **initiating** [1] - 51:21
  **injuries** [30] - 19:18,
19:20, 20:5, 20:6,
20:8, 20:9, 22:6, 25:2,
48:21, 49:9, 49:11,
50:2, 50:6, 57:22,
57:23, 64:3, 64:6,
64:11, 64:20, 71:11,
79:8, 80:3, 80:10,
80:16, 80:20, 82:21,
85:16, 89:6, 89:12,
89:21
  **injury** [3] - 49:22,
71:15, 87:20
  **input** [2] - 71:1,
87:11
  **inputting** [1] - 70:16
  **inside** [1] - 27:14
  **instance** [2] - 22:10,
98:19
  **intention** [1] - 51:10
  **interview** [1] - 79:3
  **interviewed** [1] - 9:1
  **interviews** [2] -
78:20, 78:23
  **investigate** [5] -
95:4, 95:10, 96:23,
97:2, 97:5
  **investigated** [4] -
91:20, 92:3, 95:14,
95:20
  **investigating** [7] -
15:19, 21:6, 21:11,
22:1, 87:14, 93:3,
93:14

  **investigation** [4] -
14:15, 39:9, 84:10,
84:13
  **involved** [8] - 17:21,
26:1, 53:7, 72:2, 82:1,
86:21, 104:5, 105:8
  **involving** [3] - 8:3,
8:18, 29:20
  **issues** [1] - 79:19

## J

  **January** [1] - 7:2
  **Jeanette** [4] -
103:16, 104:9,
104:12, 105:1
  **JOHN** [1] - 1:11
  **join** [1] - 16:11
  **JOSE** [5] - 1:2, 1:8,
1:15, 106:11, 107:7
  **July** [2] - 34:3, 86:5
  **justification** [3] -
91:20, 93:4, 94:23

## K

  **kept** [1] - 28:19
  **key** [1] - 82:22
  **KIM** [1] - 4:3
  **kind** [6] - 19:1, 19:2,
21:3, 21:13, 23:6,
84:2
  **kitchen** [7] - 16:9,
16:10, 16:15, 19:5,
19:6, 19:11, 20:19
  **knock** [1] - 13:17
  **knowing** [1] - 39:1
  **knowledge** [6] -
60:15, 80:8, 80:21,
81:16, 95:2, 98:5
  **known** [2] - 48:6,
88:19
  **Kusak** [3] - 15:6,
15:12, 66:15
  **KUSAK** [1] - 1:9
  **Kusak's** [2] - 27:19,
27:20

## L

  **last** [6] - 6:8, 41:13,
41:15, 43:20, 55:1,
87:18
  **Law** [1] - 1:16
  **law** [10] - 1:16, 5:5,
12:23, 14:18, 14:23,
15:2, 15:4, 26:2,
50:17, 51:14
  **lawsuit** [1] - 5:6
  **leading** [1] - 93:19
  **learn** [2] - 32:20,

39:8
  **least** [3] - 71:6, 91:5,
91:11
  **leave** [1] - 11:17
  **led** [1] - 49:11
  **LESLIE** [2] - 1:19,
107:21
  **Leslie** [1] - 107:5
  **lesson** [1] - 64:22
  **Liberty** [1] - 4:3
  **Lieutenant** [1] -
53:20
  **line** [5] - 34:16,
41:13, 41:15, 49:3,
93:11
  **Line** [1] - 3:4
  **listed** [10] - 53:9,
53:15, 54:12, 54:16,
56:21, 69:6, 69:9,
69:10, 70:14
  **lists** [4] - 53:6, 56:14,
81:21, 83:19
  **living** [5] - 16:6,
16:10, 16:13, 19:13,
19:14
  **LLC** [1] - 4:2
  **lobby** [1] - 5:4
  **location** [2] - 34:6,
75:1
  **look** [6] - 19:23,
30:6, 39:4, 39:6, 49:3,
92:11
  **looked** [1] - 86:5
  **looking** [7] - 21:23,
34:12, 34:16, 35:10,
42:1, 89:5, 89:16
  **looks** [1] - 40:18
  **lower** [2] - 34:23,
66:20
  **Lynn** [2] - 46:6,
46:11

## M

  **Machine** [1] - 107:9
  **mailbox** [1] - 55:13
  **Main** [5] - 1:17, 1:18,
4:4, 4:7, 4:7
  **male** [4] - 16:7, 35:1,
35:3, 35:5
  **manner** [1] - 107:9
  **mark** [2] - 64:6,
72:16
  **marked** [27] - 30:20,
30:23, 31:5, 33:1,
33:5, 33:9, 39:20,
40:1, 40:5, 44:21,
44:21, 45:3, 53:19,
53:21, 58:15, 58:19,
59:2, 62:21, 64:23,

65:5, 65:18, 72:15,
72:20, 72:23, 73:5,
86:6, 97:11
  **matron** [3] - 101:18,
102:3, 102:6
  **matrons** [1] - 101:13
  **matter** [1] - 27:22
  **McGuire** [132] - 1:4,
3:5, 8:4, 8:19, 9:3,
16:7, 17:13, 17:17,
18:15, 18:17, 18:21,
19:18, 20:15, 22:23,
23:13, 24:5, 24:8,
24:11, 24:23, 26:22,
27:2, 27:6, 27:8,
27:16, 28:2, 28:7,
28:19, 28:21, 29:5,
29:7, 29:10, 31:9,
32:21, 34:13, 34:18,
35:15, 40:23, 41:7,
41:19, 42:23, 43:10,
43:11, 43:13, 45:11,
47:14, 47:18, 47:22,
48:3, 48:4, 48:11,
48:15, 49:13, 49:15,
49:20, 50:2, 51:10,
51:21, 52:1, 52:2,
52:23, 53:4, 56:18,
56:19, 57:8, 57:9,
57:10, 57:14, 57:15,
57:20, 58:7, 58:12,
59:12, 59:15, 61:16,
62:2, 62:6, 62:7, 63:2,
63:6, 63:18, 67:15,
67:16, 67:18, 71:12,
71:15, 72:7, 76:2,
76:3, 76:6, 76:18,
77:12, 77:21, 79:4,
80:13, 85:6, 85:11,
85:15, 85:16, 86:10,
88:13, 89:9, 90:13,
91:1, 91:3, 91:4, 91:7,
91:9, 91:10, 91:12,
91:15, 91:16, 92:1,
92:2, 92:15, 92:16,
93:11, 93:12, 94:9,
94:12, 102:13, 103:1,
103:3, 103:6, 103:9,
104:9
  **MCGUIRE** [1] - 1:11
  **McGuire's** [19] -
22:10, 47:1, 47:10,
47:14, 47:18, 47:23,
48:7, 48:8, 61:15,
62:10, 62:12, 63:19,
81:1, 81:10, 90:4,
92:22, 94:14, 94:18,
95:13
  **mean** [17] - 12:3,
27:12, 31:8, 38:10,

39:6, 39:11, 49:8,
66:23, 68:2, 68:4,
71:23, 72:1, 76:6,
78:9, 78:10, 78:11,
95:6
  **means** [5] - 5:15,
37:15, 68:5, 72:2,
107:9
  **medical** [3] - 77:16,
77:20, 78:3
  **medication** [13] -
97:23, 99:5, 99:11,
99:17, 99:20, 100:4,
100:6, 100:8, 101:20,
101:22, 102:4,
102:11, 102:14
  **Medications** [2] -
2:19, 72:23
  **medications** [16] -
97:15, 98:9, 98:15,
98:18, 98:22, 99:4,
99:10, 99:14, 99:15,
100:19, 101:2, 101:8,
101:11, 101:12,
101:19, 102:18
  **medicine** [2] -
100:13, 102:8
  **medicines** [1] -
101:6
  **meds** [1] - 102:2
  **mental** [7] - 98:16,
98:19, 99:4, 99:10,
99:14, 100:3, 103:4
  **mentally** [3] -
102:21, 103:1, 103:7
  **mention** [2] - 63:19,
92:21
  **mentioned** [1] -
20:11
  **met** [1] - 5:3
  **mid** [1] - 7:1
  **middle** [3] - 69:1,
74:13, 96:9
  **might** [1] - 38:6
  **Miranda** [3] - 79:19,
79:20, 79:22
  **mischief** [1] - 57:5
  **Miss** [3] - 9:3, 17:13,
17:17
  **missing** [2] - 63:3,
63:15
  **misspeak** [1] - 6:3
  **moment** [2] - 41:10,
59:16
  **MONTE** [2] - 1:17,
4:6
  **most** [1] - 60:23
  **mostly** [2] - 85:16,
88:23
  **MR** [53] - 5:1, 30:19,

31:3, 31:10, 31:13,
33:1, 33:8, 36:5, 36:8,
36:10, 36:16, 36:18,
37:3, 37:10, 38:8,
38:13, 39:20, 40:3,
43:4, 43:7, 43:8,
43:20, 43:21, 44:17,
45:1, 47:5, 47:7,
58:15, 58:22, 58:23,
62:17, 62:19, 63:9,
63:11, 63:13, 64:23,
65:8, 65:9, 65:16,
65:17, 70:18, 70:21,
70:22, 70:23, 72:15,
73:3, 93:5, 93:10,
104:13, 104:14,
104:16, 105:16,
105:17
  **must** [1] - 51:14

## N

**name** [4] - 5:3,
44:16, 55:1, 60:5
**named** [2] - 46:6,
103:15
**narrative** [25] -
34:17, 40:17, 41:11,
42:7, 42:18, 43:9,
44:9, 46:18, 46:22,
47:12, 48:14, 48:18,
49:9, 56:4, 56:8,
59:22, 61:20, 63:16,
64:7, 64:9, 76:1,
92:14, 92:21, 93:19,
94:3
  **narratives** [1] - 59:17
  **nature** [1] - 22:7
  **necessarily** [4] -
36:17, 37:7, 70:13,
84:4
  **necessary** [1] -
101:19
  **need** [6] - 6:5, 6:9,
76:9, 93:20, 98:15,
99:11
  **needed** [3] - 94:1,
99:22, 100:3
  **needs** [3] - 51:18,
98:22, 102:8
  **never** [4] - 57:23,
97:8, 99:2, 103:6
  **NEW** [2] - 1:3, 107:1
  **New** [7] - 1:18, 2:8,
4:4, 4:8, 4:20, 39:22,
107:6
  **next** [11] - 18:22,
23:7, 69:15, 70:10,
70:14, 77:5, 78:19,
79:6, 84:9, 84:12,
101:4

**NICHOLAS** [1] - 4:6
**night** [11] - 26:22,
27:9, 28:2, 28:19,
38:11, 38:14, 47:9,
51:2, 57:21, 91:1,
91:4
  **nine** [2] - 53:14, 60:9
  **none** [1] - 52:5
  **normal** [1] - 15:14
  **normally** [1] - 86:1
  **notarized** [1] - 23:17
  **Notary** [4] - 1:20,
106:20, 107:5, 107:22
  **notation** [4] - 67:22,
71:17, 72:1, 72:5
  **nothing** [1] - 107:15
  **Notice** [1] - 1:15
  **noticed** [1] - 80:23
  **noting** [1] - 71:22,
86:10
  **November** [37] - 3:5,
7:19, 8:1, 8:18, 9:16,
10:10, 10:14, 10:16,
11:2, 11:8, 22:8,
23:10, 32:6, 35:16,
38:15, 39:15, 41:19,
41:20, 42:6, 42:7,
43:1, 43:11, 44:1,
56:2, 60:14, 63:7,
66:8, 72:4, 74:7, 75:4,
75:7, 77:13, 77:21,
90:13, 90:21, 97:19,
102:14
  **nowhere** [3] - 61:15,
62:5, 62:10
  **number** [19] - 15:17,
15:20, 53:14, 60:6,
60:8, 69:6, 69:9,
69:11, 69:15, 69:18,
69:22, 70:14, 71:1,
73:16, 73:19, 77:15,
81:18, 90:7
  **numbers** [4] - 30:1,
69:1, 69:3, 69:5

## O

**oath** [1] - 4:13
**objection** [1] - 43:7
**objections** [1] - 4:16
**obligation** [1] - 81:4
**oblige** [1] - 6:10
**observation** [1] -
47:3
  **observations** [3] -
18:8, 18:11, 19:17
  **observe** [1] - 20:7
  **observed** [1] - 71:11
  **obtain** [12] - 32:2,
32:9, 32:16, 34:5,

75:1, 75:14, 77:16,
78:3, 85:21, 99:15,
99:16, 100:5
  **obtained** [2] - 32:1,
77:20
  **obtaining** [1] - 99:19
  **obviously** [4] -
15:21, 18:23, 79:19,
82:21
  **occupants** [1] - 77:6
  **occurred** [5] - 42:4,
42:5, 48:9, 48:12,
105:5
  **October** [3] - 1:19,
106:6, 107:9
  **OF** [4] - 1:3, 1:6,
107:1, 107:3
  **offender** [2] - 23:20,
67:20, 67:21
  **Offender** [1] - 92:19
  **offenders** [1] - 67:11
  **officer** [23] - 15:20,
15:22, 40:4, 51:13,
52:4, 52:8, 53:13,
53:15, 53:18, 60:5,
60:11, 61:7, 68:19,
75:19, 84:11, 84:15,
85:20, 90:9, 91:21,
96:12, 100:20, 101:3,
101:7
  **Officer** [100] - 1:7,
1:8, 1:9, 1:10, 1:11,
5:3, 6:17, 9:8, 9:10,
9:13, 9:17, 9:23,
10:21, 11:6, 11:13,
12:7, 12:19, 12:22,
13:3, 13:6, 13:14,
13:17, 13:23, 14:17,
14:22, 15:6, 15:12,
16:3, 16:22, 17:8,
17:11, 18:11, 18:23,
19:3, 19:8, 20:11,
20:14, 20:18, 23:1,
23:10, 24:2, 24:7,
24:14, 24:19, 25:11,
25:16, 25:20, 26:10,
26:20, 27:19, 27:20,
28:3, 29:14, 31:4,
32:16, 44:1, 44:6,
45:2, 45:15, 46:8,
46:18, 46:23, 47:3,
47:8, 47:13, 47:17,
47:22, 48:4, 48:18,
49:12, 50:9, 50:20,
54:23, 55:3, 55:7,
55:11, 55:12, 55:17,
56:1, 56:5, 59:1, 60:2,
60:4, 61:10, 61:22,
62:5, 62:11, 63:1,
63:14, 63:17, 65:10,

66:14, 66:15, 73:4,
80:22, 84:17, 88:12,
88:15, 95:9, 98:13
  **officer's** [5] - 42:18,
46:15, 69:10, 84:10,
84:13
  **Officers** [1] - 96:15
  **officers** [75] - 13:1,
13:21, 14:19, 14:23,
15:2, 15:4, 15:17,
18:18, 21:10, 22:16,
25:22, 26:2, 28:1,
28:5, 29:11, 31:19,
34:4, 34:7, 35:17,
35:20, 36:2, 36:12,
37:12, 37:19, 37:22,
37:23, 45:19, 48:19,
52:5, 53:6, 53:9, 55:4,
58:10, 66:4, 66:12,
66:17, 68:6, 69:19,
69:23, 72:10, 72:12,
73:17, 74:18, 75:16,
76:13, 76:23, 77:5,
77:15, 78:20, 79:13,
80:23, 81:4, 81:9,
81:23, 82:14, 85:8,
86:2, 86:16, 86:22,
87:10, 88:1, 89:19,
91:5, 91:11, 92:3,
92:7, 93:18, 95:3,
95:9, 95:23, 96:10,
99:15, 100:5, 101:11,
101:14
  **offices** [1] - 1:17
  **often** [2] - 6:3, 73:13
  **oftentimes** [1] -
54:12
  **on-scene** [1] - 22:19
  **once** [4] - 68:6, 74:4,
74:5
  **one** [22] - 5:13, 6:8,
10:21, 15:21, 23:6,
24:3, 25:2, 34:13,
53:11, 53:22, 57:13,
62:4, 69:17, 70:5,
74:17, 82:22, 86:12,
88:11, 91:19, 93:11,
94:22
  **ones** [1] - 54:1
  **open** [1] - 13:15
  **operating** [2] -
74:14, 74:23
  **opinion** [1] - 93:13
  **opposition** [1] - 27:4
  **OPS** [3] - 71:18,
71:20, 71:22
  **order** [4] - 57:19,
72:3, 75:20, 76:10
  **Order** [2] - 2:16,
72:19

**orders** [3] - 71:21,
71:22, 72:6
  **originally** [1] - 26:12
  **outcome** [3] - 37:5,
53:3, 87:9
  **outs** [1] - 86:13
  **outside** [2] - 27:13,
27:15
  **overnight** [1] -
103:12

## P

**P.C** [2] - 1:17, 4:6
**page** [33] - 2:6, 2:8,
2:10, 2:11, 2:17, 33:3,
39:22, 40:20, 41:1,
41:23, 42:2, 42:8,
42:22, 44:20, 58:18,
61:20, 62:4, 63:3,
63:15, 72:21, 74:12,
75:18, 77:15, 78:19,
80:2, 81:17, 83:18,
84:12, 84:19, 89:1,
90:6, 91:18, 96:5
  **Page** [1] - 3:4
  **pages** [1] - 106:2
  **pain** [1] - 29:11
  **paperwork** [4] -
27:23, 29:13, 55:11,
94:17
  **park** [2] - 12:7, 12:12
  **parked** [2] - 12:15,
12:22
  **part** [19] - 14:15,
15:14, 26:7, 26:10,
26:19, 39:8, 42:10,
49:18, 57:12, 61:3,
74:19, 75:10, 75:15,
80:2, 81:3, 81:7, 82:7,
83:19, 85:10
  **particularly** [1] -
98:20
  **parties** [18] - 4:11,
4:13, 9:2, 16:1, 21:13,
22:15, 37:13, 64:7,
64:11, 64:20, 72:2,
75:21, 76:11, 81:8,
82:1, 89:6, 90:10,
90:20
  **partner** [3] - 9:7,
9:10, 23:4
  **partners** [1] - 15:7
  **party** [3] - 67:1,
91:19, 94:22
  **past** [1] - 39:11
  **PAT** [1] - 1:10
  **Pat** [2] - 54:23, 55:1
  **patrol** [3] - 7:12,
7:20, 11:14

**patrolman** [2] - 7:5, 15:12
**pedigree** [1] - 29:19
**pending** [1] - 6:14
**perfectly** [1] - 6:13
**period** [1] - 20:20
**perpetrator** [4] - 44:5, 59:14, 64:4, 79:18
**person** [12] - 51:15, 70:16, 83:2, 83:4, 83:11, 84:4, 85:19, 87:19, 87:20, 100:9, 100:17, 105:8
**person's** [2] - 23:7, 101:3
**personally** [6] - 11:3, 11:4, 24:12, 24:13, 32:11, 100:22
**pertain** [1] - 104:18
**pertaining** [1] - 66:7
**pertains** [1] - 97:22
**pertinent** [3] - 22:4, 38:2, 38:6
**PFALZGRAF** [1] - 4:2
**Pfalzgraf** [1] - 5:5
**phone** [4] - 30:1, 35:2, 35:4, 35:6
**photograph** [1] - 31:7
**Photographs** [2] - 2:5, 30:22
**photographs** [12] - 22:3, 22:5, 22:6, 22:9, 51:1, 51:4, 79:8, 80:3, 80:9, 80:19, 81:5, 81:9
**photography** [1] - 50:23
**physical** [32] - 17:19, 64:3, 82:3, 82:8, 82:15, 82:20, 83:1, 83:2, 83:5, 83:6, 83:9, 83:10, 83:11, 83:15, 83:16, 84:3, 84:11, 84:14, 85:3, 85:7, 85:15, 86:3, 86:8, 87:6, 88:2, 88:21, 89:3, 90:8, 90:17, 92:5, 105:7, 105:9
**physically** [1] - 88:6
**picked** [1] - 101:11
**pictures** [1] - 22:12
**Pinzone** [1] - 107:5
**PINZONE** [2] - 1:20, 107:21
**pipe** [20] - 17:21, 17:23, 18:4, 18:6, 18:9, 48:1, 50:13,

50:14, 50:16, 51:1, 51:5, 51:7, 57:15, 57:21, 58:3, 58:8, 58:12, 76:22, 77:1, 77:3
**place** [8] - 8:1, 10:8, 16:15, 19:4, 42:3, 52:6, 89:23, 94:13
**Place** [16] - 10:9, 10:12, 10:17, 11:22, 12:2, 12:7, 12:23, 27:6, 28:8, 28:11, 29:15, 32:14, 32:23, 33:22, 75:4, 75:7
**placed** [7] - 16:5, 27:8, 27:16, 27:18, 27:21, 28:14, 28:16
**places** [1] - 16:2
**Plaintiff** [3] - 1:5, 4:5, 5:6
**play** [2] - 54:6, 102:6
**played** [1] - 25:5
**point** [15] - 6:1, 6:8, 17:18, 17:20, 18:23, 25:23, 26:9, 26:13, 26:14, 28:18, 29:7, 29:10, 55:14, 87:18, 89:1
**Police** [32] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:6, 2:10, 2:13, 2:16, 2:18, 6:18, 6:21, 28:9, 28:12, 30:14, 33:3, 44:20, 46:12, 50:20, 65:3, 72:18, 72:21, 95:8, 95:15, 96:14, 98:7, 98:13, 99:8, 103:19, 104:1, 104:3, 105:5
**police** [14] - 8:11, 8:16, 9:21, 12:8, 12:12, 13:7, 13:20, 25:22, 44:13, 44:15, 47:21, 78:17, 100:2, 101:3
**policies** [2] - 21:19, 78:16
**Policy** [2] - 2:16, 72:19
**policy** [18] - 21:5, 21:9, 21:21, 30:13, 30:16, 73:10, 73:11, 73:14, 74:10, 74:13, 93:2, 95:3, 95:9, 97:15, 97:16, 97:18, 97:22, 98:8
**portion** [2] - 59:22, 62:4
**position** [4] - 7:4, 7:6, 7:8, 7:20

**positions** [1] - 7:14
**possible** [3] - 77:8, 79:7, 83:4
**possibly** [2] - 87:8, 91:13
**practice** [3] - 64:10, 64:15, 68:8
**Practice** [1] - 1:16
**prepare** [1] - 8:7
**prescribed** [1] - 99:21
**present** [1] - 60:16
**press** [3] - 32:9, 32:11, 96:6
**previous** [8] - 32:4, 32:17, 32:20, 35:11, 35:22, 36:1, 37:20, 38:1
**previously** [4] - 36:3, 52:17, 61:19, 62:20
**primary** [32] - 21:15, 30:9, 36:19, 39:3, 81:21, 82:2, 82:8, 82:15, 82:20, 83:1, 83:5, 83:10, 83:11, 83:20, 83:22, 84:3, 84:11, 84:14, 85:3, 85:7, 85:11, 85:15, 86:3, 86:7, 87:6, 88:2, 88:20, 89:3, 90:8, 90:17, 105:7, 105:9
**prisoner** [1] - 97:15
**Prisoners** [2] - 2:19, 72:22
**prisoners** [2] - 97:23, 98:8
**Procedure** [2] - 2:18, 72:22
**procedure** [11] - 15:14, 21:5, 21:10, 32:7, 55:10, 74:14, 74:23, 75:10, 75:15, 82:7, 98:8
**procedures** [1] - 21:19
**proceeding** [1] - 50:22
**prohibit** [1] - 90:9
**promoted** [4] - 7:10, 7:11, 7:12, 54:9
**property** [6] - 22:6, 79:9, 80:3, 80:10, 80:12, 85:17
**prosecute** [1] - 51:11
**prosecution** [1] - 53:3
**prosecutor** [1] - 58:11
**prosecutors** [1] - 51:23

**protect** [2] - 50:21, 87:19
**protection** [4] - 71:21, 71:22, 72:3, 72:6
**Protection** [2] - 2:16, 72:19
**prove** [6] - 51:14, 57:19, 57:20, 57:22, 58:11
**provide** [4] - 51:23, 52:8, 75:16, 79:23
**provided** [4] - 62:2, 63:4, 63:21, 72:10
**provides** [1] - 69:1
**proving** [1] - 52:9
**proximity** [2] - 78:8, 78:9
**PTSD** [7] - 34:22, 36:4, 36:15, 38:5, 38:11, 39:14, 86:11
**Public** [4] - 1:20, 106:20, 107:5, 107:22
**punched** [2] - 57:10, 91:4, 91:10
**punching** [6] - 43:14, 43:17, 43:22, 48:4, 91:16, 94:15
**purpose** [1] - 97:22
**pursuant** [1] - 1:15
**pursue** [1] - 96:2
**put** [8] - 20:2, 23:18, 43:4, 44:4, 44:6, 44:8, 100:4, 100:19
**puts** [1] - 42:13

## Q

**questions** [8] - 4:17, 5:23, 6:2, 6:3, 29:20, 29:21, 41:15, 105:16
**quick** [2] - 49:3, 61:13
**quickly** [1] - 65:10
**quite** [1] - 6:2
**quotes** [1] - 82:2

## R

**rather** [1] - 78:14
**read** [7] - 41:10, 41:13, 46:17, 59:18, 84:22, 93:8, 106:1
**real** [1] - 49:3
**really** [8] - 9:3, 14:2, 16:8, 20:1, 61:13, 65:10, 68:18, 87:17
**reason** [3] - 34:17, 34:20, 78:13
**reasonable** [4] - 51:15, 77:8, 99:18,

100:21
**reasonably** [1] - 85:20
**reasoning** [1] - 25:12
**reasons** [1] - 24:22
**receive** [8] - 73:11, 73:13, 73:17, 74:6, 96:15, 96:17, 96:20, 97:18
**received** [14] - 9:5, 11:10, 30:23, 33:5, 39:23, 44:21, 58:19, 65:5, 72:20, 72:23, 73:21, 74:1, 93:1, 99:2
**recess** [1] - 63:12
**recognize** [11] - 31:6, 33:10, 33:13, 40:5, 40:8, 45:3, 45:6, 59:2, 65:19, 73:7, 97:12
**recollection** [2] - 23:9, 56:9
**recommended** [1] - 70:11
**record** [5] - 43:5, 63:5, 65:11, 70:18, 95:16
**red** [3] - 20:12, 20:16, 48:16
**redness** [22] - 46:23, 47:9, 47:14, 47:18, 47:23, 48:6, 48:9, 48:12, 49:21, 49:23, 62:12, 62:14, 62:23, 63:19, 80:23, 81:5, 81:9, 89:15, 89:17, 89:20, 90:3, 90:5
**reduced** [1] - 107:10
**refer** [6] - 43:17, 67:10, 69:4, 69:18, 71:20, 83:1
**Referee** [1] - 4:14
**referring** [3] - 38:14, 45:12, 50:9
**refers** [2] - 49:9, 71:21
**refrain** [1] - 5:21
**regarding** [2] - 32:17, 32:21
**related** [2] - 22:3, 52:16
**relative** [1] - 107:16
**remark** [1] - 71:23
**remarks** [4] - 66:20, 67:21, 68:23, 71:17
**remember** [82] - 8:15, 8:20, 8:22, 8:23, 10:3, 10:5, 10:19, 10:23, 11:5, 11:12,

11:19, 12:17, 13:9,
13:16, 13:19, 13:22,
14:2, 14:3, 14:6, 14:9,
16:8, 16:16, 16:19,
16:20, 17:1, 17:3,
17:6, 18:16, 18:20,
19:10, 19:16, 20:6,
20:9, 20:13, 20:17,
20:20, 22:11, 22:13,
24:9, 25:10, 25:15,
25:16, 25:18, 26:13,
26:18, 27:7, 27:14,
27:17, 29:3, 29:6,
29:9, 29:12, 31:12,
31:14, 32:15, 44:3,
47:11, 47:20, 49:23,
50:15, 50:18, 56:13,
60:21, 66:19, 71:16,
77:2, 77:4, 85:22,
87:17, 88:8, 88:11,
89:17, 90:5, 90:14,
90:22, 91:17, 98:17,
99:12, 102:19,
102:22, 103:8, 105:11
**repeat** [3] - 6:5, 6:7,
93:5
**rephrase** [1] - 6:7
**Report** [6] - 2:9,
2:10, 2:12, 39:23,
44:21, 58:19
**report** [64] - 3:5,
8:11, 8:12, 8:16,
23:11, 29:16, 29:17,
30:4, 40:9, 40:10,
40:14, 41:2, 41:8,
41:18, 42:12, 43:5,
44:11, 44:13, 44:15,
45:8, 45:14, 46:15,
47:21, 53:6, 53:16,
53:21, 53:23, 54:1,
54:4, 54:6, 54:17,
55:21, 56:12, 59:6,
59:8, 59:23, 60:1,
60:4, 60:10, 60:13,
60:16, 60:19, 60:22,
61:3, 61:6, 61:7,
62:16, 62:18, 62:20,
63:6, 63:8, 64:2, 81:2,
92:10, 94:8, 94:11,
94:18, 95:17, 95:22,
96:11, 96:13, 96:15,
96:23, 97:6
**reported** [1] - 42:4
**reporter** [2] - 5:14,
93:8
**reporting** [3] - 60:5,
91:21, 92:7
**reports** [9] - 10:11,
23:2, 23:4, 23:5, 23:7,
54:13, 63:23, 64:19,

96:10
**represent** [1] - 5:6
**request** [8] - 32:8,
63:5, 69:12, 100:4,
100:14, 100:17,
100:19, 101:10
**requested** [3] - 70:1,
93:7, 99:14
**requests** [2] - 102:7,
102:13
**REQUESTS** [1] - 3:1
**require** [3] - 95:3,
95:9, 99:3
**required** [4] - 57:20,
74:10, 82:1, 99:13
**requirement** [1] -
28:4
**reserved** [1] - 4:17
**respective** [1] - 4:13
**respond** [8] - 5:17,
6:13, 8:3, 11:22, 13:4,
67:5, 86:19, 87:2
**responded** [18] -
10:17, 10:22, 15:5,
15:6, 26:3, 37:19,
38:1, 44:2, 66:4,
66:12, 66:17, 69:19,
72:4, 75:7, 76:5,
86:16, 86:22, 87:11
**responding** [22] -
8:23, 11:16, 12:19,
15:13, 31:21, 32:13,
32:19, 35:9, 36:11,
38:17, 38:21, 39:1,
68:8, 68:12, 72:13,
73:17, 73:21, 74:6,
74:19, 75:11, 87:7,
102:16
**response** [2] - 5:22,
74:14
**responses** [2] - 5:19,
5:21
**responsibility** [2] -
96:22, 104:21
**responsible** [1] -
54:20
**rest** [1] - 61:6
**restore** [2] - 75:19,
76:10
**result** [4] - 52:19,
52:22, 91:5, 91:11
**retrieves** [2] - 55:14,
55:15
**review** [8] - 8:7, 31:6,
35:17, 37:18, 59:16,
59:22, 61:13, 84:21
**reviewed** [3] - 8:11,
54:17, 61:19
**reviewing** [11] -
33:20, 36:1, 37:22,

59:7, 61:12, 66:6,
66:11, 68:20, 69:11,
85:1, 92:14
**ribs** [6] - 18:7, 18:12,
58:4, 58:8, 58:12,
80:17
**ride** [2] - 9:13, 28:4
**riding** [1] - 9:16
**rights** [3] - 30:1,
79:20, 79:22
**Road** [2] - 4:20,
28:10
**rode** [2] - 9:7, 9:8
**role** [3] - 54:5, 102:6,
104:21
**room** [6] - 16:6,
16:10, 16:13, 19:13,
19:14, 28:22
**roughly** [1] - 6:23
**Rules** [1] - 1:16
**rules** [1] - 5:12
**run** [1] - 99:22
**RUPP** [1] - 4:2
**Rupp** [1] - 5:5

## S

**safe** [4] - 68:6, 69:23,
78:17, 78:18
**safety** [2] - 15:21,
77:7
**saw** [1] - 68:19
**scene** [21] - 13:4,
15:15, 21:9, 22:19,
26:4, 45:22, 50:11,
60:12, 60:14, 68:6,
69:20, 69:23, 71:4,
72:10, 78:7, 78:12,
78:15, 78:17, 78:18,
89:19, 102:17
**scratched** [4] - 57:9,
92:2, 92:19, 93:12
**scratches** [11] -
19:21, 19:22, 20:4,
25:3, 25:9, 25:13,
49:14, 49:16, 50:3,
89:10, 90:4
**scratching** [1] -
92:16
**sealed** [1] - 56:20
**second** [4] - 5:20,
40:20, 76:13, 95:16
**section** [20] - 41:1,
41:17, 42:7, 42:14,
43:9, 46:22, 47:12,
48:18, 66:21, 67:21,
68:23, 69:10, 71:18,
74:17, 75:19, 78:19,
79:12, 81:23, 90:7,
91:18

**Section** [1] - 42:21
**see** [39] - 14:1, 31:7,
31:19, 34:8, 46:22,
47:2, 47:12, 48:22,
58:2, 62:23, 63:16,
63:18, 65:13, 66:21,
67:22, 68:23, 71:18,
73:5, 74:13, 74:22,
75:22, 76:16, 77:9,
77:18, 78:21, 79:10,
80:5, 81:18, 81:21,
82:4, 83:20, 84:17,
86:18, 87:21, 90:7,
91:22, 94:5, 96:4,
97:21
**seeing** [1] - 89:17
**self** [11] - 91:19,
92:2, 92:16, 92:22,
93:3, 93:12, 93:15,
93:17, 93:20, 94:1,
94:22
**sense** [1] - 37:9
**sentence** [4] - 76:13,
77:5, 84:9, 84:13
**separate** [3] - 15:23,
16:1, 21:13
**separated** [5] -
14:11, 16:4, 16:21,
17:4, 76:3
**separating** [2] -
75:21, 76:11
**September** [1] - 7:11
**sequence** [1] -
100:16
**Sergeant** [9] - 15:5,
15:11, 25:23, 26:6,
26:9, 26:16, 26:19,
27:1, 66:14
**sergeant** [6] - 7:9,
7:10, 7:12, 15:11,
54:10, 54:12
**sergeants** [1] - 15:10
**serotonins** [6] -
98:15, 98:19, 99:3,
99:10, 99:13, 100:3
**service** [16] - 10:18,
11:10, 11:21, 31:20,
32:20, 33:21, 34:11,
35:22, 36:14, 36:21,
38:1, 38:17, 39:4,
39:5, 66:2, 66:13
**set** [4] - 15:20, 73:16,
73:19, 106:3
**setting** [1] - 5:8
**seven** [5] - 2:5,
23:23, 30:22, 83:18,
84:12
**severe** [2] - 19:23,
20:2
**severity** [1] - 89:5

**shakes** [1] - 5:22
**shall** [4] - 82:3,
84:11, 84:15, 91:20
**sheet** [2] - 37:11,
67:9
**short** [5] - 20:20,
44:11, 63:12, 67:3,
67:4
**Shorthand** [1] -
107:9
**show** [9] - 26:13,
31:4, 32:4, 33:9, 40:4,
45:2, 59:1, 65:18,
97:11
**showing** [1] - 96:4
**side** [1] - 21:14
**sign** [3] - 69:19,
70:4, 70:10
**sit** [9] - 49:1, 53:2,
66:16, 71:14, 90:2,
95:12, 97:4, 102:12,
102:23
**sitting** [1] - 16:13
**situation** [5] - 75:20,
76:10, 83:13, 90:16,
101:15
**six** [4] - 69:17, 70:5
**sixteen** [1] - 6:22
**slash** [2] - 74:15,
75:11
**someone** [3] - 23:8,
77:16, 96:5
**sometimes** [2] - 6:3,
56:10
**somewhere** [1] -
64:7
**sorry** [10] - 36:6,
36:8, 43:20, 44:12,
59:23, 69:7, 70:21,
84:1, 91:8, 93:6
**sort** [3] - 24:22, 27:2,
98:7
**speaking** [8] - 5:15,
17:13, 18:17, 18:21,
19:9, 20:18, 21:4,
25:21
**specific** [6] - 33:11,
55:8, 56:2, 57:14,
87:16, 105:1
**specifics** [1] - 10:5
**speculate** [1] - 97:7
**SPEYER** [2] - 1:17,
4:6
**SS** [1] - 107:2
**STACIE** [1] - 1:4
**Stacie** [108] - 8:4,
8:19, 15:23, 16:4,
16:17, 16:19, 16:21,
16:23, 17:4, 19:12,
19:15, 20:7, 20:9,

21:2, 22:12, 23:13, 24:3, 24:11, 24:17, 25:7, 26:17, 26:22, 27:2, 27:6, 27:8, 27:16, 28:2, 28:7, 28:18, 28:21, 29:4, 29:7, 29:10, 32:21, 34:13, 34:17, 35:15, 37:14, 40:23, 41:6, 42:23, 43:10, 45:11, 47:1, 47:9, 47:14, 47:18, 47:23, 48:4, 48:6, 48:11, 48:15, 49:20, 51:10, 51:21, 52:1, 52:6, 52:23, 53:4, 56:19, 57:9, 57:14, 58:6, 59:15, 61:16, 62:6, 62:12, 63:19, 67:17, 71:12, 71:14, 72:7, 76:3, 76:6, 77:12, 77:21, 78:4, 79:1, 79:4, 81:1, 81:10, 85:6, 85:11, 85:14, 86:10, 88:5, 88:13, 88:16, 89:13, 91:3, 91:9, 91:16, 91:17, 92:1, 92:15, 92:22, 93:11, 94:8, 94:11, 94:12, 94:13, 94:18, 95:13, 102:13, 103:1, 103:9, 104:9, 105:2
**Stacie's** [6] - 20:11, 20:15, 25:12, 25:17, 89:16, 90:3
**stage** [1] - 68:4
**staged** [6] - 69:13, 70:2, 78:1, 78:6, 78:7
**staging** [4] - 67:22, 69:16, 70:11, 70:15
**standard** [7] - 32:7, 55:10, 74:14, 74:22, 75:10, 75:15, 82:7
**standardized** [1] - 29:20
**standby** [7] - 68:5, 68:10, 68:14, 68:17, 68:21, 70:12, 71:9
**start** [1] - 33:12
**started** [1] - 7:3
**starting** [1] - 6:23
**State** [3] - 2:8, 39:22, 107:6
**state** [4] - 29:20, 40:11, 40:15, 66:12
**STATE** [1] - 107:1
**statement** [17] - 23:17, 23:21, 23:23, 30:10, 40:19, 40:22, 41:3, 52:2, 57:7, 57:8,

61:5, 61:13, 61:15, 62:10, 62:11, 79:23, 91:9
**statements** [4] - 23:22, 79:17, 102:17, 102:20
**states** [1] - 66:20
**STATES** [1] - 1:3
**Station** [2] - 28:9, 28:12
**station** [1] - 46:3
**stay** [2] - 27:22, 78:13
**step** [2] - 79:6, 101:5
**steps** [7] - 48:7, 50:19, 74:18, 76:9, 78:2, 82:14, 82:19
**still** [6] - 7:6, 19:6, 19:13, 76:6, 76:7, 87:1
**stipulated** [1] - 4:12
**stipulations** [1] - 4:10
**stop** [1] - 92:20
**stories** [3] - 19:1, 19:4, 92:4
**story** [4] - 21:3, 21:14, 25:17, 25:18
**strangled** [1] - 61:17
**Street** [3] - 1:18, 4:4, 4:7
**street** [3] - 12:13, 78:12, 78:14
**striking** [2] - 43:15, 43:16
**struck** [4] - 38:18, 39:16, 61:16, 62:6
**struggle** [2] - 48:1, 81:8
**sub** [9] - 66:21, 66:23, 67:18, 74:17, 75:18, 78:19, 81:23, 90:7, 91:18
**subject** [2] - 67:4, 67:18
**subjects** [1] - 67:6
**successful** [2] - 52:19, 52:23
**supervisor** [7] - 15:15, 53:19, 53:23, 54:6, 54:13, 54:16, 102:9
**support** [1] - 51:18
**supporting** [5] - 22:14, 23:15, 29:22, 30:3, 30:5
**suspect** [3] - 28:4, 96:7, 100:23
**sworn** [6] - 4:21, 5:8, 79:7, 79:13, 79:17,

107:14
**Sworn** [1] - 106:14

**T**

**talks** [1] - 46:23
**technically** [2] - 23:19, 28:1
**ten** [1] - 23:23
**ten-thirty** [1] - 23:23
**term** [2] - 44:11, 67:1
**terms** [3] - 21:18, 52:8, 58:3
**testified** [1] - 4:22
**testify** [1] - 107:15
**testimony** [8] - 8:6, 52:4, 52:8, 106:5, 107:7, 107:10, 107:12, 107:19
**THE** [11] - 31:12, 36:6, 36:9, 36:17, 37:4, 38:9, 47:6, 62:18, 70:20, 93:9, 104:15
**thinking** [1] - 25:5
**third** [4] - 6:1, 57:5, 85:18, 87:20
**thirty** [1] - 23:23
**thoroughly** [3] - 91:20, 93:2, 93:13
**threatened** [1] - 76:15
**three** [8] - 2:6, 2:8, 33:3, 39:22, 75:19, 81:18, 90:6, 91:18
**three-page** [4] - 2:6, 2:8, 33:3, 39:22
**throughout** [1] - 7:15
**title** [1] - 103:20
**TO** [2] - 2:1, 3:1
**today** [17] - 5:4, 5:14, 7:6, 7:8, 7:18, 8:6, 30:16, 49:1, 53:2, 66:16, 71:14, 90:2, 94:7, 95:12, 97:4, 102:12, 102:23
**together** [2] - 9:8, 14:7
**took** [7] - 8:1, 11:20, 22:23, 23:6, 42:3, 42:12, 52:6
**top** [2] - 82:18, 82:21
**totality** [2] - 49:6, 49:8
**towards** [3] - 13:11, 74:13, 88:7
**TOWN** [1] - 1:6
**Town** [36] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:15, 2:17, 6:17, 6:20, 7:4,

7:15, 15:18, 21:5, 25:21, 26:3, 28:12, 30:14, 36:13, 46:11, 50:20, 72:18, 72:21, 95:8, 95:14, 96:14, 96:19, 98:6, 98:12, 99:8, 101:4, 103:18, 104:1, 104:2, 105:4
**trained** [7] - 64:18, 64:21, 79:12, 81:13, 82:11, 97:16, 99:6
**training** [10] - 73:11, 73:13, 73:17, 73:21, 74:1, 74:6, 81:3, 93:1, 97:18, 99:2
**transcribe** [1] - 46:15
**transcribed** [1] - 46:8
**transcribes** [1] - 46:4
**transcript** [4] - 4:15, 106:4, 107:18, 107:19
**transpired** [1] - 96:3
**transported** [2] - 27:23, 100:18
**treatment** [3] - 77:16, 77:20, 78:3
**Trial** [1] - 1:14
**trial** [1] - 4:17
**trigger** [1] - 81:4
**true** [2] - 106:4, 107:18
**truth** [5] - 39:8, 107:15, 107:16
**trying** [1] - 21:15
**turn** [2] - 55:13, 81:17
**turned** [1] - 17:18
**turning** [1] - 56:11
**turns** [1] - 23:6
**two** [27] - 2:10, 2:11, 2:17, 7:14, 11:3, 13:3, 14:11, 14:21, 16:1, 20:22, 37:13, 41:1, 44:20, 58:18, 72:2, 72:16, 72:21, 75:18, 76:11, 77:15, 78:19, 80:2, 81:8, 81:18, 81:19, 90:7, 92:4
**two-page** [6] - 2:10, 2:11, 2:17, 44:20, 58:18, 72:21
**type** [2] - 34:7, 35:10
**typed** [2] - 92:12, 92:13
**types** [3] - 21:23, 54:13, 98:22
**typical** [6] - 50:19, 64:10, 68:8, 68:11,

68:12, 72:12
**typically** [17] - 5:13, 9:13, 15:18, 32:9, 41:2, 46:14, 55:19, 56:5, 56:22, 60:10, 60:23, 64:6, 91:11, 96:1, 96:9, 97:5, 104:17
**typist** [1] - 46:7

**U**

**ultimate** [1] - 24:10
**ultimately** [2] - 85:6, 85:10
**um-hum** [1] - 84:1
**uncover** [1] - 39:8
**under** [6] - 1:15, 60:5, 74:13, 74:17, 74:22, 107:11
**underneath** [1] - 97:21
**Union** [2] - 4:20, 28:10
**UNITED** [1] - 1:3
**up** [11] - 9:2, 25:8, 26:13, 35:7, 37:7, 55:16, 55:19, 55:23, 87:10, 100:15, 101:11
**upset** [1] - 16:19
**uses** [4] - 83:2, 83:9, 83:11, 83:15

**V**

**vehicle** [10] - 9:21, 9:23, 10:21, 12:8, 12:12, 12:15, 12:16, 13:7, 100:2, 100:18
**verbal** [2] - 5:21, 17:18
**verbatim** [2] - 17:15, 107:8
**verify** [1] - 48:8
**version** [5] - 25:7, 45:7, 65:13, 92:12, 92:13
**versus** [1] - 89:21
**victim** [28] - 29:23, 30:1, 30:6, 30:10, 40:11, 40:15, 41:3, 41:7, 42:17, 42:19, 44:5, 52:2, 56:14, 56:17, 56:18, 59:9, 59:11, 60:11, 60:23, 61:3, 64:4, 77:17, 79:14, 90:18, 95:23, 96:1, 96:6, 105:9
**victims** [1] - 104:22
**violence** [42] - 15:19, 21:6, 21:11, 22:1,

Jose Domenech

29:21, 30:7, 30:11,
31:17, 32:14, 35:9,
35:12, 36:11, 38:7,
38:22, 39:2, 52:16,
68:13, 72:13, 73:10,
73:18, 73:22, 74:1,
74:7, 74:15, 74:20,
75:11, 81:8, 83:2,
83:5, 83:9, 83:12,
83:15, 85:20, 86:20,
95:3, 95:5, 95:8,
95:13, 95:23, 103:21,
104:19, 104:23
 **visible** [1] - 25:3
 **visibly** [1] - 77:6
 **visual** [2] - 18:8,
19:17
 **visually** [2] - 58:2
 **voice** [2] - 35:1, 35:6
 **vs** [1] - 1:5

---

## W

 **W-E-I-C-H** [1] - 70:9
 **wait** [2] - 5:16, 78:16
 **waive** [2] - 79:20,
79:22
 **waived** [2] - 4:14,
4:15
 **wants** [1] - 96:6
 **weapon** [2] - 76:19,
76:21
 **weapons** [3] - 22:3,
29:21, 76:14
 **Weich** [2] - 70:9,
70:18
 **Weich's** [1] - 70:10
 **well-being** [1] - 77:8
 **Wesoloski** [71] - 9:8,
9:10, 9:14, 9:17, 9:23,
10:21, 11:6, 11:14,
12:7, 12:19, 12:22,
13:3, 13:6, 13:14,
13:17, 13:23, 14:17,
14:22, 16:3, 16:22,
17:8, 17:11, 18:11,
19:1, 19:3, 19:8,
20:11, 20:15, 20:18,
23:1, 24:2, 24:7,
24:14, 24:19, 25:11,
25:16, 25:20, 26:11,
26:20, 28:3, 29:14,
32:16, 44:1, 44:6,
45:15, 46:9, 46:19,
46:23, 47:3, 47:9,
47:13, 47:17, 47:22,
48:4, 48:19, 49:12,
50:9, 55:11, 55:17,
56:5, 60:2, 60:4,
61:10, 61:22, 62:5,
63:1, 63:17, 66:14,

80:23, 88:12, 88:15
 **WESOLOSKI** [1] -
1:7
 **Wesoloski's** [2] -
23:10, 62:11
 **WESTERN** [1] - 1:3
 **whole** [1] - 107:15
 **wife** [4] - 38:5, 38:18,
39:3, 39:13
 **WITNESS** [11] -
31:12, 36:6, 36:9,
36:17, 37:4, 38:9,
47:6, 62:18, 70:20,
93:9, 104:15
 **witness** [2] - 52:5,
55:4
 **witnesses** [1] - 5:13
 **WOO** [1] - 4:3
 **word** [1] - 20:2
 **works** [3] - 44:14,
103:18, 104:1
 **wrench** [21] - 17:21,
18:1, 18:4, 18:6, 18:9,
48:1, 50:13, 50:14,
50:17, 51:2, 51:5,
51:7, 57:11, 57:15,
57:21, 58:3, 58:8,
58:13, 76:22, 77:1,
77:3
 **write** [5] - 62:5,
62:12, 62:14, 62:16
 **writes** [1] - 48:19
 **writing** [1] - 107:11
 **written** [5] - 41:3,
46:15, 61:21, 63:16,
63:17
 **wrote** [2] - 46:9, 96:6
 **Wynant** [9] - 15:5,
15:11, 25:23, 26:6,
26:9, 26:16, 26:19,
27:1, 66:15

---

## Y

 **years** [2] - 6:22,
52:12
 **YORK** [2] - 1:3,
107:1
 **York** [7] - 1:18, 2:8,
4:4, 4:8, 4:20, 39:22,
107:6
 **YOUNG** [1] - 4:3
 **yourself** [2] - 8:7,
32:10
 **yourselves** [1] -
13:20

---

## Z

 **zero** [1] - 60:9