UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STACIE MCGUIRE, )<br><br>Plaintiff, )<br><br>v. )<br><br>TOWN OF CHEEKTOWAGA; )<br>BRIAN WESOLOSKI, individually, and )<br>in his capacity as a Town of Cheektowaga )<br>Police Officer; JOSE DOMENECH, )<br>individually, and in his capacity as a Town )<br>of Cheektowaga Police Officer; DENNIS )<br>KUSAK, individually, and in his capacity as )<br>a Town of Cheektowaga Police Officer; )<br>JOHN WANAT, individually, and in his )<br>capacity as a Town of Cheektowaga Police )<br>Officer; PAT CHLUDZINSKI, )<br>individually, and in his official capacity as a )<br>Town of Cheektowaga Police Officer; JOHN )<br>DOE(S), individually, and in his/her capacity as )<br>a Town of Cheektowaga Police Officer; and )<br>COREY MCGUIRE, )<br><br>Defendants. ) | Case No. 1:20-cv-01632 |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
TOWN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 33)

Defendants Town of Cheektowaga (the "Town"), Brian Wesoloski, Jose

Domenech, Dennis Kusak, John Wanat, and Pat Chludzinski (collectively, the "Town

Defendants") moved for summary judgment on February 10, 2023, (Doc. 33), with regard

to Plaintiff Stacie McGuire's claims against them under 42 U.S.C. § 1983. Plaintiff

opposed the motion on April 10, 2023, (Doc. 40), arguing that genuine issues of material

fact preclude summary judgment. The Town Defendants filed a reply on April 21, 2023,

(Doc. 45). The court held a hearing on the Town Defendants' motion on July 20, 2023, at which point the court took the pending motion under advisement.

Against the Town Defendants, Plaintiff alleges false arrest for violations of her rights under the Fourth and Fourteenth Amendments (Count I); false imprisonment for violations of her rights under the Fourth and Fourteenth Amendments (Count II); malicious prosecution (Count III); failure to intervene for violations of her rights under the Fourth and Fourteenth Amendments (Count IV); deliberate indifference to her serious medical needs pursuant to her rights under the Fifth, Eighth, and Fourteenth Amendments (Count V); conspiracy to violate her rights pursuant to the Fourth and Fourteenth Amendments (Count VI); and violation of her due process rights pursuant to the Fourteenth Amendment (Count VII). She also brings a claim against the Town for violation of her rights pursuant to the Fourth and Fourteenth Amendments for the Town's policy, custom, and practice of failing to supervise and train its police officers (Count VIII). Plaintiff requests compensatory and punitive damages.

Plaintiff is represented by Chad A. Davenport, Esq., R. Anthony Rupp, III, Esq., and Young Woo Kim, Esq. The Town Defendants are represented by Kevin Eugene Loftus, Jr., Esq., and Nicholas M. Hriczko, Esq.

## I. Undisputed Facts.

At all relevant times, Plaintiff resided at 22 Christa Place in Cheektowaga, New York, with her husband, Defendant Corey McGuire. In or around 2015, Plaintiff and Mr. McGuire began experiencing marital issues.

On November 8, 2017, Mr. McGuire arrived home from work at approximately 3:00 p.m. Plaintiff called Mr. McGuire's employer, Steuben Foods, to advise that Mr. McGuire was drunk. A domestic disturbance between Plaintiff and Mr. McGuire ensued. At an unspecified time, Mr. McGuire called 911 and stated that Plaintiff had struck him with a pipe wrench. Sergeant Jose Domenech and his partner, Sergeant Brian Wesoloski, from the Town's Police Department (collectively, the "Law Enforcement Defendants")

responded to Plaintiff's and Mr. McGuire's home.[1]

At the time of the incident, Sergeant Domenech had been employed by the Town's Police Department for approximately sixteen years. Sergeant Wesoloski had been an officer with the Town since 2006 and was promoted to sergeant in February 2020.

As part of their investigation, the Law Enforcement Defendants separated Plaintiff and Mr. McGuire. Mr. McGuire told Sergeant Domenech that he and Plaintiff had a verbal argument which turned into a physical altercation. He reported that Plaintiff struck him in the ribs with a pipe wrench. Sergeant Domenech observed scratches on Mr. McGuire's face that were bleeding and damage to his eyeglasses. Sergeant Wesoloski similarly noted the "bloody scratches on [Mr. McGuire's] face and neck." (Doc. 40-7 at 11, ¶ 39) (internal quotation marks omitted). Sergeant Wesoloski also observed the pipe wrench. Color photographs submitted with the Town Defendants' motion for summary judgment, *see* Doc. 33-9, depict Mr. McGuire's facial injuries.

The domestic incident report indicates that Plaintiff was also interviewed and claimed Mr. McGuire attacked her, unprovoked, shoved her to the ground, and hit her in the face and abdomen. She asserted that she defended herself, including by scratching Mr. McGuire to get him to stop the attack. At the time, Plaintiff had a bruise on her left eye. When Mr. McGuire was reportedly asked about the redness and swelling around Plaintiff's eye, he denied hitting her and stated the injury to her eye must have happened when the two struggled over the pipe wrench.

The Law Enforcement Defendants determined that Plaintiff was the aggressor due to Mr. McGuire's facial injuries and damaged eyeglasses and the allegation that Plaintiff had struck Mr. McGuire with a pipe wrench. Sergeant Domenech found Mr. McGuire

---

[1] The domestic incident report identifies Defendants Dennis Kusak and John Wanat as responding officers and Defendant Pat Chludzinski as the supervising officer. Officer Kusak testified in his deposition that he does not recall this incident. Officer Wanat recalls responding, although he does not recall Officer Kusak's role. Officer Wanat testified that Officer Chludzinski's role was to process the initial domestic incident report. Plaintiff does not allege any specific individual acts or omissions but instead refers to "defendants" generally. The Law Enforcement Defendants do not seek dismissal for failure to establish their personal involvement in the alleged constitutional violations.

"more credible[,]" (Doc. 40-7 at 10, ¶ 35), than Plaintiff "based on a totality of the circumstances encountered at the scene[,]" *id.* at ¶ 36. Plaintiff was subsequently arrested and charged with assault in the third degree and with criminal mischief in the fourth degree.

Plaintiff was handcuffed and confined in a "Holding Center" until her release the following day. While Plaintiff was being processed, she called her friend, Frank Lattanzio. After her release from the police station, she retrieved her belongings from 22 Christa Place and stayed with Mr. Lattanzio at his residence. She was informed about domestic violence shelters but did not stay at one because of her cat. Mr. McGuire sought and was issued an order of protection against Plaintiff. To resolve the criminal charges against her, Plaintiff accepted an adjournment in contemplation of dismissal (an "ACD").

In December of 2017, Plaintiff requested an order of protection against Mr. McGuire, which was denied by a Family Court Judge. Thereafter, Plaintiff returned to 22 Christa Place and resumed living with Mr. McGuire. She later obtained orders of protection against Mr. McGuire from the Family Court on March 20, 2018 and from the Integrated Domestic Violence Court on April 30, 2018 and July 2, 2018.

Prior to the November 8, 2017 incident, Plaintiff did not report a number of alleged domestic violence incidents involving Mr. McGuire to the Town's Police Department. These include: an alleged incident occurring in or around 2009 or 2010, an alleged incident in 2016 when Mr. McGuire pushed Plaintiff to the ground, and an alleged incident in 2017 wherein Plaintiff thought Mr. McGuire broke her hand. In April of 2017, Plaintiff reported a physical altercation with her mother to the Town's Police Department.

## II.    Disputed Facts.

The Town Defendants assert that, during the domestic disturbance, Plaintiff grabbed a pipe wrench from the pantry and hid it behind her back. Plaintiff disputes this statement as incomplete and misleading because she was "thrown to the ground and was mercilessly beaten and strangled by [Mr.] McGuire, which led to her losing consciousness temporarily." *Id.* at 3, ¶ 6. Because of their difference in size and her

4

inexperience fighting, Plaintiff asserts her only option was to attempt to use her hands to push Mr. McGuire away, which she concedes may have scratched him. Plaintiff claims that she is a foot shorter than Mr. McGuire and weighs approximately sixty pounds less than he. She recalls Mr. McGuire's eyeglasses falling on her during their altercation but does not recall whether the eyeglasses broke. She asserts Mr. McGuire was wearing the eyeglasses the next day.

When she regained consciousness, Plaintiff claims she opened the back door and yelled for help. She asserts she wanted to call 911 immediately but that the phone was two rooms away and retrieving it would have required her to crawl past Mr. McGuire. She found the pipe wrench in the pantry and picked it up "to prevent further attack[.]" *Id.* She asserts she only tried to swing the pipe wrench at her husband when he lunged at her in order to "fend him off, not to hurt him." *Id.* at ¶ 7. She claims that the pipe wrench was too heavy for her to swing and she did not hit Mr. McGuire with it. After being unable to lift the pipe wrench, Plaintiff dropped it on the floor and crawled to safety.

Plaintiff submits undated photographs of herself and Mr. McGuire, which she claims were taken shortly after the November 8, 2017 incident. *See* Doc. 40-8 at 12. The photograph of Plaintiff depicts a black eye, an injury which she states was "so severe that her orbital bone was fractured." *Id.* The photograph of Mr. McGuire shows scratches on his neck.

When the Law Enforcement Defendants arrived, Plaintiff asserts she was inside the home, unaware of what was happening, and having difficulty breathing. She claims she informed the Law Enforcement Defendants that she "was 100% disabled and needed medical help due to [her] bipolar disorder and the injuries [she] suffered from [Mr.] McGuire." (Doc. 40-5 at 3, ¶ 22.) She told the Law Enforcement Defendants that Mr. McGuire "attacked her unprovoked, punched her in the eye, and threw her on the ground, and she had to defend herself." (Doc. 40-8 at 12.) She stated that she had to use her hands to stop Mr. McGuire from punching her but the Law Enforcement Defendants were dismissive of her answers to their questions. When asked about Mr. McGuire's broken eyeglasses and the pipe wrench, Plaintiff claims she told the Law Enforcement

5

Defendants that the eyeglasses had fallen off while Mr. McGuire was punching her and that she picked up the pipe wrench to prevent further assault but never hit Mr. McGuire with it.

Plaintiff contends that the Law Enforcement Defendants should have known "by simply looking at the faces of Plaintiff and [Mr.] McGuire that the injury on Plaintiff's face shows undisputable signs of being punched while [Mr.] McGuire's scratch wounds were the result of Plaintiff trying to defend herself." *Id.* at 12-13. By "deliberately disregard[ing]" the discrepancy in the severity of her and her husband's injuries and the discrepancy in their physical size in deciding whom to arrest, *id.* at 13, she claims the Law Enforcement Defendants "solely relied on [Mr.] McGuire's statement[.]" (Doc. 40-7 at 10, ¶ 36.) Plaintiff claims the Law Enforcement Defendants did not check for the alleged injury to Mr. McGuire's ribs, nor did they take photos or collect evidence, secure the pipe wrench, or examine the complaint history at 22 Christa Place as required by "the procedures set out under General [O]rder O-44-1 of the Cheektowaga Town Police Department Domestic Violence Policy[]" (the "Domestic Violence Policy"). *Id.* The Law Enforcement Defendants contest this claim and assert they fulfilled the Town's Domestic Violence Policy in their investigation.

The Law Enforcement Defendants' testimony regarding whether they checked the injury to Mr. McGuire's ribs was equivocal. Sergeant Wesoloski testified:

Q.    Were there any observable injuries to [Mr. McGuire's] ribs?

A.    I imagine I would have looked. I don't recall.

Q.    Okay. Aside from just looking, though, do you recall seeing any injuries to [Mr.] McGuire on his ribs?

A.    Could you rephrase that?

Q.    So your testimony is that you would have looked. But what I'm asking is, did you observe any injuries to [Mr.] McGuire's ribs?

A.    I don't recall looking. I imagine I would have if [—] in that instance, I imagine I would have asked him to lift his shirt.

Q.    Okay.

A.    I don't recall if [—] I don't recall seeing an injury.

6

Q.    Okay.

A.    Not that I didn't see one. That I don't [—] I just don't remember.

(Doc. 33-20 at 28-29.) Sergeant Domenech testified:

Q.    Okay. Did you make any visual observations of where [Mr. McGuire] said he was hit with the pipe wrench?

A.    No.

Q.    Did [Sergeant] Wesoloski make any observations of where [Mr. McGuire] was hit in the ribs?

A.    I don't know.

(Doc. 33-14 at 19.)

Plaintiff asserts that she requested medical assistance while being taken into custody and she was escorted past an ambulance that was at the scene on standby but was informed that the ambulance was for Mr. McGuire, not her. She claims she requested medical attention again at the police station where she was held but the Law Enforcement Defendants ignored her request. The Town Defendants deny Plaintiff's allegation that she requested medical attention at the scene, pointing to Officer Wesoloski's testimony that he did not remember "anyone request[ing] medical attention there at the scene[]" and that Plaintiff was not "asking for medical attention at the scene." (Doc. 33-20 at 46-47.)

The Town Defendants assert that law enforcement[2] escorted Plaintiff to 22 Christa Place so she could retrieve her personal belongings, including her medications. She contends that law enforcement only secured some of her medications on November 10 and it took until November 13 for her to obtain the remainder, "despite Plaintiff's repeated request[s]" to pick up "medications that were imperative for her." (Doc. 40-7 at 6, ¶ 16.) At the time of the incident, she claims she was "100% disabled with bipolar one disorder, panic disorder, and other health issues" which she was diagnosed with "in or around 2005." (Doc. 40-5 at 1, ¶ 5.) She states that she was on multiple medications, including lithium, lamotrigine, Ativan, and levothyroxine, and that she "cannot go without these medications," and that "skipping one would be tremendously detrimental to

---

[2] Neither party specifies who from the Town's Police Department aided Plaintiff in obtaining her medications.

7

[her] health." *Id.* The Town Defendants allegedly "deliberately delayed or prevented Plaintiff from getting access to her essential medications, despite being told and aware of the issue." (Doc. 40-8 at 22.) The Town Defendants assert Plaintiff picked up her medications from the police station on November 10, 2017.

Plaintiff contends that the Town failed to properly screen its law enforcement officers and retained police officers with a history of inappropriate responses to domestic violence incidents and who had failed to assist individuals with serious mental disorders. She identifies no police officers by name who fall within this category. She asserts that, despite the Town's awareness that the Law Enforcement Defendants unlawfully arrested her, they did not review their policies or training or impose any discipline on the Law Enforcement Defendants.

Finally, Plaintiff asserts there is circumstantial evidence that the Law Enforcement Defendants made efforts to "shield [Mr.] McGuire through breaching their own written procedures and training, and their hostile treatment of Plaintiff." (Doc. 40-7 at 5, ¶ 14.) On July 9, 2017, she called the Town's Police Department to report threatening acts by Mr. McGuire. Upon law enforcement's arrival, "all of the veteran male police officers rallied around [Mr. McGuire] in the living room[,]" and she "could hear them talking about how he had PTSD, and . . . that the officers were veterans as well and sympathized with him." (Doc. 40-5 at 2, ¶ 9.) She contends the Town's Police Department never followed up on the incident.

### III.   Whether the "Sham Affidavit" Doctrine Applies.

The Town Defendants argue the July 9, 2017 welfare check does not create a material issue of fact because Plaintiff makes these assertions for the first time in an affidavit that contradicts her previous deposition testimony, in which she "provided no substantive testimony concerning the details of that alleged incident." (Doc. 45 at 10.) They also assert that Plaintiff's contention that she requested medical assistance the evening of November 8, 2017 is not supported by the record.

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's

8

previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "The purpose of the doctrine is clear: 'if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (alteration adopted) (quoting *Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

Under the sham affidavit doctrine, "a material issue of fact may be revealed by [a party's] subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). "If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998), *amended*, 169 F.3d 782 (2d Cir. 1998).

At her deposition, Plaintiff was asked *why* the police were called on July 9, 2017, and she could not recall specifically,[3] however, she was not asked about what happened during the welfare check on that date. She also did not affirmatively deny having a memory of that event.

Contrary to the Town Defendants' characterization, details of the alleged

---

[3]       Q.       Okay. The only other report we have in the Cheektowaga system of a call regarding 22 Christa is July 9th, 2017 where there was a welfare check. Do you remember that incident?

          A.       I don't know if that's when I told you that the cops were at my house.

          Q.       What was the reason that the cops were called that particular day?

          A.       I'm sure there was some kind of whatever abuse was going on that was unbearable that day.

(Doc. 33-13 at 102-03.)

interaction at the welfare check were provided during Plaintiff's deposition because she testified that at some time prior to the November 8, 2017 incident the police visited her house and "all of the veteran male police officers rallied around [Mr. McGuire] in the living room," "talk[ed] about how [Mr. McGuire] had PTSD and . . . was a veteran[,]" and "let[] [Mr. McGuire] know that they were veterans too." (Doc. 33-13 at 73.) Although Plaintiff did not provide a date for this event, it is unlikely there were two such events. Because there is no direct inconsistency between Plaintiff's deposition testimony and her affidavit, the sham affidavit doctrine does not apply.

The Town Defendants assert that Plaintiff never mentioned that she requested an ambulance or any other medical attention on the evening of November 8, 2017 until her affidavit was submitted in opposition to summary judgment. Plaintiff testified she told an officer who questioned her at the scene the night of the incident that she "was having a panic attack." *Id.* at 68. Despite being asked if she remembered "anything else [she] would have said to the police officers that night[,]" *id.* at 71-72, Plaintiff only mentioned needing someone to take care of her cat. Her testimony is otherwise devoid of any mention that she communicated her medical needs to the Law Enforcement Defendants the night of the incident. Such allegations are also absent from her complaint.

Although Plaintiff's affidavit adds new allegations, she was not specifically questioned on whether she requested medical attention on the night of the incident, only whether she remembered anything else, and therefore her "affidavit does not actually contradict the prior testimony[.]" *Ampong v. Costco Wholesale Corp.*, 2023 WL 4744185, at *3 (S.D.N.Y. July 25, 2023) (citing *White v. ABCO Eng'g, Corp.*, 221 F.3d 293, 304 (2d Cir. 2000)). "If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *Lewis v. Westchester Cnty.*, 2023 WL 5610302, at *4 (S.D.N.Y. Aug. 30, 2023) (internal quotation marks and citation omitted). In this case, the inconsistency is based on an omission. Although a close question, because there is no direct contradiction, the court finds the sham affidavit doctrine does not apply.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his [or her] favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue,

11

a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### B.    Whether the Disputed Facts Preclude Summary Judgment.

"On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson*, 477 U.S. at 248). Factual disputes that are irrelevant or unnecessary will not be counted. "[T]he substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.

In the instant case, the parties dispute whether the Law Enforcement Defendants correctly determined that Plaintiff, rather than Mr. McGuire, was the primary aggressor and whether they conducted an adequate investigation. These factual disputes are not material if, after regarding them in the light most favorable to Plaintiff, the Law Enforcement Defendants had arguable probable cause to arrest her. On the other hand, if the evidence is contested as to whether the Law Enforcement Defendants willfully ignored Plaintiff's injuries in making a probable cause determination, summary judgment is inappropriate.

### C.    Whether to Grant Summary Judgment on Plaintiff's Claims for False Arrest (Count I) and False Imprisonment (Count II).

Plaintiff alleges that the Town Defendants unlawfully seized and arrested her in violation of the Fourth and Fourteenth Amendments to the U.S Constitution under the color of state law. As a result, she alleges that the Town Defendants deprived her of the rights, privileges, and immunities guaranteed to her by the U.S. Constitution. She contends that the Law Enforcement Defendants handcuffed her and confined her in a "Holding Center" on November 8, 2017, until her release the following day. The Town Defendants counter that the Law Enforcement Defendants had probable cause to arrest Plaintiff and that, even if they did not, they are entitled to qualified immunity because they had arguable probable cause to do so.

Plaintiff's claims arise under 42 U.S.C. § 1983 and allege violations of her federal constitutional rights. Section 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A § 1983 claimant must allege the violation or deprivation of a federal right committed by a person acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). A § 1983 claimant further "must p[rove] that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) (alteration in original).

A law enforcement officer is entitled to qualified immunity as a matter of law where "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), and citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "Under New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 252 (E.D.N.Y. 2000). The elements of the claim under both § 1983 and New York law are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement,

(3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Id.* (alteration adopted) (internal quotation marks omitted) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)).

The parties agree Plaintiff has established the first three prongs of her claims. The only issue is whether her arrest was "otherwise privileged." *Id.* (internal quotation marks omitted). "If an officer has probable cause to arrest, the confinement is privileged." *Solomon v. City of Rochester*, 449 F. Supp. 3d 104, 114 (W.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015) (summary order)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' . . . whether that action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, . . . or may require a trial if the facts are in dispute[.]" *Id.* (internal citations omitted). A conviction following an arrest "would be conclusive evidence of probable cause." *Id.* (internal quotation marks omitted) (quoting *Broughton v. State*, 335 N.E.2d 310, 315 (N.Y. 1975)). "On the other hand, evidence of a subsequent dismissal, acquittal[,] or reversal on appeal would also be admissible to refute the affirmative defense of justification." *Broughton*, 335 N.E.2d at 315.

"When information is received from a putative victim or an eyewitness, probable cause exists, . . . unless the circumstances raise doubt as to the person's veracity[.]" *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); *see also Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997) ("[A]bsent circumstances that raise doubts as to the victim's veracity[,] . . . [t]he veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."). "[T]he probable cause standard does not require

14

that the arresting officer affirmatively seek out reasons to doubt the victim or a witness where none are apparent." *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010). Rather, "the 'uncorroborated testimony of a victim or other percipient witness' is usually sufficient on its own to support a finding of probable cause." *United States v. Barbosa*, 2016 WL 3976559, at *4 (D. Mass. July 22, 2016) (quoting *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004)). This is because "[a] victim is considered a 'reliable informant' even if 'his or her reliability has not theretofore been proved or tested.'" *Id.* (quoting *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972)). While probable cause is based on "what the officer knew at the time of the arrest[,]" an officer may not "deliberately disregard facts known to him which establish justification." *Jocks v. Tavernier*, 316 F.3d 128, 135-36 (2d Cir. 2003).

> A law enforcement officer is

> not required to perform a perfect investigation in order to establish probable cause. As a result, facts related to the quality of [the defendant law enforcement officers'] investigation, such as their alleged failure to . . . ask certain questions, or arrest all of the participants potentially involved in a suspected crime, do not affect the probable cause determination[.]

*Harig v. City of Buffalo*, 574 F. Supp. 3d 163, 189-90 (W.D.N.Y. 2021), *aff'd*, 2023 WL 3579367 (2d Cir. May 22, 2023); *see also Rae*, 693 F. Supp. 2d at 225 ("While, in hindsight, it may be that [the arresting officer] could have asked additional questions, or conducted a fuller investigation, the role of the court is not to overly scrutinize the decisions of police officers from its vantage in chambers, long after those decisions were made, but to determine whether the officers acted reasonably and in compliance with what the law requires based on what they knew at the time.").

Arguable probable cause exists if "the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987). Arguable probable cause does not mean "almost" probable cause; at all times "probable cause remains the relevant standard." *Jenkins v.*

*City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks omitted).

> Under New York law, a person is guilty of assault in the third degree when:

> 1. With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or

> 2. He recklessly causes physical injury to another person; or

> 3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument.

N.Y. Penal Law § 120.00 (McKinney 2023). As the Second Circuit has explained:

> "'Physical injury' means impairment of physical condition or substantial pain." [N.Y. Penal Law] § 10.00(9) [(McKinney 2023)]. "*[P]etty* slaps, shoves, kicks and the like delivered out of hostility, meanness and similar motives constitute only harassment and not assault, because they do not inflict physical injury." *People v. Chiddick*, 8 N.Y.3d 445, 448, 834 N.Y.S.2d 710, 866 N.E.2d 1039 (2007) (emphasis added) (internal quotation marks omitted). Moreover, "[m]ere evidence of being struck and suffering a red mark or a black eye is insufficient for the crime of assault." *Malte v. State*, 125 A.D.2d 958, 959, 510 N.Y.S.2d 353 (4th Dep't 1986).

*Marom v. Town of Greenburgh*, 722 F. App'x 32, 35 (2d Cir. 2018) (summary order).

A person is guilty of criminal mischief in the fourth degree under New York law when, "having no right to do so nor any reasonable ground to believe that he or she has such a right, he or she [i]ntentionally damages property of another person[.]" N.Y. Penal Law 145.00(1) (McKinney 2023). Under New York law, self-defense is "an exculpatory defense[]" which can "negate the existence of a crime" and "similarly negate probable cause." *Jocks*, 316 F.3d at 135. For this reason, "a police officer's awareness of the facts supporting [self-defense] can eliminate probable cause." *Id.*

In this case, there is no dispute that Plaintiff was arrested and physically restrained without her consent. She received an ACD for the crimes of assault in the third degree and criminal mischief in the fourth degree. Under New York law, this is not treated as a conviction. *See In re Edwin L.*, 671 N.E.2d 1247, 1250 (N.Y. 1996) ("[I]n the adult context, an ACD is neither an acquittal nor a conviction[.]"); *People v. Prokopienko*, 905 N.Y.S.2d 725, 726 (N.Y. App. Div. 2010) ("Defendant's acceptance of an ACD on that charge does not constitute a conviction of that crime.").

There are disputed issues of material fact as to whether there was a visible discrepancy regarding the severity of Plaintiff's injuries when compared with those of Mr. McGuire. If the Law Enforcement Defendants purposefully ignored the severity of Plaintiff's injuries and discounted her claim of self-defense to protect a veteran, there would neither be probable cause nor arguable probable cause to arrest.

In the light most favorable to Plaintiff, although Mr. McGuire had visible scratches and asserted he was hit with a pipe wrench, the alleged injury from the pipe wrench was not documented or apparently verified while Plaintiff's black eye was. The court therefore cannot determine, as a matter of law, whether it was "objectively reasonable" for the Law Enforcement Defendants to believe they had probable cause to arrest Plaintiff until the disputed material facts are established. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996); *see also Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020) ("[D]isputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury, while the reasonableness of an officer's view of the law is decided by the district court.").

For the foregoing reasons, the court DENIES the Town Defendants' motion for summary judgment on Plaintiff's claims for false arrest (Count I) and false imprisonment (Count II).

## D. Whether to Grant Summary Judgment on Plaintiff's Claim for Malicious Prosecution (Count III).

Plaintiff argues that despite knowing that probable cause did not exist to detain, arrest, and prosecute her, the Town Defendants acted intentionally and with malice to pursue criminal charges against her in violation of her Fourth and Fourteenth Amendment rights.

"Claims for . . . malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for . . . malicious prosecution under state law." *Jocks*, 316 F.3d at 134 (quoting *Weyant*, 101 F.3d at 852).

A malicious prosecution claim under New York law requires the plaintiff to

17

prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."

*Id.* at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). The Town Defendants argue that Plaintiff cannot establish the second, third, or fourth elements of her malicious prosecution claim.

### 1.   Whether the Criminal Charges Were Terminated in Plaintiff's Favor.

The Town Defendants argue that Plaintiff's criminal charges were not terminated on the merits in her favor because she accepted an ACD. In *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002), the Second Circuit held that, under New York Law, an ACD "is not a favorable termination because it leaves open the question of the accused's guilt." *Id.* (citing *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)).

In *Thompson v. Clark*, 596 U.S. 36 (2022), however, the United States Supreme Court effectively overruled *Fulton* by holding: "[t]o demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Id.* at 39.[4] A plaintiff need not show "that the criminal prosecution ended with some affirmative indication of innocence." *Id.* at 49. Because Plaintiff has established that the prosecution of her ended without a conviction, she has established the second prong of her claim.

### 2.   Whether the Town Defendants Had Probable Cause to Commence Criminal Proceedings Against Plaintiff.

The Town Defendants argue that because the Law Enforcement Defendants had probable cause or arguable probable cause to arrest Plaintiff, there was, in turn, probable cause to commence criminal proceedings. "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of*

---

[4] *Thompson* overruled the Second Circuit's opinion in *Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018), which concluded that a plaintiff must demonstrate that a criminal prosecution ended with some affirmative indication of innocence. *Id.* at 28.

*New York*, 331 F.3d 63, 72 (2d Cir. 2003). Disputed issues of material fact preclude the court from concluding, as a matter of law, that probable cause or arguable probable cause existed to prosecute Plaintiff. A jury must resolve the disputed facts regarding the circumstances of the assault and the arrest before the court may determine whether there was probable cause to commence criminal proceedings against Plaintiff.

### 3.   Whether the Town Defendants Acted with Malice.

Plaintiff argues there is support for "an inference of malice" because the Law Enforcement Defendants lacked probable cause to arrest her, their investigation of the incident "was heavily one-sided[,]" and they arrested her without following proper procedures. (Doc. 40-8 at 18-19.) The Town Defendants counter that there is "absolutely no evidence[,]" (Doc. 33-24 at 9), that the Law Enforcement Defendants demonstrated any animus towards Plaintiff, acted improperly in pursuing charges against her, or failed to follow applicable procedure. (Doc. 33-24 at 9.)

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth*, 82 F.3d at 573 (quoting *Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978)). "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Id.* (quoting *Conkey v. State*, 427 N.Y.S.2d 330, 332 (N.Y. App. Div. 1980)). In addition, malice "may be manifested in an egregious deviation from proper investigative procedures." *Ramos v. City of New York*, 729 N.Y.S.2d 678, 691 (N.Y. App. Div. 2001). "Actual malice, in fact, is seldom shown by direct evidence of an ulterior motive, but is usually inferred from the facts and circumstances of the investigation." *Id.*

The court cannot determine, as a matter of law, whether the Law Enforcement Defendants had probable cause or arguable probable cause to arrest and commence criminal charges against Plaintiff. If, as Plaintiff alleges, the Law Enforcement Defendants purposefully ignored exculpatory evidence in the course of their investigation

in order to protect a veteran, this bias and deviation from proper investigatory procedures, if sufficiently egregious, may support an inference of malice.

The court DENIES the Town Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim (Count III) because there are disputed material facts regarding whether there was probable cause or arguable probable cause to pursue criminal charges against Plaintiff and whether the Law Enforcement Defendants acted with malice.

## E.   Whether to Grant Summary Judgment on Plaintiff's Claim for Failure to Intervene (Count IV).

Plaintiff alleges that the Law Enforcement Defendants who responded each "failed to take reasonable steps to prevent their fellow officers from engaging in the illegal acts alleged[,]" even though "they were present at the scene of such violations and were capable of doing so." (Doc. 1 at 23, ¶ 172.) She claims the Law Enforcement Defendants knew or should reasonably have known that such conduct violated her constitutional rights and that they acted "with intent to violate, or with deliberate or reckless indifference to," those rights under the color of state law. *Id.* at 24, ¶ 175.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

> An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used . . . ; (2) that a citizen has been unjustifiably arrested . . . ; or (3) that any constitutional violation has been committed by a law enforcement official[.]

*Id.* (internal citations omitted). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* "[D]efendants cannot be liable for both the underlying constitutional deprivation and a failure to

intervene to stop themselves from committing that violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).

"[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson*, 375 F.3d at 229. Generally, district courts in this circuit have concluded that a plaintiff "need not establish who, among a group of officers, directly participated in the [constitutional violation] and who failed to intervene." *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 384 (D. Conn. 2009) (internal quotation marks omitted). To survive a motion for summary judgment, a plaintiff "need only produce evidence that the [o]fficer [d]efendants were present on the night in question and participated in his [or her] arrest." *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017). Plaintiff adduced evidence that the Law Enforcement Defendants were present for and participated to varying degrees in her arrest. She has not established that they played a material role in bringing charges against her. *See Nixon v. City of New York*, 2023 WL 2799920, at *5 (E.D.N.Y. Apr. 6, 2023) (concluding failure to intervene claim survived motion for summary judgment where "a reasonable jury could find that [] there was no arguable probable cause to arrest" and "the arrest was made in the presence of" two officers); *Coleman v. Cnty. of Nassau*, 2022 WL 493207, at *5 (E.D.N.Y. Feb. 17, 2022) (concluding that where officers "acted as partners" during vehicle stop and subsequent arrest, plaintiff established both officers were "involved in the decision to or, at least, aware of the circumstances leading up to [the] [p]laintiff's arrest[]" and therefore were "directly involved or, alternatively, failed to intervene").

For the foregoing reasons, the court DENIES the Town Defendants' motion for summary judgment on Plaintiff's claim for failure to intervene pertaining to her arrest and GRANTS the motion as it pertains to her prosecution. (Count IV).

### F.    Whether to Grant Summary Judgment on Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs (Count V).

Plaintiff alleges that the Town Defendants, under color of state law, acted with

deliberate indifference to her serious medical needs in violation of her right to due process and to be free from cruel and unusual punishment under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. She alleges they "knew of Plaintiff's need for her medication," yet "intentionally refused to provide assistance to . . . Plaintiff to help her obtain said medication; prevented Plaintiff from obtaining her prescriptions; failed to take Plaintiff's complaints seriously; and delayed Plaintiff's ability to obtain her prescriptions." (Doc. 1 at 25, ¶ 182.) Plaintiff alleges that she made her medical issues known to the Law Enforcement Defendants and that, despite their knowledge, they failed to ensure that she received medical attention.

To state a § 1983 claim under the Eighth Amendment's Cruel and Unusual Punishment Clause, a convicted prisoner must establish that the state was deliberately indifferent to his or her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In contrast, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). The rights of pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The court thus GRANTS the Town Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim and turns to her Fourteenth Amendment claim.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856. As the Second Circuit observed in *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019):

> It is well established that when the state takes a person into custody, severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the . . . proscription against the unnecessary and wanton infliction of pain is violated. That is true whether the deliberate indifference is manifested by prison doctors in their response

> to the prisoner's needs, or by prison guards who intentionally deny or delay
> access to medical care or intentionally deny or delay access to the treatment
> once prescribed.

*Id.* (citing *Estelle*, 429 U.S. at 104-05). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

A "serious medical need" is one that requires urgent treatment and may result in "death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). It may also arise where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain[.]'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). To assess seriousness, courts consider "whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86 (citing *Chance*, 143 F.3d at 702). The conditions "must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30 (internal quotation marks omitted). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003). Here, Plaintiff offers no expert witness opinion that her individual daily activities were affected or whether she suffered chronic and substantial pain.

"A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'" *Charles*, 925 F.3d at 87 (emphasis and alteration in original).(quoting *Darnell*, 849 F.3d at 35). As a result, a delay in medical care may establish deliberate indifference to

23

medical needs, but "a prisoner's [constitutional] rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment[.]'" *Rodriguez v. Ames*, 224 F. Supp. 2d 555, 561 (W.D.N.Y. 2002) (quoting *Rodriguez v. Mercado*, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002)).

Plaintiff argues that at the time of the incident she requested medical attention and the Law Enforcement Defendants ignored her request. She describes a panic attack as her reason for requesting medical attention. In addition, she asserts that the Town's Police Department failed to provide law enforcement officers to accompany her to her home after the incident to obtain her prescribed medications, only secured part of her medication on November 10, and it took until November 13 for her to secure the remainder. According to Plaintiff, this shows that the Law Enforcement Defendants "deliberately delayed or prevented Plaintiff from getting access to her essential medications, despite being told and aware of the issue." (Doc. 40-8 at 22.)

The Town Defendants argue that there is no evidence that they "made a conscious decision to disregard any serious medical needs of the Plaintiff on the night of the incident or in the days following." (Doc. 33-24 at 12.) Rather, when Plaintiff was released from custody on November 9, 2017, she coordinated with the police to pick up her personal belongings and medications from her home, which she did on November 10 and 13, 2017.

Plaintiff has failed to establish she suffered from a life-threatening injury or painful injury. Any delay in treatment was brief. *See Rodriguez*, 2002 WL 1997885, at *9 (granting summary judgment where plaintiff failed to establish his injuries were "life-threatening" or "fast-degenerating" or caused him "extreme pain that more rapid treatment would have alleviated[]" and treatment was delayed eight or nine hours) (internal quotation marks omitted). She cites no adverse consequences as a result of not being treated for her panic attack. The court thus GRANTS the Town Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment claim based on the alleged

failure to obtain medical treatment.

To the extent Plaintiff argues that the Law Enforcement Defendants violated her due process rights by failing to timely assist her in picking up her medications from her home after she was released from custody, she was no longer a pretrial detainee at that point, and she cites no authority for finding a due process violation for deliberate indifference to medical needs post-release. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.").[5] The Supreme Court's precedents regarding deliberate indifference "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. At the point of her release, Plaintiff was no longer in custody and the Law Enforcement Defendants were not the sole means through which Plaintiff could obtain her necessary medications.

Accordingly, the court GRANTS the Town Defendants' motion for summary judgment on Plaintiff's claim for deliberate indifference to her serious medical needs (Count V).

### G.     Whether to Grant Summary Judgment on Plaintiff's Claim of Conspiracy to Violate Her Constitutional Rights (Count VI).

Plaintiff alleges that the Town Defendants conspired with Mr. McGuire "to fabricate a story that . . . Plaintiff was the aggressor and therefore liable for domestic violence[-]related criminal charges" (Doc. 1 at 26, ¶ 192) in violation of her rights under the Fourth and Fourteenth Amendments.

---

[5] The Second Circuit has held that the government's failure to perform discharge planning, including the provision of sufficient quantities of medication upon release, may state a claim for deliberate indifference because such treatment should have been provided while the plaintiff was in custody. *See Charles v. Orange Cnty.*, 925 F.3d 73, 83 (2d Cir. 2019). This case is distinguishable because, in *Charles*, the plaintiff was in custody for "many months" and discharge planning was a necessary component of the medical treatment provided to the plaintiff throughout detention. *Id.* at 77.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Because "'conspiracies are by their very nature secretive operations,' [they] . . . may have to be proven by circumstantial, rather than direct, evidence." *Id.* (quoting *Rounseville v Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)). The circumstantial evidence must "reasonably lead to the inference that the defendants positively or tacitly came to mutual understanding to try to accomplish a common and unlawful plan." *Buari v. City of New York*, 530 F. Supp. 3d 356, 394 (S.D.N.Y. 2021) (alterations adopted) (internal quotation marks and citation omitted).

Plaintiff concedes that she has no evidence of an agreement between the Law Enforcement Defendants and Mr. McGuire to arrest her. (Doc. 33-13 at 74.) She instead argues there is "sufficient circumstantial evidence for [her] to prove at trial that the Town Defendants conspired against [her] due to their association with [Mr.] McGuire or preference of him and his veteran status over [Plaintiff]." (Doc. 40-8 at 23.) The circumstantial evidence on which Plaintiff relies is that the Town's police officers "on a previous occasion, have shown their sympathy and preferential treatment for [Mr. McGuire] due to [his] status as a military veteran." *Id.* Plaintiff, however, points to no evidence that any of the Law Enforcement Defendants responded to this alleged prior incident. She also does not cite evidence establishing the Law Enforcement Defendants were aware of the prior incident.

In the absence evidence of a conspiracy, Plaintiff's allegation that the prior incident supports an inference that on November 8 the Law Enforcement Defendants came to an agreement to violate her constitutional rights in order to protect Mr. McGuire due to his veteran status is "not substantiated in any way" and is insufficient evidence to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998); *see also Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (affirming grant of summary judgment in § 1983 conspiracy action where plaintiff's "allegations [were]

26

unsupported by any specifics, and many of them [were] flatly contradicted by the evidence proffered by defendants"); *see also Warr v. Liberatore*, 270 F. Supp. 3d 637, 650 (W.D.N.Y. 2017) ("The mere fact that the officers were all present at the time of the alleged constitutional violations is insufficient to support a conspiracy claim.").

"To survive a motion for summary judgment, a plaintiff's evidence of a [§ 1983] conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016) (alteration in original). Plaintiff's evidence falls far short of this showing. The court thus GRANTS the Town Defendants' motion for summary judgment on Plaintiff's conspiracy claim (Count VI).

### H.   Whether to Grant Summary Judgment on Plaintiff's Due Process Claim (Count VII).

Plaintiff alleges that the Town Defendants violated her right to substantive due process under the Fourteenth Amendment when they acted "arbitrarily, oppressively, and in a conscience-shocking manner in falsely arresting . . . Plaintiff." (Doc. 1 at 27, ¶ 199.) "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (internal quotation marks omitted). The Fourth Amendment governs Plaintiff's false arrest, false imprisonment, and malicious prosecution claims. A substantive due process claim does not lie in addition to those claims.

The court GRANTS the Town Defendants' motion for summary judgment on Plaintiff's substantive due process claim (Count VII).

### I.   Whether to Grant Summary Judgment on Plaintiff's Claim of Supervisory Liability Against the Town (Count VIII).

Plaintiff alleges that the Town's police officers "developed and maintained policies, customs, and practices exhibiting deliberate indifference to the constitutional rights of persons in the Town of Cheektowaga, which caused the violation of . . .

27

Plaintiff's rights." (Doc. 1 at 28, ¶ 207.) She asserts that the Town was aware that its officers were inadequately trained to recognize and respond to domestic violence, yet "maintained a policy or custom of failing to provide . . . training on how to recognize, properly address, and correct incidents of domestic violence." *Id.* at ¶ 208. Plaintiff also alleges that it was the policy and/or custom of the Town to inadequately supervise and train its police officers with respect to "identifying and correcting incidents of domestic violence," thus failing to prevent the constitutional violations Plaintiff suffered. *Id.* at 28-29, ¶ 209. She alleges that the Town failed to properly screen officers and retained officers with a history of faulty responses to domestic violence and those with serious mental disorders.

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Anilao v. Spota*, 27 F.4th 855, 873-74 (2d Cir. 2022) (emphasis in original) (internal quotation marks omitted) (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)). "[I]nherent in the principle that a municipality can be liable under § 1983 only where its policies are the moving force

[behind] the constitutional violation, is the concept that the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 874 (alterations in original) (internal quotation marks omitted) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018)).

"A municipality's '"policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the [municipality] itself to violate the Constitution."'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Connick*, 563 U.S. at 61-62) (alteration in original). "In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Id.* at 297-98 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)).

> Plaintiff asserts that the Town Defendants violated her constitutional rights by:
>
> failing to collect any evidence other than the victim's statement, failing to take any photographs relating to the case, failing to properly identify the victim of domestic violence, and failing to obtain medical treatment for the victim, who was crying out for help and was in the midst of [a] panic attack due to her pre-existing bipolar disorder that was exacerbated by the domestic violence that just occurred.

(Doc. 40-8 at 25.) She additionally argues that despite the subsequent orders of protection granted in favor of her against Mr. McGuire, the Town "did not take any action to review their policy and training or to discipline the defendant officers in question due to their failure to abide by the policy or procedure to protect the victim of domestic violence." *Id.* at 26.

To the extent Plaintiff urges that the Law Enforcement Defendants should have followed the Domestic Violence Policy when responding on November 8, 2017, the alleged "failure to comply with th[is] polic[y] is not sufficient to allege *Monell* liability." *Winters v. City of New York*, 2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020); *see also Ruiz v. Westchester Cnty.*, 2020 WL 4340788, at *9 (S.D.N.Y. July 28, 2020) (collecting

29

cases for the proposition that "failure to follow policy fails to state a *Monell* claim by definition") (alteration adopted) (internal quotation marks and citation omitted).

Regarding the existence of a policy or custom of inadequate training or supervision, Plaintiff relies on the allegedly inadequate response to the incident on November 8, 2017, which alone is insufficient to establish that the Town had a *policy* of inadequate training or supervision despite its knowledge that its police officers were unequipped to address incidents of domestic violence. *Cf. Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (explaining that municipal liability may attach where municipality "is faced with a *pattern* of misconduct and does nothing") (emphasis supplied). A single incident does not demonstrate or support an inference that the Town "constructive[ly] acquiesce[d]" to "persistent and widespread" constitutional violations as a result of its law enforcement's alleged policy of inadequate training on how to respond to domestic violence incidents. *Lucente*, 980 F.3d at 297-98 (internal quotation marks and citation omitted). Similarly, an allegation that the Town failed to discipline its police officers "for a single incident" is insufficient to establish the existence of an unlawful municipal policy of ratification of unconstitutional conduct. *Santiago v. City of Rochester*, 481 F. Supp. 3d 152, 160 (W.D.N.Y. 2020); *see also Kuiken v. Cnty. of Hamilton*, 2023 WL 2984420, at *7 (N.D.N.Y. Apr. 18, 2023) (collecting cases).

For the reasons stated above, the court GRANTS the Town of Cheektowaga's motion for summary judgment on Plaintiff's supervisory liability claim (Count VIII).

### J.    Whether Plaintiff's Claim for Punitive Damages Fails as a Matter of Law.

"Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Although punitive damages are intended to "punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct[,]" *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67 (1981) (citations omitted), "an award of

punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort." *Id.* at 267. "For that reason, municipalities are generally immune from punitive damages." *Zhou v. Roswell Park Cancer Inst. Corp.*, 2021 WL 4272286, at *4 (W.D.N.Y. Sept. 21, 2021). This rule extends to municipal employees sued in their official capacities. *See Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997) (holding municipal officers sued in official capacity "enjoy the same immunity from punitive damages" as municipalities). To the extent Plaintiff seeks punitive damages from the Town or from the Law Enforcement Defendants in their official capacities, the Town Defendants' motion for summary judgment is GRANTED.

There is, however, a material issue of fact regarding whether the Law Enforcement Defendants lacked probable cause, which "may give rise to an inference of malice[]" and sustain a claim for punitive damages. *Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) (internal quotation marks and citation omitted) (concluding punitive damages instruction was required where police officers allegedly knew they lacked probable cause to arrest the plaintiffs and provided false information to the prosecutor who later charged the plaintiffs). Although a close call, the court DENIES WITHOUT PREJUDICE the request to dismiss Plaintiff's punitive damages claim against the Law Enforcement Defendants in their individual capacities.

## CONCLUSION

For the foregoing reasons, the Town Defendants' motion for summary judgment (Doc. 33) is GRANTED IN PART AND DENIED IN PART.

SO ORDERED.

Dated this 31st day of January, 2024.

Christina Reiss, District Judge
United States District Court